08 CIV 4049 (VM)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ECF CASE**

PUTRA MASAGUNG and IMELDA
MASAGUNG,

NO. _____

Plaintiffs,

-against-

KEVO-JEAN AYVAZIAN and K.J.A.
DIAMONDS INT'L CORP.,

COMPLAINT

Defendants.

Plaintiffs Putra Masagung ("Mr. Masagung") and Imelda Masagung ("Mrs. Masagung")

(collectively, "Plaintiffs"), by and through their undersigned counsel, for their complaint against

defendants Kevo-Jean Ayvazian ("Mr. Ayvazian") and K.J.A. Diamonds Int'l Corp. ("K.J.A.")

(collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract, breach of fiduciary duty, conversion, and

related claims involving Defendants' breach of a joint venture agreement between Plaintiffs and

Defendants relating to the sale of certain diamonds.  As a result of Defendants' misconduct in

connection with these diamonds, Plaintiffs have suffered damages.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over the subject matter of the claims asserted

herein pursuant to 28 U.S.C. §1332 because there is diversity of the parties and the amount in

controversy exceeds $75,000.

3.      Venue is proper in this judicial district under 28 U.S.C. §§1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this district, K.J.A. may be found in this judicial district, Mr. Ayvazian maintains his office in this judicial district and may be found in this judicial district, and Defendants are subject to personal jurisdiction in this judicial district.

**THE PARTIES**

4.      Mr. Masagung, an individual, is a citizen of Indonesia.

5.      Mrs. Masagung, an individual, is a citizen of Singapore.

6.      Kevo-Jean Ayvazian, an individual, is a citizen of New Jersey.  Mr. Ayvazian operates, and is the President of, K.J.A. Diamonds Int'l Corp.

7.      K.J.A. Diamonds Int'l Corp. is a New York corporation with its principal place of business at 580 Fifth Avenue, Suite 2002, New York, New York 10036.  K.J.A.'s business principally involves the trading of diamonds and other precious gem stones.

8.      Plaintiffs are informed and believe and, on the basis of such information and belief, allege that at all times relevant to the complaint, K.J.A. and Mr. Ayvazian and others working in concert with them, in addition to acting for themselves and on his or its own behalf individually, is and were acting as the agent, servant, employee and representative of, and with the knowledge, consent and permission of, and in conspiracy with the other Defendants and within the course, scope and authority of that agency, service, employment, representation and conspiracy.  Plaintiffs further allege on information and belief that the acts of each of the Defendants were fully ratified by the other Defendants.  Specifically, and without limitation, Plaintiffs allege, on information and belief, that the actions, failures to act, breaches, and misrepresentations alleged herein and attributed to one or more of the specific Defendants were

approved, ratified, and done with the cooperation and knowledge of each and all of the Defendants.

9.      Plaintiffs are informed and believe and, on the basis of such information and belief, allege that at all times relevant to the complaint, K.J.A. was and is so controlled, used and managed that it was and is, in effect, the alter ego of Mr. Ayvazian such that it would be appropriate to pierce the corporate veil and hold Mr. Ayvazian liable for K.J.A.'s conduct.

10.     Plaintiffs are informed and believe and, on the basis of such information and belief, allege that individuals and/or entities other than the named Defendants participated and engaged in the wrongful conduct set forth in this complaint.  Plaintiffs thus reserve the right to amend this complaint to add these additional defendants when their identities are discovered and their wrongful conduct becomes known.

## FACTUAL BACKGROUND

11.     At the time of the events described in this Complaint, neither Mr. Masagung nor Mrs. Masagung had any experience in purchasing rough diamonds for resale in a business context.  In or around October 2003, the Plaintiffs and Defendants began discussing the possibility of entering into an agreement to purchase two rough diamonds and, after cutting and polishing them, sell them for a profit.  In a fax dated October 21, 2003, Mr. Ayvazian made certain promises regarding the purchase of these two rough diamonds, including the promise to keep the Plaintiffs informed at every step of the cutting and polishing process.  Because of their inexperience in the rough diamonds industry, Plaintiffs reduced the agreement to writing.  On or about October 31, 2003, Mr. Masagung and Mrs. Masagung, on the one hand, and Mr. Ayvazian and K.J.A., on the other hand, formalized their agreement by entering into a joint venture agreement (the "Joint Venture Agreement").  (Exhibit 1.)

## THE TERMS OF THE JOINT VENTURE AGREEMENT

12.     Pursuant to the terms of the Joint Venture Agreement, Plaintiffs contributed seven hundred and fifty thousand dollars ($750,000) as an initial investment towards the purchase of two (2) rough uncut diamonds with a total weight of 9.60 carats, which at the time were priced at one million dollars ($1,000,000).  Plaintiffs provided this initial investment via a wire transfer shortly after the Joint Venture Agreement was signed.  Shortly after Plaintiffs wired their initial investment, Defendants informed Plaintiffs that they also had provided their initial investment of approximately $250,000 as contemplated by the Joint Venture Agreement.  As a result, Plaintiffs were led to believe that their initial investment of $750,000 and Defendants' initial investment of $250,000 were used in their entirety to purchase the two rough uncut diamonds from a diamond dealer in Brazil.

13.     As consideration for Plaintiffs' investment of $750,000 and other valuable consideration given to K.J.A. and Mr. Ayvazian, K.J.A. and Mr. Ayvazian jointly and severally made certain "continuous warranties and guarantees" to Plaintiffs.  One of these warranties and guarantees was that the two rough uncut diamonds at issue were "fancy green" and "blue green" of natural color with "good valid clear legal and equitable title."  Defendants also warranted in the Joint Venture Agreement that they would complete the cutting and polishing process for these two diamonds within one year and that Defendants, at all times and under all circumstances, would "hold these 2 diamonds on Trust for Mr. Ayvazian, K.J.A. Diamonds and Mr. & Mrs. Masagung in the proportion of their contribution."  Based on their initial contribution, Mr. Masagung and Mrs. Masagung are owners of 75% of the two diamonds yielded by the cutting and polishing process (the "Joint Venture Diamonds").

14.     Pursuant to the Joint Venture Agreement, Defendants were required to sell both Joint Venture Diamonds within six (6) months after they were cut and polished, unless the

Plaintiffs agreed in writing to defer such sale.  Plaintiffs and Defendants also agreed that all sale

proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in

the following priority and proportion:

        a.      First, Mr. Masagung and Mrs. Masagung would receive $750,000,

representing the value of their initial investment into the joint venture with Defendants;

        b.      Second, K.J.A. and Mr. Ayvazian would receive $250,000, representing

the value of their initial investment into the joint venture with Plaintiffs;

        c.      Third, any balance of the sale proceeds of the Joint Venture Diamonds,

after deducting certain insurance and processing costs, *i.e.*, any remaining profits, would be

distributed equally—fifty percent (50%) to Mr. Ayvazian and K.J.A., and fifty percent (50%) to

Mr. Masagung and Mrs. Masagung.

      15.      The Joint Venture Agreement also contained an indemnity provision, whereby

Mr. Ayvazian and K.J.A. Diamonds agreed to "jointly and severally indemnify and keep

indemnified Mr. & Mrs. Masagung at all times against any loss they may suffer whatsoever and

however arising from this venture."  According to the terms of the Joint Venture Agreement,

Plaintiffs expected a return on their investment by the spring of 2005.

### PROCESSING OF THE TWO DIAMONDS CONSISTENT WITH THE JOINT VENTURE AGREEMENT

      16.      Plaintiffs are informed and believe and, on the basis of such information and

belief, allege that in the year following the execution of the Joint Venture Agreement,

Defendants obtained, using both Plaintiffs' and Defendants' initial investment, the two diamonds

contemplated by the Joint Venture Agreement.  Defendants subsequently performed and

completed the cutting and polishing process of these Joint Venture Diamonds, which the Joint

Venture Agreement also contemplated and required.  This cutting and polishing process resulted

in the two Joint Venture Diamonds—being (a) one 4.53 carat fancy intense green diamond (the "4.53 Diamond") and (b) one 3.20 carat fancy intense green diamond (the "3.20 Diamond"). Both Joint Venture Diamonds were subsequently certified by the Gemological Institute of America ("GIA").

17.     During the cutting and polishing process, which lasted about one year, Mr. Masagung traveled to New York to see Mr. Ayvazian two or three times.  Mr. Ayvazian showed the Joint Venture Diamonds to Mr. Masagung at his office in New York.  In one of these trips, Mr. Masagung met with a GIA representative at Mr. Ayvazian's office.  Mr. Ayvazian provided to the GIA representative the necessary paperwork to secure certification.  Plaintiffs were comfortable that everything was going according to the Joint Venture Agreement during this time.

18.     When the Joint Venture Diamonds were finished, Mr. Ayvazian traveled to Northern California two times to meet with Mr. Masagung and show them to him.  Mr. Ayvazian also showed the GIA certificates for the Joint Venture Diamonds.  At the same time, Mr. Ayvazian showed numerous diamonds unrelated to the Joint Venture Diamonds to Mr. Masagung.  Plaintiffs were satisfied that, at this time, everything was still proceeding as agreed to in the Joint Venture Agreement.

### MR. AYVAZIAN'S EFFORTS TO SELL THE JOINT VENTURE DIAMONDS AND EXCUSES FOR HIS FAILURE TO SELL

19.     Plaintiffs trusted and relied on Mr. Ayvazian's knowledge of the industry to determine the appropriate sale price of the Joint Venture Diamonds.  In the six-month period after the Joint Venture Diamonds were cut and polished, about the spring of 2005, Plaintiffs repeatedly requested that Defendants advise them of the status of the efforts to sell the Joint

Venture Diamonds.  Because Mr. Ayvazian rarely returned Plaintiffs' numerous telephone calls, Mr. Masagung would call Mr. Ayvazian's wife and/or mother.  During this time, Defendants consistently delayed in responding to Plaintiffs.  When Plaintiffs finally spoke with Mr. Ayvazian, he provided excuses about why the Joint Venture Diamonds had not been sold.  For example, Mr. Ayvazian repeatedly told Plaintiffs that he was busy and so could not sell the diamonds.  Mr. Ayvazian also told Plaintiffs that he was trying to sell the Joint Venture Diamonds in the Middle East because he believed that the Middle East was a better market for green diamonds.

20.     On or around February 24, 2005, Mr. Ayvazian informed Mr. Masagung that the 3.20 Diamond would be re-cut for more brilliance.  After being re-cut, the 3.20 Diamond actually weighed 3.04 carats.  This 3.04 carat diamond was certified by the GIA on September 21, 2005 in GIA Report 14577678.[1]

21.     Mr. Masagung was disappointed that it was taking so much time to sell the Joint Venture Diamonds.  For that reason, Mr. Masagung traveled to New York to see Mr. Ayvazian in the spring of 2005.  Mr. Masagung was unable to see the Joint Venture Diamonds during these visits because Mr. Ayvazian said that they were in Dubai, in the United Arab Emirates, so that they could be shown to potential buyers.  Mr. Ayvazian even told Mr. Masagung that someone had offered $400,000 per carat for one of the two Joint Venture Diamonds, but that Mr. Ayvazian believed that he could negotiate a sale price of over $500,000 per carat.  This discussion reassured Mr. Masagung that everything was still going according to the Joint Venture Agreement.

---

[1]     For clarity, all future references to the "3.20 Diamond" refer to the 3.04 carat diamond, as re-cut.

22.     A few months after Mr. Masagung's visit to New York, Mr. Ayvazian again met with Mr. Masagung in Northern California.  During this visit, Mr. Ayvazian showed Mr. Masagung the 3.20 Diamond and continued to say that he was still trying to sell it.  Mr. Masagung told Mr. Ayvazian that he wanted the 3.20 Diamond so that he could try to help Mr. Ayvazian sell it in Asia.  Mr. Ayvazian told Mr. Masagung that he could still sell the 3.20 Diamond, and that he would continue to show it to buyers in the Middle East, as he would the 4.53 Diamond.  Mr. Ayvazian also said that he believed he could extract a higher price per carat from these potential buyers in the Middle East.

23.     Mr. Masagung disagreed and instructed Mr. Ayvazian to sell the Joint Venture Diamonds at the price offered by the potential purchasers.  Mr. Ayvazian said he understood and would do so.  A few days later, when Mr. Masagung contacted Mr. Ayvazian to inquire about the status of the sale, Mr. Ayvazian informed Mr. Masagung that the purchaser was no longer interested and, as a result, no sale had been made.  Mr. Ayvazian then told Mr. Masagung that he had another potential purchaser for the Joint Venture Diamonds.  In the following weeks, this process repeated itself several times: Mr. Ayvazian would tell Mr. Masagung about a potential purchaser, Mr. Masagung would approve the sale on the asked-for price, and Mr. Ayvazian would then report to Mr. Masagung that he had lost the purchaser but that he had lined up another one.

24.     Fearing that the Joint Venture Diamonds were becoming unsellable, Plaintiffs on multiple occasions requested that the Joint Venture Diamonds be auctioned by a reputable auction house, such as Christie's or Sotheby's.  Mr. Ayvazian responded that this was not a good idea because if they did not sell in an auction house, this fact would become known to the industry and make any future sale impossible.  Mr. Ayvazian, however, continued to provide

further assurances that he would be able to sell the Joint Venture Diamonds.  In light of Mr. Ayvazian's assurances and experience in the industry, Mr. Masagung reluctantly agreed not to put the Joint Venture Diamonds in an auction house.

25.    Their patience wearing thin, however, Plaintiffs gave Defendants an ultimatum, telling Mr. Ayvazian that he had until January 2006 to sell the Joint Venture Diamonds. Plaintiffs informed Defendants that they would try to sell the diamonds on their own if Defendants could not sell them by January 2006.

## SHIPMENT OF THE 3.20 DIAMOND TO HONG KONG

26.    In or around March 2006, after yet further delay by Defendants in selling the Joint Venture Diamonds, Plaintiffs attempted to contact Mr. Ayvazian.  Plaintiffs were only able to reach Mr. Ayvazian after they called his mother and apprised her that Mr. Ayvazian was not returning their calls.  When he spoke to Mr. Masagung, Mr. Ayvazian repeated the same excuse he had been providing—that he had a potential buyer looking at the Joint Venture Diamonds but that he thought he could obtain a little bit more in terms of the selling price per carat.  At that point, Plaintiffs instructed Mr. Ayvazian to ship both of the Joint Venture Diamonds to Edmond Chin ("Mr. Chin") in Hong Kong for inspection and possible sale.  Mr. Chin is a highly reputable jeweler.  Plaintiffs believed that if Mr. Chin could not sell the Joint Venture Diamonds, then they should go to an auction.  Mr. Ayvazian responded that he could not ship the 4.53 Diamond because it was still tied up in negotiations with potential purchasers in the Middle East.  Mr. Ayvazian did agree, though, to ship the 3.20 Diamond to Mr. Chin.

27.    Mr. Ayvazian sent the 3.20 Diamond from K.J.A. to Mr. Chin via courier. Plaintiffs are informed and believe and, on the basis of such information and belief, allege that Mr. Chin received the diamond in late March 2006 or early April 2006.  Mr. Chin then called

Mr. Masagung to let him know that he had received and reviewed the 3.20 Diamond.  According to Mr. Chin's analysis, the 3.20 Diamond could be sold for somewhere in between $400,000 and $500,000 per carat.

### PLAINTIFFS LEARN FOR THE FIRST TIME THAT DEFENDANTS HAD SECRETLY SOLD THE JOINT VENTURE DIAMONDS

28.     On or about April 13, 2006, Mr. Chin telephoned Mr. Masagung and told him that someone had called him (Mr. Chin), claiming to be the owner of the 3.20 Diamond and demanding that the diamond be sent to the caller.  At first, Mr. Masagung believed and assumed that Mr. Ayvazian was the caller, since he owned 25% of the 3.20 Diamond under the terms of the Joint Venture Agreement, and instructed Mr. Chin not to release the 3.20 Diamond.

29.     Later that same day, Mr. Chin called back the caller and related Mr. Masagung's instructions to the caller.  At that point, Mr. Chin realized that the caller was Larry West ("Mr. West").  Plaintiffs are informed and believe and, on the basis of such information and belief, allege that Mr. West operates L.J. West Diamonds, Inc. ("L.J. West"), a New York corporation. Mr. West told Mr. Chin that he had purchased a fifty percent (50%) interest in the 3.20 Diamond from K.J.A. and Mr. Ayvazian.  Mr. Chin responded that he believed that Mr. Masagung was the 75% owner of the 3.20 Diamond.

30.     To resolve this apparent confusion regarding the ownership of the 3.20 Diamond, L.J. West then sent to Mr. Chin on April 13, 2006 the "memorandum" for the diamond—a document purporting to establish that the diamond had been consigned or entrusted to L.J. West.

31.     As a result, late on April 13, 2006, Mr. Chin called Mr. Masagung to report the substance of his conversations with Mr. West.  Mr. Chin also told Mr. Masagung that Mr. West's agents threatened to call the Hong Kong authorities if he refused to release the diamond.  Mr.

10

Chin told Mr. Masagung that he felt he had no choice but to release the 3.20 Diamond to L.J. West's agents in Hong Kong. Mr. Chin also gave Mr. Masagung Mr. West's telephone number and asked Mr. Masagung to call Mr. West immediately.

32. Mr. Masagung did so. At that time, Plaintiffs first learned that K.J.A. had sold an interest in the Joint Venture Diamonds to L.J. West. Plaintiffs did not have any reason to suspect, before Mr. Masagung's conversation with Mr. West, that Defendants had surreptitiously sold the Joint Venture Diamonds. In particular, during the telephone conversation, Mr. West informed Mr. Masagung of Mr. West's belief that he owned 50% of the 3.20 Diamond and that he paid Mr. Ayvazian in full for his share.

33. After a few calls back and forth, on or about April 19, 2006, Mr. Masagung faxed to Mr. West a copy of the Joint Venture Agreement to show Mr. West that Plaintiffs had a 75% ownership interest in the Joint Venture Diamonds. In return, Mr. West faxed to Mr. Masagung the copies of two K.J.A. invoices for the Joint Venture Diamonds, dated January 26, 2005 and April 27, 2005. (Exhibits 2 and 3.) These invoices purport to reflect L.J. West's payments to K.J.A. for Mr. West's purported 50% share of the Joint Venture Diamonds, amounting by itself to more than one million dollars ($1,000,000). Plaintiffs are informed and believe and, on the basis of such information and belief, allege that the profits of the sale of the Joint Venture Diamonds were approximately two million dollars ($2,000,000). Once Mr. West, on the one hand, and Plaintiffs, on the other hand, understood what Defendants had done with respect the Joint Venture Diamonds, they began to discuss ways to collect what they were owed by the Defendants.

34. In light of the documents that Mr. West showed Mr. Masagung, on or about April 19, 2006, Mr. Masagung authorized Mr. Chin to release the 3.20 Diamond to Mr. West's agents.

Mr. Masagung asked, however, that the Receipt and Bailment Note—the document evidencing this release—state that "Larry West is aware that [as spoken on the phone] according to information this stone is 75% owned by Mr. Putra Masagung." (Exhibit 4.) Mr. Chin thereafter released the 3.20 Diamond to Mr. West's agents in Hong Kong.

35.     Neither K.J.A. nor its alter ego, Mr. Ayvazian, disclosed this sale to Plaintiffs. Defendants did not pay Plaintiffs for their 75% ownership of the Joint Venture Diamonds out of the sale, as was required by the Joint Venture Agreement. Nor did Defendants pay Plaintiffs their 50% share on any profits realized on the sale, as was required by the Joint Venture Agreement.

36.     In his conversations with Mr. Masagung, Mr. West confirmed that L.J. West still had possession of the 3.20 Diamond—on information and belief, the diamond that Mr. Chin had released to Mr. West's agent. Mr. West also said that he had bought a 50% interest in the 4.53 Diamond from K.J.A. and had already re-sold it, apparently to a purchaser in Hong Kong. Mr. West also told Mr. Masagung that a friend of Mr. West's had purchased a 25% interest in the 3.20 Diamond and that Mr. Ayvazian had kept a 25% interest. Plaintiffs do not know the identity of the purchaser of the 25% interest in the 3.20 Diamond.


### MR. AYVAZIAN ADMITS TO SECRETLY SELLING THE JOINT VENTURE DIAMONDS AND REPEATEDLY PROMISES TO MAKE THE PLAINTIFFS WHOLE

37.     Immediately after Mr. Masagung's April 19, 2006 call with Mr. West, Mr. Masagung attempted to contact Mr. Ayvazian. Mr. Masagung was only able to reach Mr. Ayvazian by telephone a couple of weeks later. During this telephone call, Mr. Masagung confronted Mr. Ayvazian with these newly discovered facts regarding his conduct in connection with surreptitiously selling the Joint Venture Diamonds to L.J. West. Mr. Ayvazian denied these

sales.  Rather, Mr. Ayvazian told Mr. Masagung that he was mistaken, and that the 3.04 carat

diamond, which Mr. Ayvazian had sold to L.J. West, was a diamond completely different from

the 3.20 Diamond in which Mr. Masagung held a 75% ownership interest.  Mr. Ayvazian also

said that the 4.53 Diamond was still in the Middle East for potential buyers.  Mr. Masagung did

not believe Mr. Ayvazian and told him that if that was in fact the case, Mr. Ayvazian was to

immediately ship the 3.20 Diamond to Mr. Chin in Hong Kong and the 4.53 Diamond from the

Middle East to Mr. Masagung.  Mr. Ayvazian assured Mr. Masagung that he would do so.

38.     Mr. Ayvazian never shipped the Joint Venture Diamonds as instructed by Mr.

Masagung.  Instead, in a telephone call a few days later, Mr. Ayvazian admitted to Mr.

Masagung that he had sold the Joint Venture Diamonds to L.J. West in early 2005.

39.     On or about May 5, 2006, Plaintiffs, through their counsel, wrote to Mr. Ayvazian

and to K.J.A., informing them of their recent discovery that K.J.A. had sold the two Joint

Venture Diamonds.  Plaintiffs demanded to receive the Joint Venture Diamonds, or payment in

full for their value, by May 15, 2006.

40.     Over the next few months, the parties then began discussing possible ways to

resolve the dispute over the sale proceeds of the Joint Venture Diamonds.  Mr. Ayvazian was

again often unavailable during these months.  Throughout this process, however, Defendants

consistently and repeatedly admitted responsibility for their misconduct.  For example, in a

signed fax dated June 21, 2006, Mr. Ayvazian assured the Plaintiffs, "I assure you, you will

know everything and will receive your share of the partnerships!"  As another example, in a

signed fax dated August 23, 2006, Mr. Ayvazian made the following admission to the Plaintiffs:

"Dear Putra & Imelda – Do not know where to start. . . but to apologize. . . specifically the trust

part.  Never, never, never, did I mean to take advantage. . . friendshipwise or businesswise.  I

made a big mistake and I am paying for it. . .  I assure you that your share of profit will be paid A.S.A.P.!"  (Exhibit 5.)

### MR. AYVAZIAN ADMITS IN WRITING TO HAVING SECRETLY SOLD THE JOINT VENTURE DIAMONDS TO L.J. WEST

41.      On or about September 6 and 7, 2006, Plaintiffs and Defendants met in New York to continue discussing possible resolution scenarios.  At that meeting, Defendants further admitted to their misconduct and stated to Plaintiffs the Defendants' calculation of what they owed to Plaintiffs.  On K.J.A. letterhead dated September 7, 2006 memorializing these discussions (the "September 7, 2006 Writing"), Mr. Ayvazian valued the profit of the sales of the Joint Venture Diamonds at two million dollars ($2,000,000).  The September 7, 2006 Writing also reflects that Plaintiffs' share of the profits, as provided by the Joint Venture Agreement, is one million dollars ($1,000,000), to be added to the $750,000 owed to Plaintiffs to reimburse their initial investment in the joint venture.  Thus, Mr. Ayvazian expressly admitted, "Therefore, Kevo Ayvazian owe [sic] Putra [Masagung] amount of $1,750,000."  (Exhibit 6.)

42.      As a further admission of the debt they owed to Plaintiffs, Defendants informed L.J. West through the September 7, 2006 Writing that they had sold or transferred their remaining 25% ownership share of the 3.20 Diamond to Mr. Masagung.  This gave Mr. Masagung the right to collect directly this 25% ownership share (in addition to Mr. Masagung's original 75% ownership share) of the whole sale of the 3.20 Diamond.  Mr. Ayvazian signed the September 7, 2006 Writing in his office in the presence of both Mr. Masagung and Mrs. Masagung.

43.      Also on September 7, 2006, immediately following this meeting with Mr. Ayvazian, Mr. Ayvazian, Mr. Masagung and Mrs. Masagung together went to L.J. West's office

in New York to meet with Mr. West.  At this meeting, Mr. Ayvazian presented Mr. West with a

copy of the September 7, 2006 Writing and informed him that Plaintiffs now owned a 100%

interest in the 3.20 Diamond.  Pursuant to the September 7, 2006 Writing, Mr. Ayvazian

authorized Mr. West to transfer his 25% interest in the 3.20 Diamond to Mr. Masagung.  Mr.

Ayvazian also surrendered the September 21, 2005 GIA certificate for the 3.20 Diamond (as re-

cut) to Mr. West, and Mr. Masagung kept a copy.  At that time, Mr. Masagung also saw the 3.20

Diamond in Mr. West's office.

### MR. AYVAZIAN OFFERS VARIOUS DIAMONDS TO REPAY THE DEFENDANTS' DEBT TO PLAINTIFFS PURSUANT TO THE JOINT VENTURE AGREEMENT

44.    After the two meetings in September 2006, Defendants continued to admit

responsibility for their secretive sale of the Joint Venture Diamonds without providing Plaintiffs

their agreed-upon share of the profits.  Defendants also continued to express their desire to make

Plaintiffs whole.  Because Defendants said they did not have enough liquid assets to pay off their

debt to Plaintiffs, however, Mr. Ayvazian offered to consign his inventory of unrelated diamonds

to L.J. West and to use the sale proceeds to pay down Defendants' debt to Plaintiffs.  Plaintiffs

are informed and believe and, on the basis of such information and belief, allege that the value of

this inventory was more than two million dollars.

45.    Plaintiffs are informed and believe and, on the basis of such information and

belief, allege that these other, unrelated diamonds were consigned to L.J. West by K.J.A., and

were in L.J. West's possession.  Mr. Ayvazian confirmed this arrangement in writing several

times, including in a signed fax dated October 30, 2006.  In a fax dated September 13, 2006, Mr.

Ayvazian further confirmed this arrangement by telling Mr. Masagung that he would send a

letter to Mr. West to instruct him to return the balance of the unsold inventory to Mr. Masagung.

Plaintiffs are informed and believe, and on the basis of such information and belief allege, that Mr. Ayvazian never sent such a letter to Mr. West.

46.    Plaintiffs are informed and believe, and on the basis of such information and belief allege, that L.J. West did sell certain diamonds in K.J.A.'s inventory and collect the sale proceeds therefrom.  Plaintiffs also allege on information and belief that K.J.A. owed L.J. West approximately $800,000 from an unrelated transaction between those two entities.  Plaintiffs further allege on information and belief that after L.J. West sold enough diamonds from K.J.A.'s inventory to satisfy this $800,000 debt, L.J. West returned the balance of K.J.A.'s inventory to Mr. Ayvazian.

47.    By early 2007, however, Plaintiffs had still not recovered any money in payment of the debt owed them by Defendants.  Mr. Ayvazian, meanwhile, was still promising to pay to Plaintiffs the proceeds of his sale of the other diamonds and jewelry in K.J.A.'s inventory.

48.    Over the ensuing months, Plaintiffs continued to entertain possible resolution of the instant dispute without resort to litigation.  To this end, in or around February 2007, Plaintiffs' counsel drafted a first draft of a Debt Workout Agreement (the "Draft Debt Workout Agreement").  The Draft Debt Workout Agreement contemplated that Defendants would use the proceeds of the sale of certain diamonds and other jewelry and stones owned by the Defendants—and unrelated to the Joint Venture Diamonds—as collateral to effect payment in part or in full of the $1,750,000 debt owed by Defendants to Plaintiffs, with interest of 8% per annum beginning on September 7, 2006.  The Draft Debt Workout Agreement also provided that Defendants agreed to execute and a deliver to Plaintiffs a Confession of Judgment.

49.    In or around May 2007, Mr. Ayvazian's lawyer suggested revisions to the Draft Debt Workout Agreement that essentially negated much of the purpose of the Draft Debt

Workout Agreement.  Plaintiffs' counsel objected to these changes and indicated that they were unacceptable.  Mr. Ayvazian then involved his advisor, who also reviewed the Draft Debt Workout Agreement.  The process of further revisions to the Draft Debt Workout Agreement lasted until November 2007.

50.    Meanwhile, Mr. Ayvazian was continuing to promise to Plaintiffs to make them whole.  In a signed fax dated May 10, 2007, for example, Mr. Ayvazian wrote: "I, Kevo J. Ayvazian, promise Mr. & Mrs. Masagung . . . $50K. - $100K. to reduce the balance due" by the end of May 2007.  Contrary to his promise, Mr. Ayvazian never paid Plaintiffs this money.

51.    On or around November 8, 2007, Mr. Masagung met with Mr. Ayvazian in Singapore.  At that meeting, Mr. Ayvazian again admitted Defendants' debt to Plaintiffs arising out of the Joint Venture Agreement and stated that he would pay off this debt.

52.    On or around November 26, 2007, Plaintiffs circulated to Defendants a final draft of the Draft Debt Workout Agreement.  Despite Defendants' continuous assurances that they would sign the Draft Debt Workout Agreement, however, Defendants backed out and refused to sign the Draft Debt Workout Agreement.

53.    All other options exhausted, and having spent almost two years on Mr. Ayvazian's unfulfilled promises to pay off the debt, Plaintiffs had no choice but to file this action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

### (Against K.J.A. and Mr. Ayvazian)

54.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 53 above as though set forth in full here.

55.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

56.     Pursuant to the Joint Venture Agreement, Defendants promised to "hold these 2 diamonds on Trust for Mr. Ayvazian, K.J.A. Diamonds and Mr. & Mrs. Masagung in the proportion of their contribution."

57.     Also pursuant to the Joint Venture Agreement, Plaintiffs and Defendants agreed that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion: (i) Mr. Masagung and Mrs. Masagung receive $750,000, representing the value of their initial investment into the joint venture with the Defendants; (ii) K.J.A. and Mr. Ayvazian receive $250,000, representing the value of their initial investment into the joint venture with Plaintiffs; and (iii) any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, i.e., any remaining profits, would be distributed equally—50% to Mr. Ayvazian and K.J.A., and 50% to Mr. Masagung and Mrs. Masagung.

58.     Plaintiffs complied with all of their obligations under the Joint Venture Agreement.

59.     Defendants have breached the Joint Venture Agreement by selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs from the sale

proceeds what they were owed under the Joint Venture Agreement, including without limitation the value of Plaintiffs' initial $750,000 investment and 50% of any profits.

60.     Defendants' breach of the Joint Venture Agreement has damaged Plaintiffs in an amount to be determined at trial, but reasonably believed to be not less than $1,750,000.

61.     The Joint Venture Agreement also contained an indemnity provision, whereby Defendants agreed to jointly and severally indemnify and keep indemnified Plaintiffs "at all times against any loss they may suffer whatsoever and however arising from this venture."  As a result of the Defendants' breach, therefore, Plaintiffs are also entitled to consequential damages and attorney's fees.

## SECOND CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing

**(Against K.J.A. and Mr. Ayvazian)**

62.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 61 above as though set forth in full here.

63.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

64.     Implied in the Joint Venture Agreement, as in all contracts, is a covenant of good faith and fair dealing in the course of performance.  The duties of good faith and fair dealing encompass any promises that a reasonable person in the position of the promisee would be justified in understanding were included.

65.    Under this duty of good faith and fair dealing, K.J.A. and Mr. Ayvazian were obliged not to do anything that would result in destroying or injuring Plaintiffs' right to receive the benefits of the Joint Venture Agreement.

66.    K.J.A. and Mr. Ayvazian breached the covenant of good faith and fair dealing by, among other things, (i) repeatedly misrepresenting to Plaintiffs that the Joint Venture Diamonds had not been sold when they in fact had been sold; (ii) secretly selling the Joint Venture Diamonds without notifying Plaintiffs or paying them what was owed them under the Joint Venture Agreement; (iii) representing to third-party purchasers of the Joint Venture Diamonds, such as L.J. West or Mr. West, that K.J.A. possessed full and clear title to the Joint Venture Diamonds; and (iv) refusing, as agreed in the Joint Venture Agreement, to take steps to indemnify Plaintiffs for any loss arising from the Joint Venture Agreement, including but not limited to refusing to execute the Draft Debt Workout Agreement despite acknowledging their debt to Plaintiffs.

67.    By reason of the foregoing breach of the covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be determined at trial, but reasonably believed to be not less than $1,750,000.

## THIRD CLAIM FOR RELIEF

### Conversion

### (Against K.J.A. and Mr. Ayvazian)

68.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 67 above as though set forth in full here.

69.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

70.     Pursuant to the Joint Venture Agreement, Plaintiffs retained, among other things, a 75% ownership interest in each of the Joint Venture Diamonds until and unless the Joint Venture Diamonds were sold.

71.     Upon sale of the Joint Venture Diamonds, Plaintiffs were entitled to immediate distribution of a specific sum of money in the amount of $750,000, representing the value of their initial investment into the joint venture with Defendants.  Plaintiffs were also entitled to 50% of any remaining profits, after having paid Defendants for their initial $250,000 investment and any processing and insurance costs.

72.     In violation of and interference with Plaintiffs' rights, K.J.A. and Mr. Ayvazian sold the Joint Venture Diamonds to third party purchasers, diverting the proceeds of such sales to their own accounts.  Defendants continued to retain the money owed to Plaintiffs without authorization and in defiance of Plaintiffs' superior right of ownership in these sale proceeds.  In so doing, Defendants converted Plaintiffs' agreed upon share of the proceeds of the sale of the Joint Venture Diamonds.

73.     Plaintiffs' share of the proceeds of the sale of the Joint Venture Diamonds had a value of approximately $1,750,000.

74.     By reason of the foregoing, Plaintiffs have sustained damages in the sum of $1,750,000 and are entitled to judgment in that amount, plus interest computed from the date of conversion.

75.    Because Defendants' conversion was willful, wanton or in reckless disregard for Plaintiffs' well being, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (Against K.J.A. and Mr. Ayvazian)

76.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 75 above as though set forth in full here.

77.    On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

78.    As a participant in this joint venture, K.J.A. had a fiduciary obligation of the utmost good faith and loyalty to act in the best interests of Plaintiffs.

79.    As a participant in this joint venture, Mr. Ayvazian had a fiduciary obligation of the utmost good faith and loyalty, both individually and as the alter ego of K.J.A., to act in the best interests of Plaintiffs.

80.    By selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs what they were owed under the Joint Venture Agreement, K.J.A. breached its fiduciary duty of utmost good faith and loyalty to Plaintiffs.

81.    By selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs what they were owed under the Joint Venture Agreement, Mr. Ayvazian breached his fiduciary duty of utmost good faith and loyalty to Plaintiffs.

82.     By virtue of Defendants' breach of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial, but reasonably believed to be not less that $1,750,000.

83.     Because Defendants' breach was willful, wanton, or in reckless disregard for the Plaintiffs' well being, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Imposition of Constructive Trust

### (Against K.J.A. and Mr. Ayvazian)

84.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 83 above as though set forth in full here.

85.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

86.     By virtue of this Joint Venture Agreement, a fiduciary relationship existed between Defendants and Plaintiffs.

87.     Pursuant to the Joint Venture Agreement, Defendants expressly promised that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion: (i) Mr. Masagung and Mrs. Masagung receive $750,000, representing the value of their initial investment into the joint venture with the Defendants; (ii) K.J.A. and Mr. Ayvazian receive $250,000, representing the value of their initial investment into the joint venture with Plaintiffs; and (iii) any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, i.e., any

remaining profits, would be distributed equally—50% to Mr. Ayvazian and K.J.A., and 50% to Plaintiffs.

88.    In reliance on and as consideration for these express promises by Defendants, Plaintiffs transferred to the Defendants the sum of $750,000 as an initial investment into the joint venture.

89.    Defendants breached the Joint Venture Agreement by selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs from the sale proceeds what they were owed under the Joint Venture Agreement, including without limitation the value of Plaintiffs' initial $750,000 investment and 50% of any profits.

90.    As a result of Defendants' breach of their express promise, Plaintiffs have been damaged and the Defendants have been unjustly enriched.

91.    By reason of the facts alleged herein, Defendants hold Plaintiffs' investment, profits and gains as constructive trustees for the benefit of Plaintiffs.

## <u>SIXTH CLAIM FOR RELIEF</u>

### <u>Accounting</u>

### (Against K.J.A. and Mr. Ayvazian)

92.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 91 above as though set forth in full here.

93.    On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

94.    By virtue of this Joint Venture Agreement, a fiduciary relationship existed between Defendants and Plaintiffs.

95.     Pursuant to the Joint Venture Agreement, Defendants expressly promised that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion: (i) Mr. Masagung and Mrs. Masagung receive $750,000, representing the value of their initial investment into the joint venture with Defendants; (ii) K.J.A. and Mr. Ayvazian receive $250,000, representing the value of their initial investment into the joint venture with Plaintiffs; and (iii) any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, i.e., any remaining profits, would be distributed equally—50% to Mr. Ayvazian and K.J.A., and 50% to Mr. Masagung and Mrs. Masagung.

96.     In reliance on and as consideration for these express promises by Defendants, Plaintiffs transferred to Defendants the sum of $750,000 as an initial investment into the joint venture.

97.     Defendants breached the Joint Venture Agreement by selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs from the sale proceeds what they were owed under the Joint Venture Agreement, including without limitation the value of the Plaintiffs' initial $750,000 investment and 50% of any profits.

98.     Because Plaintiffs' breach of fiduciary duty damages depend, in part, upon the profits realized by K.J.A. and Mr. Ayvazian for their wrongful conduct, Plaintiffs are entitled to an accounting as to all such profits by K.J.A. and Mr. Ayvazian.

## SEVENTH CLAIM FOR RELIEF

### Declaratory Relief

### (Against K.J.A. and Mr. Ayvazian)

99.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 98 above as though set forth in full here.

100.     An actual case or controversy exists between Plaintiffs and Defendants regarding Plaintiffs' ownership interest in the Joint Venture Diamonds and Plaintiffs' entitlement, from the proceeds for the sale of the Joint Venture Diamonds, to their initial investment of $750,000, their 50% share of any profits realized on such sale(s), and any other costs or expenses arising from the joint venture because Defendants have not paid to Plaintiffs what they are owed under the Joint Venture Agreement.

101.     To resolve the actual controversy between the parties, the Court should issue a judgment declaring that:

a.     Plaintiffs are 75% owners of each of the Joint Venture Diamonds and that they are entitled to their $750,000 initial investment;

b.     Plaintiffs are entitled to 50% of any profits realized on the sale of the Joint Venture Diamonds, currently reasonably believed to amount to one million ($1,000,000) dollars; and

c.     Plaintiffs are entitled, pursuant to the indemnity provision in the Joint Venture Agreement, to all costs, fees (including but not limited to attorney's fees) and expenses, arising from Defendants' breach of the Joint Venture Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor and against Defendants and relief including, but not limited to, the following:

A.      On Count I, compensatory damages in an amount to be determined at trial, but reasonably believed not to be less than $1,750,000, plus consequential damages, plus attorney's fees and costs;

B.      On Count II, compensatory damages in an amount to be determined at trial, but reasonably believed not to be less than $1,750,000;

C.      On Count III, compensatory damages in an amount to be determined at trial, but reasonably believed not to be less than $1,750,000, plus interest computed from the date of conversion, plus punitive damages in an amount to be determined a trial;

D.      On Count IV, compensatory damages in an amount to be determined at trial, but reasonably believed not to be less than $1,750,000, plus punitive damages in an amount to be determined a trial;

E.      On Count V, that the Court impose a constructive trust whereby Defendants hold Plaintiffs' investment, profits and gains as a constructive trustee for the benefit of Plaintiffs;

F.      On Count VII, an accounting of all revenues and profits received by Defendants as a result of their misconduct;

G.      On Count VIII, that this Court declare that (i) Plaintiffs are 75% owners of each of the Joint Venture Diamonds, (ii) Plaintiffs are entitled to their $750,000 initial investment plus 50% of any profits realized on the sale of the Joint Venture Diamonds, and (iii) Plaintiffs are entitled, pursuant to the indemnity provision in the Joint Venture Agreement, to all costs, fees (including but not limited to attorney's fees) and expenses, arising from Defendants' breach of the Joint Venture Agreement;

H.    Plaintiffs' costs and reasonable attorney's fees; and

I.    All other relief as the Court may deem just and proper

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.

Dated: April 29, 2008                    SQUIRE, SANDERS & DEMPSEY L.L.P.

By:_____
Steven Skulnik (SS 7821)
350 Park Avenue
New York, NY 10022-6022

Mark C. Dosker (*pro hac* application
forthcoming)
One Maritime Plaza, Third Floor
San Francisco, CA 94111

Jose Luis Martin (*pro hac* application
forthcoming)
600 Hansen Way
Palo Alto, CA 94304

Attorneys for Plaintiffs
PUTRA MASAGUNG and IMELDA
MASAGUNG

# EXHIBIT 1

Oct 31 03 12:53p  A Diamonds Int'l Corp.    21  02-9199    p.2

⑦

**This Joint Venture Agreement is made between:**

**Mr Petra Masagung and Mrs Imelda Masagung**
(hereinafter known as Mr & Mrs Masagung)
C/o 1 Fifth Avenue #02-06/07, Guthrie House, Singapore 268802

AND

**Mr Kevo-Jean Ayvazian**
C/o 580 Fifth Avenue, Suite 2002 , NYC, NY 10036

AND

**KJA Diamonds International Corp.**
580 Fifth Avenue, Suite 2002, NYC, NY 10036

Further to the various discussions and facsimiles, it is agreed as follows:

That Mr Ayvazian and KJA Diamonds International Corp (hereinafter known as "KJA Diamonds") shall jointly provide US250,000/- while Mr & Mrs Masagung shall provide US$750,000/- towards the purchase of 2 rough uncut diamonds of total weight of 9.60 Carats which is priced at US$1 million.

In consideration of Mr & Mrs Masagung putting up the US$750,000/- towards the purchase of the 2 rough uncut diamonds and other valuable considerations given to KJA Diamonds and Mr Ayvazian including but not limited to entering into this venture with KJA Diamonds upon the recommendations and promises of Mr Ayvazian and his participation in this venture, both Mr Ayvazian and KJA Diamonds have jointly and severally given continuous warranties and guarantees to Mr & Mrs Masagung that:

A)   The 2 rough uncut diamonds are fancy green and blue green of natural color with good valid clear legal and equitable title.

B)   The 2 rough uncut diamonds shall be capable of yielding 2 cut and finished gemstone grade diamonds of 4.00 Carats for one and 2.75 Carats for the other.

C)   The 2 rough diamonds may be cut into either an Asscher cut diamond or a Cushion cut diamond.

D)   Mr Ayvazian and KJA Diamonds shall complete the cut polishing certifying process within 1 year and they shall at all times and under all circumstances hold these 2 diamonds on Trust for Mr Ayvazian, KJA Diamonds and Mr & Mrs Masagung in the proportion of their contribution.

E)   Mr Ayvazian and KJA Diamonds shall at all times insure and keep insured the 2 rough uncut diamonds or the finished diamonds, as the case may be, at an agreed value and shall name Mr Ayvazian, KJA Diamonds and Mr & Mrs Masagung as legal and equitable beneficiaries under the policy in the proportion of their contribution and shall provide Mr & Mrs Masagung with satisfactory evidence of this.

KJA ←

F)   Mr Ayvazian and KJA Diamonds shall jointly and severally indemnify and keep indemnified Mr & Mrs Masagung at all times against any loss they may suffer whatsoever and howsoever arising from this venture

1

G) At any time during the processing of the 2 rough uncut diamonds, should either one or both of them suffer any damage of any kind whatsoever howsoever caused including but not limited to negligence, acts of god or theft and regardless of whether the loss was partial or total loss, Mr Ayvazian and KJA Diamonds shall jointly and severally pay Mr & Mrs Masagung US$750,000/-, being the monies paid towards the purchase of the same immediately and without any reservation or condition whatsoever. However, notwithstanding the right to receive the US$750,000/- from Mr Ayvazian or KJA Diamonds as the case maybe, Mr & Mrs Masagung shall continue to retain a legal and beneficial interest in the diamonds in whatever form or state they are in.

H) Once the 2 rough uncut diamonds are finished as quality gemstones in accordance with this Agreement, should either or them or both of them suffer any damage of any kind whatsoever howsoever caused including but not limited to negligence, acts of god or theft and regardless of whether the loss was partial or total loss, Mr Ayvazian and KJA Diamonds shall jointly and severally pay Mr & Mrs Masagung at least US$750,000/- or the market value whichever is higher and this shall be payable immediately and without any reservation or condition whatsoever. However, notwithstanding the above right to be paid the US$750,000/-, Mr & Mrs Masagung shall continue to retain a legal and beneficial interest in the diamonds in whatever form or state they are in.

I) Mr Ayvazian and KJA Diamonds shall sell both diamonds whether by way of a sale or an auction within 6 months once they are finished unless the time of sale is deferred as agreed to by Mr & Mrs Masagung in writing.

J) All sale proceeds received for the diamonds shall at all times and under all circumstances be held on Trust for immediate distribution in the following agreed priority and proportion:

1) To pay Mr & Mrs Masagung US$750,000/- first before paying
2) Mr Ayvazian and KJA Diamonds jointly US$250,000/-
3) The balance of the sales proceeds after deducting the cost of processing the 2 rough uncut diamonds, the necessary insurance premiums and such other cost reasonably incurred which is estimated to be around US$20,000/- which shall represent the profit made shall be distributed equally that is to say 50% to Mr Ayvazian and KJA Diamonds jointly and 50% to Mr & Mrs Masagung.

K) All parties to this Agreement hereby agreed that the applicable law shall be the laws of the United States of America and shall submit to the jurisdiction of the Courts of the United States of America.

Dated  31  of  October,  2003

Mr Diok Masagung

Mrs Imelda Masagung

Name:  Kino  Jon  Ayvazian
Designation:  President
KJA Diamonds International Corp.

2

# EXHIBIT 2

[ JOB NO. 6929 ]    19/04 2006 WED    

# KJA Diamonds Int'l Corp.



KJA Diamonds Int'l Corp.          212.302.9100 Phone
580 Fifth Avenue                  212.302.9199 Fax
Suite 3002
NYC, NY 10036

## Invoice:

**Invoice #:2031**
Invoice Date:
Customer ID:

Bill to:                          Ship To:
L.J.WEST
580 Fifth Ave
NEW YORK NY 10036

| Date | Memo # | Terms | Due Date | Sales Rep | Tax ID |
|------|--------|-------|----------|-----------|--------|
| 4/27/05 | | NET CASH | | | |

| Quantity | Carats | Description | Price Per Carat | Total |
|----------|--------|-------------|-----------------|-------|
| RD | 3.20 | F.INT.GREEN | | 920,000.00 |
| | | PARTNERSHIP 50% | | |
| | | | | |
| | | | | |

| | Bank Info: | KJA Diamonds International Corp. | Subtotal | |
|--|-----------|-----------------------------------|----------|--|
| | | Bank Leumi U.S.A. | | |
| | | 579 Fifth Avenue | | |
| | | New York, NY 10017-1917 | Tax | |
| | | Account # 0845858701 | | |
| | | Routing # 026002794 | Shipping | |
| | | | Miscellaneous | |
| | | | Balance Due | 8460,000.00 |

4/27/05    WKF    400,000.00
Cl 4903    Balance    60,000.00

# EXHIBIT 3

@002    [JOB NO. 6929]    D7    19/04 2006 WED

# KJA Diamonds Int'l Corp.

KJA Diamonds Int'l Corp.    212-302-9100 Phone
580 Fifth Avenue    212-302-9190 Fax
Suite 2002
NYC, NY 10036

## Invoice:

**Invoice #:2023**
Invoice Date:
Customer ID:

Bill to:
LJ WEST DIAMONDS INC
580 FIFTH AVE 7TH FLOOR
New york, ny 10036

Ship To:

| Date | Memo # | Terms | Due Date | Sales Rep | Tax ID |
|------|--------|-------|----------|-----------|--------|
| 01/26/06 | | | *Net Cash* | | |

| Quantity | Carats | Description | Price Per Carat | Total |
|----------|--------|-------------|-----------------|-------|
| 1 | 4.53 | FANCY INTENSE GREEN | | 1,600,060 |
| | | 50% PARTNERSHIP | | |
| | | GIA REPORT # 13410398 | | |

Bank Info:    KJA Diamonds International Corp.

Bank Leumi U.S.A.
579 Fifth Avenue
New York, NY 10017-1917

Account # 0545858701
Routing # 026002794

| | |
|---|---|
| Subtotal | |
| Tax | |
| Shipping | |
| Miscellaneous | |
| Balance Due | 8630,000.00 |

2/1/06

# EXHIBIT 4



Mr. Putra Masury

Ottha Masury Putra Masury

## RECEIPT & BAILMENT NOTE

**Mercury in X Ltd.**
Room 1902,
15th Floor, Lap Fai Building,
No. 6-8 Pottinger Street, Central,
HONG KONG
Tel. & FAX
+852-2817-9965
+852-9753-8831
Mob.
email: diamond@mercuryinx.com

Nº 8957

On Approval given to:
etc etc etc ltd
f dia... f Chris

TH Date: 21-03-2006



| Lot No. | Description | pcs | ct | Price/ ct US$/HK$ | Amount | Remarks |
|---|---|---|---|---|---|---|
| SW37 | F1 g R VS2 G:R# 145 7x7x3x6  JCA4346 | 1 | 304 | 750 000.~ | US 2,280,000 | US 2,280,000 |
|  |  |  |  |  | HK 17,784,000 | HK 17,784,000 |

Accordy to information recceived Jhis stone is
Long West aurora that Cao spoken on
Putra Floggong    the phone )
this stone II 75% owned by Mr

(SIGNATURE OF BAILEE)

(Address)

Received from the above goods on the terms and conditions set out... [terms and conditions text, largely illegible]

# EXHIBIT 5

# KJA *Diamonds Int'l Corp.*

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone: 212.302.9100
Fax:   212.302.9199

# Fax Transmittal Form

**To:**

**Name:**
**Organization Name/Dept:**
**CC:**
**Phone number:**
**Fax number:**

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax:   212.302.9199

O Urgent
O For Review
O Please Comment
O Please Reply

**Date sent:** 8/23/06.
**Time sent:**
**Number of pages including cover page:** 2

---

Dear Putra & Imelda —

...I Do Not know where to start... t to apologize... "Especially The Trust part". EVER, Never, NEVER, did I mean to take antage... Friendship wise or business wise ... Big mistake and I - paying for it ...

I assure you that your share of it will be PAID A.S.A.P! I just cannot you specifics tonight, please give me few day put accounts together and give you a report →

②

... by the end of the week.

I do not want to mislead you with a time frame as of yet. Tomorrow, I'm seeing my accountant, I'll report you better th

I'll do anything to make sure every penny will be accounted for ...

Words CANNOT explain how I feel has been the worse year for me in ery situation ...

Please Do Not Give up on my sinceri wards you. It is authentic!

I'll call you tomorrow after my meet

✱ Kevo

cell: 917. 495.7197.
off: 212. 302.9100
hom: 914. 961.5472.
hone: 201. 567.4337.

# EXHIBIT 6



*KJA* Diamonds Int'l Corp.

580 Fifth Avenue | Phone: 212.302.9100
Suite 2002 | fax: 212.302.9199
NYC, NY 10036



# Fax Transmittal Form

To:

From

KJA Diamonds Int'l Corp.

**Name:**
**Organization Name/Dept:**
**CC:**
**Phone number:**
**Fax number:**

Phone: 212.302.9100
Fax: 212.302.9199

O **Urgent**
O **For Review**
O **Please Comment**
O **Please Reply**

**Date sent:** 9/7/06.
**Time sent:**
**Number of pages including cover page:**



$$\circledast \quad 4.^{53}/ \quad \text{Fint Green.} \quad \$ \ 1,696,000^{\underline{\underline{00}}} \quad ①$$

$$\circledast \quad 3.^{20}/ \quad \text{F.int Green.} \quad \$ \quad 460,000^{\underline{\underline{00}}}$$

$$\$ \quad 230,000^{\underline{\underline{00}}} \quad ②$$

$$\$ \quad 690,000^{\underline{\underline{00}}}$$

$$\bigstar \quad 3.^{20}/ \times 500,000./\text{ct} \times 25\% = \$ \ 400,000^{\underline{\underline{00}}}$$

$$\bigstar \quad \$ \ 1,320,000^{\underline{\underline{00}}}$$

$$\bigstar \quad \text{tobli} \quad \boxed{\$ \ 3,000,000^{\underline{\underline{00}}}}$$



# KJA *Diamonds Int'l Corp.*

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone: 212.302.9100
fax:   212.302.9199

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

O Urgent
O For Review
O Please Comment
O Please Reply

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax    212.302.9199

Date sent:  9/7/06.
Time sent:
Number of pages including cover page:

(2)

☆ Agreement.

     Initial    Investment  Putra : $ 750,000 =

       "        "     Kevo : $ 250,000 =

Profit of U.S $ 2,000,000 = million —

      Putra : $ 1,000,000 = million —

      Kevo : $ 1,000,000 = million —

therefore Kevo. Azmin — owe Putra —
☆ Amount of $ 1,750,000.⁰⁰ —

# $\mathcal{J}A$ Diamonds Int'l Corp.

) Fifth Avenue
ite 2002
'C, NY 10036

Phone:   212.302.9100
fax:     212.302.9199

(3)

# ax Transmittal Form

'o:

me:
ganization Name/Dept:
:
one number:
< number:

**Urgent**
**For Review**
**Please Comment**
**Please Reply**

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax    212.302.9199

**Date sent:** 9/7/06.
**Time sent:**
**Number of pages including cover page:**

---

To: L.J. West Diamonds —

I, Kevo Avazian, sold a "transfered" m;
ownership share of 25% (3.20 Fint. Green Radiant —

: Mr. Putra Masagung —

Therefore, mr. Masagung has the right
collect directly, 25% of the whole sm
the stone.