UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

PUTRA MASAGUNG and IMELDA
MASAGUNG,                              :

        Plaintiffs,              :     CASE NO.  08 Civ. 4049 (VM)

   -against-                       :     **AFFIDAVIT IN SUPPORT OF**
                                   **JUDGMENT BY DEFAULT**

KEVO-JEAN AYVAZIAN and K.J.A.         :
DIAMONDS INT'L CORP.,

        Defendants.              :
                                  :

------------------------------------ X

STATE OF CALIFORNIA    )
                  ) ss.:
SANTA CLARA COUNTY  )

     I, PUTRA MASAGUNG, being duly sworn, depose and say:

     1.     I am a citizen of Indonesia and, together with Imelda Masagung ("Mrs. Masagung") (collectively, "Plaintiffs"), am a plaintiff in the above-captioned action, and I am fully familiar with all the facts and circumstances in this action.

     2.     I make this affidavit pursuant to Rule 55.2 and 55.2(b) of the Civil Rules for the Southern District of New York, and the Default Judgment Procedures of United States District Judge Victor Marrero, Southern District Of New York in support of the Plaintiffs' application for the entry of a default judgment against defendants K.J.A. Diamonds Int'l Corp. ("K.J.A.") and Kevo-Jean Ayvazian ("Mr. Ayvazian") (collectively, "Defendants").

     3.     This action is to recover one million three hundred and twenty-five thousand dollars ($1,325,000.00) owed by the Defendants to the Plaintiffs for our share of the proceeds of the sale of two diamonds (the "Joint Venture Diamonds"), as described in paragraph 13 of the complaint.  A true and correct copy of the complaint is attached as Exhibit A.

4.      Jurisdiction of the subject matter of this action is based on diversity jurisdiction and amount in controversy.  I am a citizen of Indonesia.  Co-plaintiff Mrs. Masagung is citizen of Singapore.  The defendants are an individual citizen of New Jersey and a corporation incorporated and having its principal place of business in New York.  The amount in controversy is $1,325,000.00.  As provided in 28 U.S.C. §1332(a)(2) this is a controversy which exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

5.      The Court has personal jurisdiction over the Defendants because a substantial part of the events giving rise to the claims occurred in this district, K.J.A. may be found in this judicial district, and Mr. Ayvazian maintains his office in this judicial district and may be found in this judicial district.  Further, Mr. Ayvazian was, on information and belief, personally served with process in this state.

6.      I represent that, to the best of my knowledge, Mr. Ayvazian is not an infant or an incompetent and K.J.A. is not a natural person.

7.      This action was commenced on April 29, 2008 by the filing of the summons and complaint.  A copy of the summons and complaint was served on K.J.A. on May 2, 2008 by personally serving two copies of the aforesaid papers at the office of the New York State Secretary of State, located at 99 Washington Avenue, 6th Floor, in the City of Albany, New York, by delivering to and leaving papers with Carol Vogt, an authorized person in the Corporate Division of the Department of State and empowered to receive such service.  Proof of such service thereof was filed on May 5, 2008 (Docket entry # 5).  K.J.A. has not responded to the complaint and its time to do so has expired.

8.      A copy of the summons and complaint was also served on Mr. Ayvazian on May 5, 2008 by serving "John Doe," an individual of suitable age and discretion, on information and belief, matching the age, height, weight, and physical description of Mr. Ayvazian. Proof of such service thereof was filed on May 8, 2008 (Docket entry # 7) Mr. Ayvazian has not responded to the complaint and the time to do so has expired.

9.      On May 29, 2008, Plaintiffs confirmed that Mr. Ayvazian is not a member of the uniformed services for the United States or for the State in any capacity whatsoever, or is dependent upon such person. Proof of confirmation thereof was filed on May 30, 2008 (Docket entry #8), a true and correct copy of which is attached as Exhibit B.

10.     On June 2, 2008, the Plaintiffs applied to the Clerk of this Court for entry of the Defendants' default. On June 3, 2008, the Clerk of this Court entered the Defendants' default and issued a Certificate of Default for each defendant. Attached as Exhibit C and Exhibit D are true and correct copies of these Certificates of Default.

11.     As alleged in the complaint, the facts underlying the current action are as follows. In or around October 2003, the Plaintiffs and Defendants began discussing the possibility of entering into an agreement to purchase two rough diamonds and, after cutting and polishing them, selling them for a profit. In a fax dated October 21, 2003, Mr. Ayvazian made certain promises regarding the purchase of these two rough diamonds, including the promise to keep the Plaintiffs informed at every step of the cutting and polishing process. Because of Mrs. Masagung's and my inexperience in the rough diamonds industry, we reduced the agreement to writing. On or about October 31, 2003, Mrs. Masagung and I, on the one hand, and Mr. Ayvazian and K.J.A., on the other hand, formalized our agreement by entering into a joint

3

venture agreement (the "Joint Venture Agreement"). A true and correct copy of the Joint Venture Agreement is attached as Exhibit E.

12.    Pursuant to the Joint Venture Agreement, Mrs. Masagung and I wired $750,000 as an initial investment toward the purchase of the two rough uncut diamonds. Also pursuant to the Joint Venture Agreement, the Defendants were required to sell both Joint Venture Diamonds within six months after they were cut and polished, unless the Plaintiffs agreed in writing to defer such sale. The Plaintiffs and Defendants also agreed that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion:

(a)    First, Mrs. Masagung and I would receive $750,000, representing the value of our initial investment into the joint venture with the Defendants;

(b)    Second, K.J.A. and Mr. Ayvazian would receive $250,000, representing the value of their initial investment into the joint venture with the Plaintiffs;

(c)    Third, any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, *i.e.*, any remaining profits, would be distributed equally—fifty percent (50%) to Mr. Ayvazian and K.J.A., and fifty percent (50%) to Mrs. Masagung and me.

13.    The Joint Venture Agreement also contained an indemnity provision, whereby Mr. Ayvazian and K.J.A. agreed to "jointly and severally indemnify and keep indemnified Mr. & Mrs. Masagung at all times against any loss they may suffer whatsoever and however arising from this venture." According to the terms of the Joint Venture Agreement, Mrs. Masagung and I expected a return on our investment by the spring of 2005.

14.    The Plaintiffs are informed and believe and, on the basis of such information and belief, alleged that in the year following the execution of the Joint Venture Agreement, the Defendants obtained, using both the Plaintiffs' and the Defendants' initial investment, the two diamonds contemplated by the Joint Venture Agreement. The Defendants subsequently performed and completed the cutting and polishing process of these Joint Venture Diamonds, which the Joint Venture Agreement also contemplated and required. This cutting and polishing process resulted in the two Joint Venture Diamonds—(a) one 4.53 carat fancy intense green diamond (the "4.53 Diamond") and (b) one 3.20 carat fancy intense green diamond (the "3.20 Diamond"). Both Joint Venture Diamonds were subsequently certified by the Gemological Institute of America ("GIA").

15.    During the cutting and polishing process, which lasted about one year, I traveled to New York to see Mr. Ayvazian two or three times. Mr. Ayvazian showed me the Joint Venture Diamonds at his office in New York. During one of these trips, I met with a GIA representative at Mr. Ayvazian's office. Mr. Ayvazian provided to the GIA representative the necessary paperwork to secure certification. Mrs. Masagung and I were comfortable that everything was going according to the Joint Venture Agreement during this time.

16.    When the Joint Venture Diamonds were finished, Mr. Ayvazian traveled to Northern California two times to meet with me and show them to me. Mr. Ayvazian also showed me the GIA certificates for the Joint Venture Diamonds. At the same time, Mr. Ayvazian showed me numerous diamonds unrelated to the Joint Venture Diamonds. Mrs. Masagung and I were satisfied that, at this time, everything was still proceeding as agreed to in the Joint Venture Agreement.

17.    Mrs. Masagung and I trusted and relied on Mr. Ayvazian's knowledge of the industry to determine the appropriate sale price of the Joint Venture Diamonds. In the six-month period after the Joint Venture Diamonds were cut and polished, about the spring of 2005, we repeatedly requested that the Defendants advise us of the status of their efforts to sell the Joint Venture Diamonds. During this time, the Defendants consistently delayed in responding to us. Because Mr. Ayvazian rarely returned my numerous telephone calls, Mrs. Masagung and I would call Mr. Ayvazian's wife and/or mother. When we finally spoke with Mr. Ayvazian, he provided excuses about why the Joint Venture Diamonds had not been sold. For example, Mr. Ayvazian repeatedly told us that he was busy and so could not sell the diamonds. Mr. Ayvazian also told us that he was trying to sell the Joint Venture Diamonds in the Middle East because he believed that the Middle East was a better market for green diamonds.

18.    On or around February 24, 2005, Mr. Ayvazian informed me that the 3.20 Diamond would be re-cut for more brilliance. After being re-cut, the 3.20 Diamond actually weighed 3.04 carats. This 3.04 carat diamond was certified by the GIA on September 21, 2005 in GIA Report 14577678.[1]

19.    I was disappointed that it was taking so much time to sell the Joint Venture Diamonds. For that reason, I traveled to New York to see Mr. Ayvazian in the spring of 2005. I was unable to see the Joint Venture Diamonds during these visits because Mr. Ayvazian said that they were in Dubai, in the United Arab Emirates, so that they could be shown to potential buyers. Mr. Ayvazian even told me that someone had offered $400,000 per carat for one of the two Joint Venture Diamonds, but that Mr. Ayvazian believed that he could negotiate a sale price of over

---

[1]    For clarity, all future references to the "3.20 Diamond" refer to the 3.04 carat diamond, as re-cut.

$500,000 per carat. This discussion reassured me that everything was still going according to the Joint Venture Agreement.

20.    A few months after my visit to New York, Mr. Ayvazian again met with me in Northern California. During this visit, Mr. Ayvazian showed me the 3.20 Diamond and continued to say that he was still trying to sell it. I told Mr. Ayvazian that I wanted possession of the 3.20 Diamond so that I could try to help Mr. Ayvazian sell it in Asia. Mr. Ayvazian told me that he could still sell the 3.20 Diamond, and that he would continue to show it to buyers in the Middle East, as he would the 4.53 Diamond. Mr. Ayvazian also said that he believed he could extract a higher price per carat from these potential buyers in the Middle East.

21.    I disagreed and instructed Mr. Ayvazian to sell the Joint Venture Diamonds at the price offered by the potential purchasers. Mr. Ayvazian said he understood and would do so. A few days later, when I contacted Mr. Ayvazian to inquire about the status of the sale, Mr. Ayvazian informed me that the purchaser was no longer interested and, as a result, no sale had been made. Mr. Ayvazian then told me that he had another potential purchaser for the Joint Venture Diamonds. In the following weeks, this process repeated itself several times: Mr. Ayvazian would tell me about a potential purchaser, I would approve the sale on the asked-for price, and Mr. Ayvazian would then report to me that he had lost the purchaser but that he had lined up another one.

22.    Fearing that the Joint Venture Diamonds were becoming unsellable, Mrs. Masagung and I on multiple occasions requested that the Joint Venture Diamonds be auctioned by a reputable auction house, such as Christie's or Sotheby's. Mr. Ayvazian responded that this was not a good idea because if they did not sell in an auction house, this fact would become known to the industry and make any future sale impossible. Mr. Ayvazian, however, continued

to provide further assurances that he would be able to sell the Joint Venture Diamonds. In light of Mr. Ayvazian's assurances and experience in the industry, I reluctantly agreed not to put the Joint Venture Diamonds in an auction house.

23.    Our patience wearing thin, however, Mrs. Masagung and I gave the Defendants an ultimatum, telling Mr. Ayvazian that he had until January 2006 to sell the Joint Venture Diamonds. We informed the Defendants that we would try to sell the diamonds on our own if the Defendants could not sell them by January 2006.

24.    In or around March 2006, after yet further delay by Defendants in selling the Joint Venture Diamonds, Mrs. Masagung and I attempted to contact Mr. Ayvazian. We were only able to reach Mr. Ayvazian after we called his mother and apprised her that Mr. Ayvazian was not returning our calls. When he spoke to me, Mr. Ayvazian repeated the same excuse he had been providing—that he had a potential buyer looking at the Joint Venture Diamonds but that he thought he could obtain a little bit more in terms of the selling price per carat. At that point, I instructed Mr. Ayvazian to ship both of the Joint Venture Diamonds to Edmond Chin ("Mr. Chin") in Hong Kong for inspection and possible sale. Mr. Chin is a highly reputable jeweler. Mrs. Masagung and I believed that if Mr. Chin could not sell the Joint Venture Diamonds, then they should go to an auction. Mr. Ayvazian responded that he could not ship the 4.53 Diamond because it was still tied up in negotiations with potential purchasers in the Middle East. Mr. Ayvazian did agree, though, to ship the 3.20 Diamond to Mr. Chin.

25.    Mr. Ayvazian sent the 3.20 Diamond from K.J.A. to Mr. Chin via courier. Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that Mr. Chin received the diamond in late March 2006 or early April 2006. Mr. Chin then called me to let me know that he had received and reviewed the 3.20

8

Diamond. According to Mr. Chin's analysis, the 3.20 Diamond could be sold for somewhere between $400,000 and $500,000 per carat.

26. On or about April 13, 2006, Mr. Chin telephoned me and told me that someone had called him, claiming to be the owner of the 3.20 Diamond and demanding that the diamond be sent to the caller. At first, I believed and assumed that Mr. Ayvazian was the caller, since he owned 25% of the 3.20 Diamond under the terms of the Joint Venture Agreement, and I instructed Mr. Chin not to release the 3.20 Diamond.

27. Later that same day, Mr. Chin called back the caller and related my instructions to the caller. At that point, Mr. Chin realized that the caller was Larry West ("Mr. West"). Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that Mr. West operates L.J. West Diamonds, Inc. ("L.J. West"), a New York corporation. Mr. West told Mr. Chin that he had purchased a fifty percent (50%) interest in the 3.20 Diamond from K.J.A. and Mr. Ayvazian. Mr. Chin responded that he believed that I was the 75% owner of the 3.20 Diamond.

28. To resolve this situation regarding the ownership of the 3.20 Diamond, L.J. West then sent to Mr. Chin on April 13, 2006 the "memorandum" for the diamond—a document purporting to establish that the diamond had been consigned or entrusted to L.J. West.

29. As a result, late on April 13, 2006, Mr. Chin called me to report the substance of his conversations with Mr. West. Mr. Chin also told me that Mr. West's agents threatened to call the Hong Kong authorities if he refused to release the diamond. Mr. Chin told me that he felt he had no choice but to release the 3.20 Diamond to L.J. West's agents in Hong Kong. Mr. Chin also gave me Mr. West's telephone number and asked me to call Mr. West immediately.

30.    I did just that. It was at the time of this call to Mr. West that Mrs. Masagung and I first learned that K.J.A. had sold an interest in the Joint Venture Diamonds to L.J. West. Neither Mrs. Masagung nor I had any reason to suspect, before my conversation with Mr. West, that the Defendants had surreptitiously sold the Joint Venture Diamonds. In particular, during the telephone conversation, Mr. West informed me of Mr. West's belief that he owned 50% of the 3.20 Diamond and that he paid Mr. Ayvazian in full for his share.

31.    After a few calls back and forth, on or about April 19, 2006, I faxed to Mr. West a copy of the Joint Venture Agreement to show Mr. West that the Plaintiffs had a 75% ownership interest in the Joint Venture Diamonds. In return, Mr. West faxed to me the copies of two K.J.A. invoices for the Joint Venture Diamonds, dated January 26, 2005 and April 27, 2005. Attached as Exhibit F and Exhibit G, respectively, are true and correct copies of these invoices. These invoices purport to reflect L.J. West's payments to K.J.A. for Mr. West's purported 50% share of the Joint Venture Diamonds, amounting by itself to more than one million dollars ($1,000,000). Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that the profits of the sale of the Joint Venture Diamonds were approximately two million dollars ($2,000,000). Once Mr. West, on the one hand, and Mrs. Masagung and I, on the other hand, understood what the Defendants had done with respect the Joint Venture Diamonds, we began to discuss ways to collect what we were owed by the Defendants.

32.    In light of the documents that Mr. West showed me, on or about April 19, 2006, I authorized Mr. Chin to release the 3.20 Diamond to Mr. West's agents. I asked, however, that the Receipt and Bailment Note—the document evidencing this release—state that "Larry West is aware that [as spoken on the phone] according to information this stone is 75% owned by Mr.

Putra Masagung." Attached as <u>Exhibit H</u> is a true and correct copy of this Receipt and Bailment Note. Mr. Chin thereafter released the 3.20 Diamond to Mr. West's agents in Hong Kong.

33.    Neither K.J.A. nor Mr. Ayvazian disclosed this sale to Mrs. Masagung or to me. The Defendants did not pay Mrs. Masagung or me for our 75% ownership of the Joint Venture Diamonds out of the sale, as was required by the Joint Venture Agreement. Nor did the Defendants pay us our 50% share on any profits realized on the sale, as was required by the Joint Venture Agreement.

34.    In his conversations with me, Mr. West confirmed that L.J. West still had possession of the 3.20 Diamond—on information and belief, the diamond that Mr. Chin had released to Mr. West's agent. Mr. West also said that he had bought a 50% interest in the 4.53 Diamond from K.J.A. and had already re-sold it, apparently to a purchaser in Hong Kong. Mr. West also told me that a friend of Mr. West's had purchased a 25% interest in the 3.20 Diamond and that Mr. Ayvazian had kept a 25% interest. Mrs. Masagung and I do not know the identity of the purchaser of the 25% interest in the 3.20 Diamond.

35.    Immediately after my April 19, 2006 call with Mr. West, I attempted to contact Mr. Ayvazian. I was only able to reach Mr. Ayvazian by telephone a couple of weeks later. During this telephone call, I confronted Mr. Ayvazian with these newly discovered facts regarding his conduct in connection with surreptitiously selling the Joint Venture Diamonds to L.J. West. Mr. Ayvazian denied these sales. Rather, Mr. Ayvazian told me that I was mistaken, and that the 3.04 carat diamond, which Mr. Ayvazian had sold to L.J. West, was a diamond completely different from the 3.20 Diamond in which Mrs. Masagung and I held a 75% ownership interest. Mr. Ayvazian also said that the 4.53 Diamond was still in the Middle East for potential buyers. I did not believe Mr. Ayvazian and told him that if that was in fact the case,

he was to immediately ship the 3.20 Diamond to Mr. Chin in Hong Kong and the 4.53 Diamond from the Middle East to me. Mr. Ayvazian assured me that he would do so.

36.    Mr. Ayvazian never shipped the Joint Venture Diamonds per my instructions. Instead, in a telephone call a few days later, Mr. Ayvazian admitted to me that he had sold the Joint Venture Diamonds to L.J. West in early 2005.

37.    On or about May 5, 2006, my attorneys wrote to Mr. Ayvazian and to K.J.A., informing them of Mrs. Masagung's and my recent discovery that K.J.A. had sold the two Joint Venture Diamonds. Mrs. Masagung and I demanded to receive the Joint Venture Diamonds, or payment in full for their value, by May 15, 2006.

38.    Over the next few months, the Plaintiffs and the Defendants then began discussing possible ways to resolve the dispute over the sale proceeds of the Joint Venture Diamonds. Mr. Ayvazian was again often unavailable during these months. Throughout this process, however, the Defendants consistently and repeatedly admitted responsibility for their misconduct. For example, in a signed fax dated June 21, 2006, Mr. Ayvazian assured Mrs. Masagung and me, "I assure you, you will know everything and will receive your share of the partnerships!" As another example, in a signed fax dated August 23, 2006, Mr. Ayvazian made the following admission to Mrs. Masagung and to me: "Dear Putra & Imelda – Do not know where to start. . . but to apologize. . . specifically the trust part. Never, never, never, did I mean to take advantage. . . friendshipwise or businesswise. I made a big mistake and I am paying for it. . . I assure you that your share of profit will be paid A.S.A.P.!" A true and correct copy of this August 23, 2006 fax is attached as Exhibit I.

39.    On or about September 6 and 7, 2006, Mrs. Masagung, Mr. Ayvazian and I met in New York to continue discussing possible resolution scenarios. At that meeting, the Defendants

further admitted to their misconduct and stated to Mrs. Masagung and me their calculation of what they owed us. On K.J.A. letterhead dated September 7, 2006 memorializing these discussions (the "September 7, 2006 Writing"), Mr. Ayvazian valued the profit of the sales of the Joint Venture Diamonds at two million dollars ($2,000,000). The September 7, 2006 Writing also reflects that Mrs. Masagung's and my share of the profits, as provided by the Joint Venture Agreement, is one million dollars ($1,000,000), to be added to the $750,000 owed to Plaintiffs to reimburse their initial investment in the joint venture. Thus, Mr. Ayvazian expressly admitted, "Therefore, Kevo Ayvazian owe [sic] Putra [Masagung] amount of $1,750,000." A true and correct copy of the September 7, 2006 Writing is attached as Exhibit J.

40.    As a further admission of the debt they owed to the Plaintiffs, the Defendants informed L.J. West through the September 7, 2006 Writing that they had sold or transferred their remaining 25% ownership share of the 3.20 Diamond to me. This gave me the right to collect directly this 25% ownership share (in addition to my original 75% ownership share) of the whole sale of the 3.20 Diamond. Mrs. Masagung and I are informed and believe that this 25% ownership share of the 3.20 Diamond is worth approximately $400,000. This $400,000 amount was deducted from the Defendants' debt of $1,750,000, meaning that the Defendants now owed Mrs. Masagung and me at total of $1,350,000. Mr. Ayvazian signed the September 7, 2006 Writing in his office at K.J.A. in my presence and in the presence of Mrs. Masagung.

41.    Also on September 7, 2006, Mrs. Masagung purchased a diamond, unrelated to the Joint Venture Diamonds, from K.J.A., worth $25,000. Attached as Exhibit K is a true and correct copy of a fax dated December 1, 2006, the first page of which is the invoice for this purchase. Rather than paying for this diamond in cash, Mrs. Masagung and I agreed with the Defendants that the value of the diamond ($25,000) would be deducted from the Defendants'

debt owed to us ($1,350,000). As a result, the Defendants owed Mrs. Masagung and me a total of $1,325,000. This calculation is reflected on page 2 of Exhibit K, which is a true and correct copy of a fax dated December 1, 2006 and signed by Mr. Ayvazian.

42.    Also on September 7, 2006, immediately following this meeting with Mr. Ayvazian, Mr. Ayvazian, Mrs. Masagung and I together went to L.J. West's office in New York to meet with Mr. West. At this meeting, Mr. Ayvazian presented Mr. West with a copy of the September 7, 2006 Writing and informed him that Mrs. Masagung and I now owned a 100% interest in the 3.20 Diamond. Pursuant to the September 7, 2006 Writing, Mr. Ayvazian authorized Mr. West to transfer his 25% interest in the 3.20 Diamond to me. Mr. Ayvazian also surrendered the September 21, 2005 GIA certificate for the 3.20 Diamond (as re-cut) to Mr. West, and I kept a copy. Attached as Exhibit L is a true and correct copy of this GIA certificate. At that time, I also saw the 3.20 Diamond in Mr. West's office.

43.    After the two meetings in September 2006, the Defendants continued to admit responsibility for their secretive sale of the Joint Venture Diamonds without providing Mrs. Masagung and me our agreed-upon share of the profits. The Defendants also continued to express their desire to make Mrs. Masagung and me whole. Because the Defendants said that they did not have enough liquid assets to pay off their debt to us, however, Mr. Ayvazian offered to consign his inventory of unrelated diamonds to L.J. West and to use the sale proceeds to pay down the Defendants' debt to us. Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that the value of this inventory was more than two million dollars ($2,000,000.00).

44.    Mrs. Masagung and I are further informed and believe and, on the basis of such information and belief, alleged in the complaint that these other, unrelated diamonds were

consigned to L.J. West by K.J.A., and were in L.J. West's possession. Mr. Ayvazian confirmed this arrangement in writing several times, including in a signed fax dated October 30, 2006. Attached as Exhibit M is a true and correct copy of this October 30, 2006 fax.

45.    In a fax dated September 13, 2006, Mr. Ayvazian further confirmed this arrangement by telling me that he would send a letter to Mr. West to instruct him to return the balance of the unsold inventory to me. Attached as Exhibit N is a true and correct copy of this September 13, 2006 fax. Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that Mr. Ayvazian never sent such a letter to Mr. West.

46.    Mrs. Masagung and I are also informed and believe and, on the basis of such information and belief, alleged in the complaint that L.J. West did sell certain diamonds in K.J.A.'s inventory and collect the sale proceeds therefrom. Mrs. Masagung and I are also informed and believe that K.J.A. owed L.J. West approximately $800,000 from an unrelated transaction between those two entities. Mrs. Masagung and I are further informed and believe that after L.J. West sold enough diamonds from K.J.A.'s inventory to satisfy this $800,000 debt, L.J. West returned the balance of K.J.A.'s inventory to Mr. Ayvazian.

47.    By early 2007, however, Mrs. Masagung and I had still not recovered any money in payment of the debt owed to us by the Defendants. Mr. Ayvazian, meanwhile, was still promising to pay us the proceeds of his sale of the other diamonds and jewelry in K.J.A.'s inventory.

48.    Over the ensuing months, Mrs. Masagung and I continued to entertain possible resolution of the instant dispute without resort to litigation. To this end, in or around February 2007, our attorneys drafted a first draft of a Debt Workout Agreement (the "Draft Debt Workout

Agreement"). The Draft Debt Workout Agreement contemplated that the Defendants would use the proceeds of the sale of certain diamonds and other jewelry and stones owned by the Defendants—and unrelated to the Joint Venture Diamonds—as collateral to effect payment in part or in full of the debt owed by the Defendants to Mrs. Masagung and me, with interest of 8% per annum beginning on September 7, 2006. The Draft Debt Workout Agreement also provided that the Defendants agreed to execute and a deliver to Mrs. Masagung and me a Confession of Judgment.

49.     In or around May 2007, Mr. Ayvazian's lawyer suggested revisions to the Draft Debt Workout Agreement that would have essentially negated much of the purpose of the Draft Debt Workout Agreement. My attorneys objected to these changes and indicated that they were unacceptable. Mr. Ayvazian then involved his advisor, who also reviewed the Draft Debt Workout Agreement. The process of further revisions to the Draft Debt Workout Agreement lasted until November 2007.

50.     Meanwhile, Mr. Ayvazian was continuing to promise to Mrs. Masagung and me to make us whole. In a signed fax dated May 10, 2007, for example, Mr. Ayvazian wrote: "I, Kevo J. Ayvazian, promise Mr. & Mrs. Masagung . . . $50K. - $100K. to reduce the balance due" by the end of May 2007. Attached as <u>Exhibit O</u> is a true and correct copy of this May 10, 2007 fax. Contrary to his promise, Mr. Ayvazian never paid Plaintiffs this money.

51.     On or around November 8, 2007, I met with Mr. Ayvazian in Singapore. At that meeting, Mr. Ayvazian again admitted to the Defendants' debt to Mrs. Masagung and me arising out of the Joint Venture Agreement and stated that he would pay off this debt.

52.     On or around November 26, 2007, my attorneys circulated to the Defendants a final draft of the Draft Debt Workout Agreement. Attached as <u>Exhibit P</u> is a true and correct

copy of the Draft Debt Workout Agreement.  Despite the Defendants' continuous assurances that they would sign the Draft Debt Workout Agreement, however, the Defendants backed out and refused to sign the Draft Debt Workout Agreement.

53.    All of our other options exhausted, and having spent almost two years on Mr. Ayvazian's unfulfilled promises to pay off the debt, Mrs. Masagung and I had no choice but to file this action.

54.    This action seeks judgment against Mr. Ayvazian and K.J.A., jointly and severally, for the liquidated amount of $1,325,000, plus interest at 9% (the New York statutory rate) from the latest possible date, *i.e.* April 27, 2005, plus attorney fees and costs totaling $79,982.60, for a total as of June 30, 2008 of $1,777,880.10, which is justly due and owing.

55.    No part of the judgment sought has been paid.  As reflected above, the $1,325,000 amount is based upon the provisions of the Joint Venture Agreement, Mr. Ayvazian's signed admissions of Defendants' debt to Plaintiffs, and is calculated as follows:

    $750,000.00 – initial investment by Plaintiffs in joint venture

\+  $1,000,000.00 – 50% of sale proceeds of the Joint Venture Diamonds ($2,000,000.00)

– $400,000 – value of 25% of 3.20 Diamond, signed over by Defendants to Plaintiffs on September 7, 2006

– $25,000 – value of unrelated diamond sold by K.J.A. to Mrs. Masagung on September 7, 2006

_____

TOTAL: $1,325,000.00

The Defendants explained and admitted to this calculation and amount, as reflected in Exhibit J and Exhibit K.

56.    The disbursements sought to be taxed have been made in this action or will necessarily be made herein.

57.    The Defendants have been provided with reasonable notice in accordance with the Court's Default Judgment Procedures.  In particular, a copy of this Application for Default Judgment was served upon K.J.A. by mailing the same by first-class mail to K.J.A.'s business address at 580 Fifth Avenue, Suite 2002, New York, New York 10036.  Similarly, a copy of this Application for Default Judgment was served upon Mr. Ayvazian by mailing the same to him by first class mail at his business address of 580 Fifth Avenue, Suite 2002, New York, New York 10036 and at his last known address of 321 Grant Avenue, Cresskill, NJ 07626-1203.  Attached as Exhibit Q is a proof of such service.

WHEREFORE, Plaintiffs request the entry of Default and the entry of the annexed Judgment against Defendants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2008.

_____
Putra Masagung

Sworn to before me this 15
Day of July, 2008.

_____
Notary Public

CARLY DONNELLAN
Commission # 1641488
Notary Public - California
Los Angeles County
My Comm. Expires Jan 28, 2010

**'08 CIV 4049**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PUTRA MASAGUNG and IMELDA
MASAGUNG,

                    Plaintiffs,

           -against-

KEVO-JEAN AYVAZIAN and K.J.A.
DIAMONDS INT'L CORP.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NO. _____

**COMPLAINT**

Plaintiffs Putra Masagung ("Mr. Masagung") and Imelda Masagung ("Mrs. Masagung")

(collectively, "Plaintiffs"), by and through their undersigned counsel, for their complaint against

defendants Kevo-Jean Ayvazian ("Mr. Ayvazian") and K.J.A. Diamonds Int'l Corp. ("K.J.A.")

(collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

    1.     This is an action for breach of contract, breach of fiduciary duty, conversion, and

related claims involving Defendants' breach of a joint venture agreement between Plaintiffs and

Defendants relating to the sale of certain diamonds. As a result of Defendants' misconduct in

connection with these diamonds, Plaintiffs have suffered damages.

## JURISDICTION AND VENUE

    2.     This Court has original jurisdiction over the subject matter of the claims asserted

herein pursuant to 28 U.S.C. §1332 because there is diversity of the parties and the amount in

controversy exceeds $75,000.

3.     Venue is proper in this judicial district under 28 U.S.C. §§1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this district, K.J.A. may be found in this judicial district, Mr. Ayvazian maintains his office in this judicial district and may be found in this judicial district, and Defendants are subject to personal jurisdiction in this judicial district.

## THE PARTIES

4.     Mr. Masagung, an individual, is a citizen of Indonesia.

5.     Mrs. Masagung, an individual, is a citizen of Singapore.

6.     Kevo-Jean Ayvazian, an individual, is a citizen of New Jersey.  Mr. Ayvazian operates, and is the President of, K.J.A. Diamonds Int'l Corp.

7.     K.J.A. Diamonds Int'l Corp. is a New York corporation with its principal place of business at 580 Fifth Avenue, Suite 2002, New York, New York 10036.  K.J.A.'s business principally involves the trading of diamonds and other precious gem stones.

8.     Plaintiffs are informed and believe and, on the basis of such information and belief, allege that at all times relevant to the complaint, K.J.A. and Mr. Ayvazian and others working in concert with them, in addition to acting for themselves and on his or its own behalf individually, is and were acting as the agent, servant, employee and representative of, and with the knowledge, consent and permission of, and in conspiracy with the other Defendants and within the course, scope and authority of that agency, service, employment, representation and conspiracy.  Plaintiffs further allege on information and belief that the acts of each of the Defendants were fully ratified by the other Defendants.  Specifically, and without limitation, Plaintiffs allege, on information and belief, that the actions, failures to act, breaches, and misrepresentations alleged herein and attributed to one or more of the specific Defendants were

approved, ratified, and done with the cooperation and knowledge of each and all of the Defendants.

9.    Plaintiffs are informed and believe and, on the basis of such information and belief, allege that at all times relevant to the complaint, K.J.A. was and is so controlled, used and managed that it was and is, in effect, the alter ego of Mr. Ayvazian such that it would be appropriate to pierce the corporate veil and hold Mr. Ayvazian liable for K.J.A.'s conduct.

10.    Plaintiffs are informed and believe and, on the basis of such information and belief, allege that individuals and/or entities other than the named Defendants participated and engaged in the wrongful conduct set forth in this complaint. Plaintiffs thus reserve the right to amend this complaint to add these additional defendants when their identities are discovered and their wrongful conduct becomes known.

## FACTUAL BACKGROUND

11.    At the time of the events described in this Complaint, neither Mr. Masagung nor Mrs. Masagung had any experience in purchasing rough diamonds for resale in a business context. In or around October 2003, the Plaintiffs and Defendants began discussing the possibility of entering into an agreement to purchase two rough diamonds and, after cutting and polishing them, sell them for a profit. In a fax dated October 21, 2003, Mr. Ayvazian made certain promises regarding the purchase of these two rough diamonds, including the promise to keep the Plaintiffs informed at every step of the cutting and polishing process. Because of their inexperience in the rough diamonds industry, Plaintiffs reduced the agreement to writing. On or about October 31, 2003, Mr. Masagung and Mrs. Masagung, on the one hand, and Mr. Ayvazian and K.J.A., on the other hand, formalized their agreement by entering into a joint venture agreement (the "Joint Venture Agreement"). (Exhibit 1.)

## THE TERMS OF THE JOINT VENTURE AGREEMENT

12.     Pursuant to the terms of the Joint Venture Agreement, Plaintiffs contributed seven

hundred and fifty thousand dollars ($750,000) as an initial investment towards the purchase of

two (2) rough uncut diamonds with a total weight of 9.60 carats, which at the time were priced at

one million dollars ($1,000,000).  Plaintiffs provided this initial investment via a wire transfer

shortly after the Joint Venture Agreement was signed.  Shortly after Plaintiffs wired their initial

investment, Defendants informed Plaintiffs that they also had provided their initial investment of

approximately $250,000 as contemplated by the Joint Venture Agreement.  As a result, Plaintiffs

were led to believe that their initial investment of $750,000 and Defendants' initial investment of

$250,000 were used in their entirety to purchase the two rough uncut diamonds from a diamond

dealer in Brazil.

13.     As consideration for Plaintiffs' investment of $750,000 and other valuable

consideration given to K.J.A. and Mr. Ayvazian, K.J.A. and Mr. Ayvazian jointly and severally

made certain "continuous warranties and guarantees" to Plaintiffs.  One of these warranties and

guarantees was that the two rough uncut diamonds at issue were "fancy green" and "blue green"

of natural color with "good valid clear legal and equitable title."  Defendants also warranted in

the Joint Venture Agreement that they would complete the cutting and polishing process for

these two diamonds within one year and that Defendants, at all times and under all

circumstances, would "hold these 2 diamonds on Trust for Mr. Ayvazian, K.J.A. Diamonds and

Mr. & Mrs. Masagung in the proportion of their contribution."  Based on their initial

contribution, Mr. Masagung and Mrs. Masagung are owners of 75% of the two diamonds yielded

by the cutting and polishing process (the "Joint Venture Diamonds").

14.     Pursuant to the Joint Venture Agreement, Defendants were required to sell both

Joint Venture Diamonds within six (6) months after they were cut and polished, unless the

Plaintiffs agreed in writing to defer such sale. Plaintiffs and Defendants also agreed that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion:

       a.     First, Mr. Masagung and Mrs. Masagung would receive $750,000, representing the value of their initial investment into the joint venture with Defendants;

       b.     Second, K.J.A. and Mr. Ayvazian would receive $250,000, representing the value of their initial investment into the joint venture with Plaintiffs;

       c.     Third, any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, *i.e.*, any remaining profits, would be distributed equally—fifty percent (50%) to Mr. Ayvazian and K.J.A., and fifty percent (50%) to Mr. Masagung and Mrs. Masagung.

15.     The Joint Venture Agreement also contained an indemnity provision, whereby Mr. Ayvazian and K.J.A. Diamonds agreed to "jointly and severally indemnify and keep indemnified Mr. & Mrs. Masagung at all times against any loss they may suffer whatsoever and however arising from this venture." According to the terms of the Joint Venture Agreement, Plaintiffs expected a return on their investment by the spring of 2005.

### PROCESSING OF THE TWO DIAMONDS CONSISTENT WITH THE JOINT VENTURE AGREEMENT

16.     Plaintiffs are informed and believe and, on the basis of such information and belief, allege that in the year following the execution of the Joint Venture Agreement, Defendants obtained, using both Plaintiffs' and Defendants' initial investment, the two diamonds contemplated by the Joint Venture Agreement. Defendants subsequently performed and completed the cutting and polishing process of these Joint Venture Diamonds, which the Joint Venture Agreement also contemplated and required. This cutting and polishing process resulted

in the two Joint Venture Diamonds—being (a) one 4.53 carat fancy intense green diamond (the "4.53 Diamond") and (b) one 3.20 carat fancy intense green diamond (the "3.20 Diamond"). Both Joint Venture Diamonds were subsequently certified by the Gemological Institute of America ("GIA").

17.     During the cutting and polishing process, which lasted about one year, Mr. Masagung traveled to New York to see Mr. Ayvazian two or three times. Mr. Ayvazian showed the Joint Venture Diamonds to Mr. Masagung at his office in New York. In one of these trips, Mr. Masagung met with a GIA representative at Mr. Ayvazian's office. Mr. Ayvazian provided to the GIA representative the necessary paperwork to secure certification. Plaintiffs were comfortable that everything was going according to the Joint Venture Agreement during this time.

18.     When the Joint Venture Diamonds were finished, Mr. Ayvazian traveled to Northern California two times to meet with Mr. Masagung and show them to him. Mr. Ayvazian also showed the GIA certificates for the Joint Venture Diamonds. At the same time, Mr. Ayvazian showed numerous diamonds unrelated to the Joint Venture Diamonds to Mr. Masagung. Plaintiffs were satisfied that, at this time, everything was still proceeding as agreed to in the Joint Venture Agreement.

### MR. AYVAZIAN'S EFFORTS TO SELL THE JOINT VENTURE DIAMONDS AND EXCUSES FOR HIS FAILURE TO SELL

19.     Plaintiffs trusted and relied on Mr. Ayvazian's knowledge of the industry to determine the appropriate sale price of the Joint Venture Diamonds. In the six-month period after the Joint Venture Diamonds were cut and polished, about the spring of 2005, Plaintiffs repeatedly requested that Defendants advise them of the status of the efforts to sell the Joint

Venture Diamonds. Because Mr. Ayvazian rarely returned Plaintiffs' numerous telephone calls, Mr. Masagung would call Mr. Ayvazian's wife and/or mother. During this time, Defendants consistently delayed in responding to Plaintiffs. When Plaintiffs finally spoke with Mr. Ayvazian, he provided excuses about why the Joint Venture Diamonds had not been sold. For example, Mr. Ayvazian repeatedly told Plaintiffs that he was busy and so could not sell the diamonds. Mr. Ayvazian also told Plaintiffs that he was trying to sell the Joint Venture Diamonds in the Middle East because he believed that the Middle East was a better market for green diamonds.

20.     On or around February 24, 2005, Mr. Ayvazian informed Mr. Masagung that the 3.20 Diamond would be re-cut for more brilliance. After being re-cut, the 3.20 Diamond actually weighed 3.04 carats. This 3.04 carat diamond was certified by the GIA on September 21, 2005 in GIA Report 14577678.[1]

21.     Mr. Masagung was disappointed that it was taking so much time to sell the Joint Venture Diamonds. For that reason, Mr. Masagung traveled to New York to see Mr. Ayvazian in the spring of 2005. Mr. Masagung was unable to see the Joint Venture Diamonds during these visits because Mr. Ayvazian said that they were in Dubai, in the United Arab Emirates, so that they could be shown to potential buyers. Mr. Ayvazian even told Mr. Masagung that someone had offered $400,000 per carat for one of the two Joint Venture Diamonds, but that Mr. Ayvazian believed that he could negotiate a sale price of over $500,000 per carat. This discussion reassured Mr. Masagung that everything was still going according to the Joint Venture Agreement.

---

[1]     For clarity, all future references to the "3.20 Diamond" refer to the 3.04 carat diamond, as re-cut.

22.    A few months after Mr. Masagung's visit to New York, Mr. Ayvazian again met with Mr. Masagung in Northern California. During this visit, Mr. Ayvazian showed Mr. Masagung the 3.20 Diamond and continued to say that he was still trying to sell it. Mr. Masagung told Mr. Ayvazian that he wanted the 3.20 Diamond so that he could try to help Mr. Ayvazian sell it in Asia. Mr. Ayvazian told Mr. Masagung that he could still sell the 3.20 Diamond, and that he would continue to show it to buyers in the Middle East, as he would the 4.53 Diamond. Mr. Ayvazian also said that he believed he could extract a higher price per carat from these potential buyers in the Middle East.

23.    Mr. Masagung disagreed and instructed Mr. Ayvazian to sell the Joint Venture Diamonds at the price offered by the potential purchasers. Mr. Ayvazian said he understood and would do so. A few days later, when Mr. Masagung contacted Mr. Ayvazian to inquire about the status of the sale, Mr. Ayvazian informed Mr. Masagung that the purchaser was no longer interested and, as a result, no sale had been made. Mr. Ayvazian then told Mr. Masagung that he had another potential purchaser for the Joint Venture Diamonds. In the following weeks, this process repeated itself several times: Mr. Ayvazian would tell Mr. Masagung about a potential purchaser, Mr. Masagung would approve the sale on the asked-for price, and Mr. Ayvazian would then report to Mr. Masagung that he had lost the purchaser but that he had lined up another one.

24.    Fearing that the Joint Venture Diamonds were becoming unsellable, Plaintiffs on multiple occasions requested that the Joint Venture Diamonds be auctioned by a reputable auction house, such as Christie's or Sotheby's. Mr. Ayvazian responded that this was not a good idea because if they did not sell in an auction house, this fact would become known to the industry and make any future sale impossible. Mr. Ayvazian, however, continued to provide

8

further assurances that he would be able to sell the Joint Venture Diamonds. In light of Mr.

Ayvazian's assurances and experience in the industry, Mr. Masagung reluctantly agreed not to

put the Joint Venture Diamonds in an auction house.

25.     Their patience wearing thin, however, Plaintiffs gave Defendants an ultimatum,

telling Mr. Ayvazian that he had until January 2006 to sell the Joint Venture Diamonds.

Plaintiffs informed Defendants that they would try to sell the diamonds on their own if

Defendants could not sell them by January 2006.

## SHIPMENT OF THE 3.20 DIAMOND TO HONG KONG

26.     In or around March 2006, after yet further delay by Defendants in selling the Joint

Venture Diamonds, Plaintiffs attempted to contact Mr. Ayvazian. Plaintiffs were only able to

reach Mr. Ayvazian after they called his mother and apprised her that Mr. Ayvazian was not

returning their calls. When he spoke to Mr. Masagung, Mr. Ayvazian repeated the same excuse

he had been providing—that he had a potential buyer looking at the Joint Venture Diamonds but

that he thought he could obtain a little bit more in terms of the selling price per carat. At that

point, Plaintiffs instructed Mr. Ayvazian to ship both of the Joint Venture Diamonds to Edmond

Chin ("Mr. Chin") in Hong Kong for inspection and possible sale. Mr. Chin is a highly reputable

jeweler. Plaintiffs believed that if Mr. Chin could not sell the Joint Venture Diamonds, then they

should go to an auction. Mr. Ayvazian responded that he could not ship the 4.53 Diamond

because it was still tied up in negotiations with potential purchasers in the Middle East. Mr.

Ayvazian did agree, though, to ship the 3.20 Diamond to Mr. Chin.

27.     Mr. Ayvazian sent the 3.20 Diamond from K.J.A. to Mr. Chin via courier.

Plaintiffs are informed and believe and, on the basis of such information and belief, allege that

Mr. Chin received the diamond in late March 2006 or early April 2006. Mr. Chin then called

Mr. Masagung to let him know that he had received and reviewed the 3.20 Diamond. According to Mr. Chin's analysis, the 3.20 Diamond could be sold for somewhere in between $400,000 and $500,000 per carat.

### PLAINTIFFS LEARN FOR THE FIRST TIME THAT DEFENDANTS HAD SECRETLY SOLD THE JOINT VENTURE DIAMONDS

28.     On or about April 13, 2006, Mr. Chin telephoned Mr. Masagung and told him that someone had called him (Mr. Chin), claiming to be the owner of the 3.20 Diamond and demanding that the diamond be sent to the caller. At first, Mr. Masagung believed and assumed that Mr. Ayvazian was the caller, since he owned 25% of the 3.20 Diamond under the terms of the Joint Venture Agreement, and instructed Mr. Chin not to release the 3.20 Diamond.

29.     Later that same day, Mr. Chin called back the caller and related Mr. Masagung's instructions to the caller. At that point, Mr. Chin realized that the caller was Larry West ("Mr. West"). Plaintiffs are informed and believe and, on the basis of such information and belief, allege that Mr. West operates L.J. West Diamonds, Inc. ("L.J. West"), a New York corporation. Mr. West told Mr. Chin that he had purchased a fifty percent (50%) interest in the 3.20 Diamond from K.J.A. and Mr. Ayvazian. Mr. Chin responded that he believed that Mr. Masagung was the 75% owner of the 3.20 Diamond.

30.     To resolve this apparent confusion regarding the ownership of the 3.20 Diamond, L.J. West then sent to Mr. Chin on April 13, 2006 the "memorandum" for the diamond—a document purporting to establish that the diamond had been consigned or entrusted to L.J. West.

31.     As a result, late on April 13, 2006, Mr. Chin called Mr. Masagung to report the substance of his conversations with Mr. West. Mr. Chin also told Mr. Masagung that Mr. West's agents threatened to call the Hong Kong authorities if he refused to release the diamond. Mr.

Chin told Mr. Masagung that he felt he had no choice but to release the 3.20 Diamond to L.J. West's agents in Hong Kong. Mr. Chin also gave Mr. Masagung Mr. West's telephone number and asked Mr. Masagung to call Mr. West immediately.

32.     Mr. Masagung did so. At that time, Plaintiffs first learned that K.J.A. had sold an interest in the Joint Venture Diamonds to L.J. West. Plaintiffs did not have any reason to suspect, before Mr. Masagung's conversation with Mr. West, that Defendants had surreptitiously sold the Joint Venture Diamonds. In particular, during the telephone conversation, Mr. West informed Mr. Masagung of Mr. West's belief that he owned 50% of the 3.20 Diamond and that he paid Mr. Ayvazian in full for his share.

33.     After a few calls back and forth, on or about April 19, 2006, Mr. Masagung faxed to Mr. West a copy of the Joint Venture Agreement to show Mr. West that Plaintiffs had a 75% ownership interest in the Joint Venture Diamonds. In return, Mr. West faxed to Mr. Masagung the copies of two K.J.A. invoices for the Joint Venture Diamonds, dated January 26, 2005 and April 27, 2005. (Exhibits 2 and 3.) These invoices purport to reflect L.J. West's payments to K.J.A. for Mr. West's purported 50% share of the Joint Venture Diamonds, amounting by itself to more than one million dollars ($1,000,000). Plaintiffs are informed and believe and, on the basis of such information and belief, allege that the profits of the sale of the Joint Venture Diamonds were approximately two million dollars ($2,000,000). Once Mr. West, on the one hand, and Plaintiffs, on the other hand, understood what Defendants had done with respect the Joint Venture Diamonds, they began to discuss ways to collect what they were owed by the Defendants.

34.     In light of the documents that Mr. West showed Mr. Masagung, on or about April 19, 2006, Mr. Masagung authorized Mr. Chin to release the 3.20 Diamond to Mr. West's agents.

Mr. Masagung asked, however, that the Receipt and Bailment Note—the document evidencing this release—state that "Larry West is aware that [as spoken on the phone] according to information this stone is 75% owned by Mr. Putra Masagung." (Exhibit 4.) Mr. Chin thereafter released the 3.20 Diamond to Mr. West's agents in Hong Kong.

35.    Neither K.J.A. nor its alter ego, Mr. Ayvazian, disclosed this sale to Plaintiffs. Defendants did not pay Plaintiffs for their 75% ownership of the Joint Venture Diamonds out of the sale, as was required by the Joint Venture Agreement. Nor did Defendants pay Plaintiffs their 50% share on any profits realized on the sale, as was required by the Joint Venture Agreement.

36.    In his conversations with Mr. Masagung, Mr. West confirmed that L.J. West still had possession of the 3.20 Diamond—on information and belief, the diamond that Mr. Chin had released to Mr. West's agent. Mr. West also said that he had bought a 50% interest in the 4.53 Diamond from K.J.A. and had already re-sold it, apparently to a purchaser in Hong Kong. Mr. West also told Mr. Masagung that a friend of Mr. West's had purchased a 25% interest in the 3.20 Diamond and that Mr. Ayvazian had kept a 25% interest. Plaintiffs do not know the identity of the purchaser of the 25% interest in the 3.20 Diamond.

### MR. AYVAZIAN ADMITS TO SECRETLY SELLING THE JOINT VENTURE DIAMONDS AND REPEATEDLY PROMISES TO MAKE THE PLAINTIFFS WHOLE

37.    Immediately after Mr. Masagung's April 19, 2006 call with Mr. West, Mr. Masagung attempted to contact Mr. Ayvazian. Mr. Masagung was only able to reach Mr. Ayvazian by telephone a couple of weeks later. During this telephone call, Mr. Masagung confronted Mr. Ayvazian with these newly discovered facts regarding his conduct in connection with surreptitiously selling the Joint Venture Diamonds to L.J. West. Mr. Ayvazian denied these

sales. Rather, Mr. Ayvazian told Mr. Masagung that he was mistaken, and that the 3.04 carat

diamond, which Mr. Ayvazian had sold to L.J. West, was a diamond completely different from

the 3.20 Diamond in which Mr. Masagung held a 75% ownership interest. Mr. Ayvazian also

said that the 4.53 Diamond was still in the Middle East for potential buyers. Mr. Masagung did

not believe Mr. Ayvazian and told him that if that was in fact the case, Mr. Ayvazian was to

immediately ship the 3.20 Diamond to Mr. Chin in Hong Kong and the 4.53 Diamond from the

Middle East to Mr. Masagung. Mr. Ayvazian assured Mr. Masagung that he would do so.

38.    Mr. Ayvazian never shipped the Joint Venture Diamonds as instructed by Mr.

Masagung. Instead, in a telephone call a few days later, Mr. Ayvazian admitted to Mr.

Masagung that he had sold the Joint Venture Diamonds to L.J. West in early 2005.

39.    On or about May 5, 2006, Plaintiffs, through their counsel, wrote to Mr. Ayvazian

and to K.J.A., informing them of their recent discovery that K.J.A. had sold the two Joint

Venture Diamonds. Plaintiffs demanded to receive the Joint Venture Diamonds, or payment in

full for their value, by May 15, 2006.

40.    Over the next few months, the parties then began discussing possible ways to

resolve the dispute over the sale proceeds of the Joint Venture Diamonds. Mr. Ayvazian was

again often unavailable during these months. Throughout this process, however, Defendants

consistently and repeatedly admitted responsibility for their misconduct. For example, in a

signed fax dated June 21, 2006, Mr. Ayvazian assured the Plaintiffs, "I assure you, you will

know everything and will receive your share of the partnerships!" As another example, in a

signed fax dated August 23, 2006, Mr. Ayvazian made the following admission to the Plaintiffs:

"Dear Putra & Imelda – Do not know where to start. . . but to apologize. . . specifically the trust

part. Never, never, never, did I mean to take advantage. . . friendshipwise or businesswise. I

made a big mistake and I am paying for it. . . I assure you that your share of profit will be paid A.S.A.P.!" (Exhibit 5.)

### MR. AYVAZIAN ADMITS IN WRITING TO HAVING SECRETLY SOLD THE JOINT VENTURE DIAMONDS TO L.J. WEST

41.    On or about September 6 and 7, 2006, Plaintiffs and Defendants met in New York to continue discussing possible resolution scenarios.  At that meeting, Defendants further admitted to their misconduct and stated to Plaintiffs the Defendants' calculation of what they owed to Plaintiffs.  On K.J.A. letterhead dated September 7, 2006 memorializing these discussions (the "September 7, 2006 Writing"), Mr. Ayvazian valued the profit of the sales of the Joint Venture Diamonds at two million dollars ($2,000,000).  The September 7, 2006 Writing also reflects that Plaintiffs' share of the profits, as provided by the Joint Venture Agreement, is one million dollars ($1,000,000), to be added to the $750,000 owed to Plaintiffs to reimburse their initial investment in the joint venture.  Thus, Mr. Ayvazian expressly admitted, "Therefore, Kevo Ayvazian owe [sic] Putra [Masagung] amount of $1,750,000." (Exhibit 6.)

42.    As a further admission of the debt they owed to Plaintiffs, Defendants informed L.J. West through the September 7, 2006 Writing that they had sold or transferred their remaining 25% ownership share of the 3.20 Diamond to Mr. Masagung.  This gave Mr. Masagung the right to collect directly this 25% ownership share (in addition to Mr. Masagung's original 75% ownership share) of the whole sale of the 3.20 Diamond.  Mr. Ayvazian signed the September 7, 2006 Writing in his office in the presence of both Mr. Masagung and Mrs. Masagung.

43.    Also on September 7, 2006, immediately following this meeting with Mr. Ayvazian, Mr. Ayvazian, Mr. Masagung and Mrs. Masagung together went to L.J. West's office

in New York to meet with Mr. West. At this meeting, Mr. Ayvazian presented Mr. West with a

copy of the September 7, 2006 Writing and informed him that Plaintiffs now owned a 100%

interest in the 3.20 Diamond. Pursuant to the September 7, 2006 Writing, Mr. Ayvazian

authorized Mr. West to transfer his 25% interest in the 3.20 Diamond to Mr. Masagung. Mr.

Ayvazian also surrendered the September 21, 2005 GIA certificate for the 3.20 Diamond (as re-

cut) to Mr. West, and Mr. Masagung kept a copy. At that time, Mr. Masagung also saw the 3.20

Diamond in Mr. West's office.

### MR. AYVAZIAN OFFERS VARIOUS DIAMONDS TO REPAY THE DEFENDANTS' DEBT TO PLAINTIFFS PURSUANT TO THE JOINT VENTURE AGREEMENT

44.     After the two meetings in September 2006, Defendants continued to admit

responsibility for their secretive sale of the Joint Venture Diamonds without providing Plaintiffs

their agreed-upon share of the profits. Defendants also continued to express their desire to make

Plaintiffs whole. Because Defendants said they did not have enough liquid assets to pay off their

debt to Plaintiffs, however, Mr. Ayvazian offered to consign his inventory of unrelated diamonds

to L.J. West and to use the sale proceeds to pay down Defendants' debt to Plaintiffs. Plaintiffs

are informed and believe and, on the basis of such information and belief, allege that the value of

this inventory was more than two million dollars.

45.     Plaintiffs are informed and believe and, on the basis of such information and

belief, allege that these other, unrelated diamonds were consigned to L.J. West by K.J.A., and

were in L.J. West's possession. Mr. Ayvazian confirmed this arrangement in writing several

times, including in a signed fax dated October 30, 2006. In a fax dated September 13, 2006, Mr.

Ayvazian further confirmed this arrangement by telling Mr. Masagung that he would send a

letter to Mr. West to instruct him to return the balance of the unsold inventory to Mr. Masagung.

Plaintiffs are informed and believe, and on the basis of such information and belief allege, that Mr. Ayvazian never sent such a letter to Mr. West.

46.     Plaintiffs are informed and believe, and on the basis of such information and belief allege, that L.J. West did sell certain diamonds in K.J.A.'s inventory and collect the sale proceeds therefrom.  Plaintiffs also allege on information and belief that K.J.A. owed L.J. West approximately $800,000 from an unrelated transaction between those two entities.  Plaintiffs further allege on information and belief that after L.J. West sold enough diamonds from K.J.A.'s inventory to satisfy this $800,000 debt, L.J. West returned the balance of K.J.A.'s inventory to Mr. Ayvazian.

47.     By early 2007, however, Plaintiffs had still not recovered any money in payment of the debt owed them by Defendants.  Mr. Ayvazian, meanwhile, was still promising to pay to Plaintiffs the proceeds of his sale of the other diamonds and jewelry in K.J.A.'s inventory.

48.     Over the ensuing months, Plaintiffs continued to entertain possible resolution of the instant dispute without resort to litigation.  To this end, in or around February 2007, Plaintiffs' counsel drafted a first draft of a Debt Workout Agreement (the "Draft Debt Workout Agreement").  The Draft Debt Workout Agreement contemplated that Defendants would use the proceeds of the sale of certain diamonds and other jewelry and stones owned by the Defendants—and unrelated to the Joint Venture Diamonds—as collateral to effect payment in part or in full of the $1,750,000 debt owed by Defendants to Plaintiffs, with interest of 8% per annum beginning on September 7, 2006.  The Draft Debt Workout Agreement also provided that Defendants agreed to execute and a deliver to Plaintiffs a Confession of Judgment.

49.     In or around May 2007, Mr. Ayvazian's lawyer suggested revisions to the Draft Debt Workout Agreement that essentially negated much of the purpose of the Draft Debt

Workout Agreement. Plaintiffs' counsel objected to these changes and indicated that they were unacceptable. Mr. Ayvazian then involved his advisor, who also reviewed the Draft Debt Workout Agreement. The process of further revisions to the Draft Debt Workout Agreement lasted until November 2007.

50.     Meanwhile, Mr. Ayvazian was continuing to promise to Plaintiffs to make them whole. In a signed fax dated May 10, 2007, for example, Mr. Ayvazian wrote: "I, Kevo J. Ayvazian, promise Mr. & Mrs. Masagung . . . $50K. - $100K. to reduce the balance due" by the end of May 2007. Contrary to his promise, Mr. Ayvazian never paid Plaintiffs this money.

51.     On or around November 8, 2007, Mr. Masagung met with Mr. Ayvazian in Singapore. At that meeting, Mr. Ayvazian again admitted Defendants' debt to Plaintiffs arising out of the Joint Venture Agreement and stated that he would pay off this debt.

52.     On or around November 26, 2007, Plaintiffs circulated to Defendants a final draft of the Draft Debt Workout Agreement. Despite Defendants' continuous assurances that they would sign the Draft Debt Workout Agreement, however, Defendants backed out and refused to sign the Draft Debt Workout Agreement.

53.     All other options exhausted, and having spent almost two years on Mr. Ayvazian's unfulfilled promises to pay off the debt, Plaintiffs had no choice but to file this action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

### (Against K.J.A. and Mr. Ayvazian)

54.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 53 above as though set forth in full here.

55.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

56.     Pursuant to the Joint Venture Agreement, Defendants promised to "hold these 2 diamonds on Trust for Mr. Ayvazian, K.J.A. Diamonds and Mr. & Mrs. Masagung in the proportion of their contribution."

57.     Also pursuant to the Joint Venture Agreement, Plaintiffs and Defendants agreed that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion: (i) Mr. Masagung and Mrs. Masagung receive $750,000, representing the value of their initial investment into the joint venture with the Defendants; (ii) K.J.A. and Mr. Ayvazian receive $250,000, representing the value of their initial investment into the joint venture with Plaintiffs; and (iii) any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, i.e., any remaining profits, would be distributed equally—50% to Mr. Ayvazian and K.J.A., and 50% to Mr. Masagung and Mrs. Masagung.

58.     Plaintiffs complied with all of their obligations under the Joint Venture Agreement.

59.     Defendants have breached the Joint Venture Agreement by selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs from the sale

proceeds what they were owed under the Joint Venture Agreement, including without limitation the value of Plaintiffs' initial $750,000 investment and 50% of any profits.

60.    Defendants' breach of the Joint Venture Agreement has damaged Plaintiffs in an amount to be determined at trial, but reasonably believed to be not less than $1,750,000.

61.    The Joint Venture Agreement also contained an indemnity provision, whereby Defendants agreed to jointly and severally indemnify and keep indemnified Plaintiffs "at all times against any loss they may suffer whatsoever and however arising from this venture." As a result of the Defendants' breach, therefore, Plaintiffs are also entitled to consequential damages and attorney's fees.

## SECOND CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing

### (Against K.J.A. and Mr. Ayvazian)

62.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 61 above as though set forth in full here.

63.    On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

64.    Implied in the Joint Venture Agreement, as in all contracts, is a covenant of good faith and fair dealing in the course of performance.  The duties of good faith and fair dealing encompass any promises that a reasonable person in the position of the promisee would be justified in understanding were included.

65.    Under this duty of good faith and fair dealing, K.J.A. and Mr. Ayvazian were obliged not to do anything that would result in destroying or injuring Plaintiffs' right to receive the benefits of the Joint Venture Agreement.

66.    K.J.A. and Mr. Ayvazian breached the covenant of good faith and fair dealing by, among other things, (i) repeatedly misrepresenting to Plaintiffs that the Joint Venture Diamonds had not been sold when they in fact had been sold; (ii) secretly selling the Joint Venture Diamonds without notifying Plaintiffs or paying them what was owed them under the Joint Venture Agreement; (iii) representing to third-party purchasers of the Joint Venture Diamonds, such as L.J. West or Mr. West, that K.J.A. possessed full and clear title to the Joint Venture Diamonds; and (iv) refusing, as agreed in the Joint Venture Agreement, to take steps to indemnify Plaintiffs for any loss arising from the Joint Venture Agreement, including but not limited to refusing to execute the Draft Debt Workout Agreement despite acknowledging their debt to Plaintiffs.

67.    By reason of the foregoing breach of the covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be determined at trial, but reasonably believed to be not less than $1,750,000.

### THIRD CLAIM FOR RELIEF

#### Conversion

#### (Against K.J.A. and Mr. Ayvazian)

68.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 67 above as though set forth in full here.

69.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

70.     Pursuant to the Joint Venture Agreement, Plaintiffs retained, among other things, a 75% ownership interest in each of the Joint Venture Diamonds until and unless the Joint Venture Diamonds were sold.

71.     Upon sale of the Joint Venture Diamonds, Plaintiffs were entitled to immediate distribution of a specific sum of money in the amount of $750,000, representing the value of their initial investment into the joint venture with Defendants.  Plaintiffs were also entitled to 50% of any remaining profits, after having paid Defendants for their initial $250,000 investment and any processing and insurance costs.

72.     In violation of and interference with Plaintiffs' rights, K.J.A. and Mr. Ayvazian sold the Joint Venture Diamonds to third party purchasers, diverting the proceeds of such sales to their own accounts.  Defendants continued to retain the money owed to Plaintiffs without authorization and in defiance of Plaintiffs' superior right of ownership in these sale proceeds.  In so doing, Defendants converted Plaintiffs' agreed upon share of the proceeds of the sale of the Joint Venture Diamonds.

73.     Plaintiffs' share of the proceeds of the sale of the Joint Venture Diamonds had a value of approximately $1,750,000.

74.     By reason of the foregoing, Plaintiffs have sustained damages in the sum of $1,750,000 and are entitled to judgment in that amount, plus interest computed from the date of conversion.

75.     Because Defendants' conversion was willful, wanton or in reckless disregard for Plaintiffs' well being, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (Against K.J.A. and Mr. Ayvazian)

76.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 75 above as though set forth in full here.

77.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

78.     As a participant in this joint venture, K.J.A. had a fiduciary obligation of the utmost good faith and loyalty to act in the best interests of Plaintiffs.

79.     As a participant in this joint venture, Mr. Ayvazian had a fiduciary obligation of the utmost good faith and loyalty, both individually and as the alter ego of K.J.A., to act in the best interests of Plaintiffs.

80.     By selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs what they were owed under the Joint Venture Agreement, K.J.A. breached its fiduciary duty of utmost good faith and loyalty to Plaintiffs.

81.     By selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs what they were owed under the Joint Venture Agreement, Mr. Ayvazian breached his fiduciary duty of utmost good faith and loyalty to Plaintiffs.

82.     By virtue of Defendants' breach of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial, but reasonably believed to be not less that $1,750,000.

83.     Because Defendants' breach was willful, wanton, or in reckless disregard for the Plaintiffs' well being, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Imposition of Constructive Trust

### (Against K.J.A. and Mr. Ayvazian)

84.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 83 above as though set forth in full here.

85.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

86.     By virtue of this Joint Venture Agreement, a fiduciary relationship existed between Defendants and Plaintiffs.

87.     Pursuant to the Joint Venture Agreement, Defendants expressly promised that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion: (i) Mr. Masagung and Mrs. Masagung receive $750,000, representing the value of their initial investment into the joint venture with the Defendants; (ii) K.J.A. and Mr. Ayvazian receive $250,000, representing the value of their initial investment into the joint venture with Plaintiffs; and (iii) any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, i.e., any

remaining profits, would be distributed equally—50% to Mr. Ayvazian and K.J.A., and 50% to Plaintiffs.

88.     In reliance on and as consideration for these express promises by Defendants, Plaintiffs transferred to the Defendants the sum of $750,000 as an initial investment into the joint venture.

89.     Defendants breached the Joint Venture Agreement by selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs from the sale proceeds what they were owed under the Joint Venture Agreement, including without limitation the value of Plaintiffs' initial $750,000 investment and 50% of any profits.

90.     As a result of Defendants' breach of their express promise, Plaintiffs have been damaged and the Defendants have been unjustly enriched.

91.     By reason of the facts alleged herein, Defendants hold Plaintiffs' investment, profits and gains as constructive trustees for the benefit of Plaintiffs.

## SIXTH CLAIM FOR RELIEF

### Accounting

### (Against K.J.A. and Mr. Ayvazian)

92.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 91 above as though set forth in full here.

93.     On or about October 31, 2003, for valuable consideration, Plaintiffs and Defendants entered into the Joint Venture Agreement described above and a copy of which is attached hereto as Exhibit 1.

94.     By virtue of this Joint Venture Agreement, a fiduciary relationship existed between Defendants and Plaintiffs.

95.    Pursuant to the Joint Venture Agreement, Defendants expressly promised that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion: (i) Mr. Masagung and Mrs. Masagung receive $750,000, representing the value of their initial investment into the joint venture with Defendants; (ii) K.J.A. and Mr. Ayvazian receive $250,000, representing the value of their initial investment into the joint venture with Plaintiffs; and (iii) any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, i.e., any remaining profits, would be distributed equally—50% to Mr. Ayvazian and K.J.A., and 50% to Mr. Masagung and Mrs. Masagung.

96.    In reliance on and as consideration for these express promises by Defendants, Plaintiffs transferred to Defendants the sum of $750,000 as an initial investment into the joint venture.

97.    Defendants breached the Joint Venture Agreement by selling the Joint Venture Diamonds without notifying Plaintiffs and without paying Plaintiffs from the sale proceeds what they were owed under the Joint Venture Agreement, including without limitation the value of the Plaintiffs' initial $750,000 investment and 50% of any profits.

98.    Because Plaintiffs' breach of fiduciary duty damages depend, in part, upon the profits realized by K.J.A. and Mr. Ayvazian for their wrongful conduct, Plaintiffs are entitled to an accounting as to all such profits by K.J.A. and Mr. Ayvazian.

## SEVENTH CLAIM FOR RELIEF

### Declaratory Relief

### (Against K.J.A. and Mr. Ayvazian)

99.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 98 above as though set forth in full here.

100.    An actual case or controversy exists between Plaintiffs and Defendants regarding Plaintiffs' ownership interest in the Joint Venture Diamonds and Plaintiffs' entitlement, from the proceeds for the sale of the Joint Venture Diamonds, to their initial investment of $750,000, their 50% share of any profits realized on such sale(s), and any other costs or expenses arising from the joint venture because Defendants have not paid to Plaintiffs what they are owed under the Joint Venture Agreement.

101.    To resolve the actual controversy between the parties, the Court should issue a judgment declaring that:

        a.      Plaintiffs are 75% owners of each of the Joint Venture Diamonds and that they are entitled to their $750,000 initial investment;

        b.      Plaintiffs are entitled to 50% of any profits realized on the sale of the Joint Venture Diamonds, currently reasonably believed to amount to one million ($1,000,000) dollars; and

        c.      Plaintiffs are entitled, pursuant to the indemnity provision in the Joint Venture Agreement, to all costs, fees (including but not limited to attorney's fees) and expenses, arising from Defendants' breach of the Joint Venture Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor and against Defendants and relief including, but not limited to, the following:

A.      On Count I, compensatory damages in an amount to be determined at trial, but reasonably believed not to be less than $1,750,000, plus consequential damages, plus attorney's fees and costs;

B.      On Count II, compensatory damages in an amount to be determined at trial, but reasonably believed not to be less than $1,750,000;

C.      On Count III, compensatory damages in an amount to be determined at trial, but reasonably believed not to be less than $1,750,000, plus interest computed from the date of conversion, plus punitive damages in an amount to be determined a trial;

D.      On Count IV, compensatory damages in an amount to be determined at trial, but reasonably believed not to be less than $1,750,000, plus punitive damages in an amount to be determined a trial;

E.      On Count V, that the Court impose a constructive trust whereby Defendants hold Plaintiffs' investment, profits and gains as a constructive trustee for the benefit of Plaintiffs;

F.      On Count VII, an accounting of all revenues and profits received by Defendants as a result of their misconduct;

G.      On Count VIII, that this Court declare that (i) Plaintiffs are 75% owners of each of the Joint Venture Diamonds, (ii) Plaintiffs are entitled to their $750,000 initial investment plus 50% of any profits realized on the sale of the Joint Venture Diamonds, and (iii) Plaintiffs are entitled, pursuant to the indemnity provision in the Joint Venture Agreement, to all costs, fees (including but not limited to attorney's fees) and expenses, arising from Defendants' breach of the Joint Venture Agreement;

H.    Plaintiffs' costs and reasonable attorney's fees; and

I.    All other relief as the Court may deem just and proper

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.

Dated:  April 29, 2008                SQUIRE, SANDERS & DEMPSEY L.L.P.

By:_____
Steven Skulnik (SS 7821)
350 Park Avenue
New York, NY 10022-6022

Mark C. Dosker (*pro hac* application
forthcoming)
One Maritime Plaza, Third Floor
San Francisco, CA 94111

Jose Luis Martin (*pro hac* application
forthcoming)
600 Hansen Way
Palo Alto, CA 94304

Attorneys for Plaintiffs
PUTRA MASAGUNG and IMELDA
MASAGUNG

# EXHIBIT 1

Oot 31 03 12:53p  R Diamonds Int'l Corp.     21  02-9199                    P.2

⑦

**This Joint Venture Agreement is made between:**

**Mr Petra Masagung  and Mrs Imelda Masagung**
(hereinafter known as Mr & Mrs Masagung)
C/o 1 Fifth Avenue #02-06/07, Guthrie House, Singapore 268802

AND

**Mr Kevo-Jean Ayvazian**
C/o 580 Fifth Avenue, Suite 2002 , NYC, NY 10036

AND

**KJA Diamonds International Corp.**
580 Fifth Avenue, Suite 2002, NYC, NY 10036

Further to the various discussions and facsimiles, it is agreed as follows:

That Mr Ayvazian and KJA Diamonds International Corp (hereinafter known as "KJA Diamonds") shall jointly provide US250,000/- while Mr & Mrs Masagung shall provide US$750,000/- towards the purchase of 2 rough uncut diamonds of total weight of 9.60 Carats which is priced at US$1 million.

In consideration of Mr & Mrs Masagung putting up the US$750,000/- towards the purchase of the 2 rough uncut diamonds and other valuable considerations given to KJA Diamonds and Mr Ayvazian including but not limited to entering into this venture with KJA Diamonds upon the recommendations and promises of Mr Ayvazian and his participation in this venture, both Mr Ayvazian and KJA Diamonds have jointly and severally given continuous warranties and guarantees to Mr & Mrs Masagung that:

A)   The 2 rough uncut diamonds are fancy green and blue green of natural color with good valid clear legal and equitable title.

B)   The 2 rough uncut diamonds shall be capable of yielding 2 cut and finished gemstone grade diamonds of 4.00 Carats for one and 2.75 Carats for the other.

C)   The 2 rough diamonds may be cut into either an Asscher cut diamond or a Cushion cut diamond.

D)   Mr Ayvazian and KJA Diamonds shall complete the cut polishing certifying process within 1 year and they shall at all times and under all circumstances hold these 2 diamonds on Trust for Mr Ayvazian, KJA Diamonds and Mr & Mrs Masagung in the proportion of their contribution.

E)   Mr Ayvazian and KJA Diamonds shall at all times insure and keep insured the 2 rough uncut diamonds or the finished diamonds, as the case may be, at an agreed value and shall name Mr Ayvazian, KJA Diamonds and Mr & Mrs Masagung as legal and equitable beneficiaries under the policy in the proportion of their contribution and shall provide Mr & Mrs Masagung with satisfactory evidence of this.

KJA ←

F)   Mr Ayvazian and KJA Diamonds shall jointly and severally indemnify and keep indemnified Mr & Mrs Masagung at all times against any loss they may suffer whatsoever and howsoever arising from this venture

1



G) At any time during the processing of the 2 rough uncut diamonds, should either one or both of them suffer any damage of any kind whatsoever howsoever caused including but not limited to negligence, acts of god or theft and regardless of whether the loss was partial or total loss, Mr Ayvazian and KJA Diamonds shall jointly and severally pay Mr & Mrs Masagung US$750,000/-, being the monies paid towards the purchase of the same immediately and without any reservation or condition whatsoever. However, notwithstanding the right to receive the US$750,000/- from Mr Ayvazian or KJA Diamonds as the case maybe, Mr & Mrs Masagung shall continue to retain a legal and beneficial interest in the diamonds in whatever form or state they are in.

H) Once the 2 rough uncut diamonds are finished as quality gemstones in accordance with this Agreement, should either or them or both of them suffer any damage of any kind whatsoever howsoever caused including but not limited to negligence, acts of god or theft and regardless of whether the loss was partial or total loss, Mr Ayvazian and KJA Diamonds shall jointly and severally pay Mr & Mrs Masagung at least US$750,000/- or the market value whichever is higher and this shall be payable immediately and without any reservation or condition whatsoever. However, notwithstanding the above right to be paid the US$750,000/-, Mr & Mrs Masagung shall continue to retain a legal and beneficial interest in the diamonds in whatever form or state they are in.

I) Mr Ayvazian and KJA Diamonds shall sell both diamonds whether by way of a sale or an auction within 6 months once they are finished unless the time of sale is deferred as agreed to by Mr & Mrs Masagung in writing.

J) All sale proceeds received for the diamonds shall at all times and under all circumstances be held on Trust for immediate distribution in the following agreed priority and proportion:

1) To pay Mr & Mrs Masagung US$750,000/- first before paying
2) Mr Ayvazian and KJA Diamonds jointly US$250,000/-
3) The balance of the sales proceeds after deducting the cost of processing the 2 rough uncut diamonds, the necessary insurance premiums and such other cost reasonably incurred which is estimated to be around US$20,000/- which shall represent the profit made shall be distributed equally that is to say 50% to Mr Ayvazian and KJA Diamonds jointly and 50% to Mr & Mrs Masagung.

K) All parties to this Agreement hereby agreed that the applicable law shall be the laws of the United States of America and shall submit to the jurisdiction of the Courts of the United States of America.

Dated    31    of    October,    2003

Mr Cirdi Masagung

Mrs Imelda Masagung

Authorized Signatory
Name:   Kino Jon Ayvazian
Designation:   President
KJA Diamonds International Corp.

2

# EXHIBIT 2

19/04 2006 WED 16:57    [JOB NO. 6929]    ☑001



# KJA *Diamonds Int'l Corp.*

KJA Diamonds Int'l Corp.         212.302.9200 Phone
580 Fifth Avenue                 212.302.9199 Fax
Suite 2002
NYC, NY 10036

## Invoice:

**Invoice #:2031**
Invoice Date:
Customer ID:

Bill to:                          Ship To:
L.J. WEST
580 FIFTH AVE
NEW YORK NY 10036



| Date | Memo # | Terms | Due Date | Sales Rep | Tax ID |
|------|--------|-------|----------|-----------|--------|
| 4/27/05 | | NET CASH | | | |

| Quantity | Carats | Description | Price Per Carat | Total |
|----------|--------|-------------|-----------------|-------|
| RD | 3.20 | F.INT.GREEN | | 920,000.00 |
| | | PARTNERSHIP 50% | | |
| | | ◁ 1637 | | |
| | | | | |

| Bank Info: | KJA Diamonds International Corp. | Subtotal | |
|---|---|---|---|
| | Bank Leumi U.S.A. | | |
| | 579 Fifth Avenue | | |
| | New York, NY 10017-1917 | Tax | |
| | | | |
| | Account # 0545858701 | Shipping | |
| | Routing # 026002794 | Miscellaneous | |
| | | Balance Due | $460,000.00 |

4/27/05   WIRE   400,000⁰⁰
Cl 4903   Balance   60,000⁰⁰

# EXHIBIT 3

19/04 2006 WED 07    [JOB NO. 6929]    @002



# KJA Diamonds Int'l Corp.

KJA Diamonds Int'l Corp.    212-302-9100 Phone
580 Fifth Avenue    212-302-9190 Fax
Suite 2002
NYC, NY 10036

## Invoice:

**Invoice #:2023**
Invoice Date:
Customer ID:

Bill To:
LJ WEST DIAMONDS INC
580 FIFTH AVE 7TH FLOOR
New york, ny 10036

Ship To:

| Date | Memo # | Terms | Due Date | Sales Rep | Tax ID |
|------|--------|-------|----------|-----------|--------|
| 01/26/06 | | | *Net Cash* | | |

| Quantity | Carats | Description | Price Per Carat | Total |
|----------|--------|-------------|-----------------|-------|
| 1 | 4.53 | FANCY INTENSE GREEN | | 1,000,060 |
| | | 50% PARTNERSHIP | | |
| | | GIA REPORT # 13410398 | | |

w583

Bank Info:    KJA Diamonds International Corp.

Bank Leumi U.S.A.
579 Fifth Avenue
New York, NY 10017-1917

Account # 0545858701
Routing # 026002794

2/1/06
whf

| | |
|---|---|
| Subtotal | |
| Tax | |
| Shipping | |
| Total Invoice | |
| Balance Due | $530,000.00 |

# EXHIBIT 4

(12)

Mr. Putra Masagung

Ottha...

**RECEIPT & BAILMENT NOTE**

**Mercury in X Ltd.**
Room 1902,
19th Floor, Lap Fai Building,
No. 6-8 Pottinger Street, Central,
HONG KONG
Tel. & FAX
+852-2817 9981
+852-9753 8431
e-mail: diamond@mercuryinx.com

№ 8957

On Approval given to:
etc etc ltd
f diamond Chris
Tel/
Date: 21-03-2006

| Lot No. | Description | pcs | ct | Price/ct US$/HK$ | Amount | Remarks |
|---|---|---|---|---|---|---|
| SW34 | F I G R VS2 G/R# 145 7636 JCA4846 | 1 | 304 | 750,000.— | US 2,280,000 | |
| | | | | | HK 17,784,000 | |

According to information received this stone is
Long West aware that Cao problem on
the stone.

Putra Masagung
(SIGNATURE OF BAILEE)

(75% owned by Mr

(Address)

Received the above goods on the terms and conditions set out overleaf...

19/04 2006 WED 10:57    [JOB NO. 6923]    @001

# EXHIBIT 5

# KJA *Diamonds Int'l Corp.*

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:   212.302.9100
fax:       212.302.9199

# Fax Transmittal Form

**To:**

**Name:**
**Organization Name/Dept:**
**CC:**
**Phone number:**
**Fax number:**

○ **Urgent**
○ **For Review**
○ **Please Comment**
○ **Please Reply**

**From:**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax    212.302.9199

**Date sent:**  8/23/06.
**Time sent:**
**Number of pages including cover page:**  2

---

1) Dear Putra & Imelda —

...' I do not know where to start...
t to apologize... Specially the Trust part".
Ever, Never, Never, did I mean to take
antage ... Friendship wise or business wise.
I made a Big mistake and I
pay for it...
I assure you that your share of
it will be paid A.S.A.P! I just cannot
you specifics tonight, please give me few day
put accounts together and give you a report →

(2)

... by the end of the week.

I do NOT want to mislead you with a time frame as of yet. Tomorrow, I'm seeing my accountant, I'll report you better th

I'll do anything to make sure every penny will be accounted for ...

Words CANNOT explain how I feel has been the worse year for me in ery situation ...

Please Do NOT Give up on my sinceri wards you. It is authentic!

I'll call you tomorrow after my meet

* Kevon

cell: 917. 495. 7197.
off: 212. 302. 9100
hom: 914. 961. 5472.
home: 201. 567. 4337.

# EXHIBIT 6

# KJA Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:  212.302.9100
fax:    212.302.9199

① 

# Fax Transmittal Form

**To:**

**Name:**
**Organization Name/Dept:**
**CC:**
**Phone number:**
**Fax number:**

○ **Urgent**
○ **For Review**
○ **Please Comment**
○ **Please Reply**

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax    212.302.9199

**Date sent:**  9/7/06.
**Time sent:**
**Number of pages including cover page:**

---

⊛  4.⁵³/   Fint Green.        $ 1,696,000.⁰⁰   ①

⊛  3.²⁰/   F. int. Green.      $   460,000.⁰⁰
                              $   230,000.⁰⁰   ②
                              $   690,000.⁰⁰

⊛  3.²⁰/  × 500,000./ct. × 25% = $ 400,000.⁰⁰

⊛  $ 1,320,000.⁰⁰

⊛  tobli   $ 3,000,000.⁰⁰



**KJA** *Diamonds Int'l Corp.*

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:   212.302.9100
fax:     212.302.9199

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

○ Urgent
○ For Review
○ Please Comment
○ Please Reply

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax    212.302.9199

9/7/06.

Date sent:
Time sent:
Number of pages including cover page:

②

☆ Agreement.

Initial    Investment    Putra: $ 750,000=
                         Kevo : $ 250,000~
        "              "

Profit f U.S. $ 2,000,000.= million –

        Putra: $ 1,000,000.= million –

        Kevo: $ 1,000,000= million –

therefore Kevo. Azmzin – owe Putra –
    * Amount of : $ 1,750,000.ºº –

 Diamonds Int'l Corp.

Phone:  212.302.9100
fax:    212.302.9199

③

) Fifth Avenue
ite 2002
YC, NY 10036

# ax Transmittal Form

**From**

KJA Diamonds Int'l Corp.

'o:

Phone: 212.302.9100
Fax    212.302.9199

me:
ganization Name/Dept:

one number:
x number:

Date sent:  9/7/06.
Time sent:
Number of pages including cover page:

**Urgent**
**For Review**
**Please Comment**
**Please Reply**

To: L.J. West Diamonds –

I, Kevo Avazian, Sold a "transfered" my
ownership share of 25% (3.20 Fint. Green Radiant

Mr. Putra Masagung –

Therefore, mr. Masagung has the right
collect directly, 25% of the whole SA
the stone.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
PUTRA MASAGUNG, **ET ANO.**,                    CASE NO. 08 CIV 4049

                              Plaintiff(s),
        -against-

KEVO-JEAN AYVAZIAN, **ET ANO.**,

                              Defendant(s).    **AFFIDAVIT OF INVESTIGATION**
-----------------------------------------------------------X
STATE OF NEW YORK        )
                                 s.s :
COUNTY OF NEW YORK    )

    MICHAEL J. KEATING, being duly sworn, deposes and says that he is an employee of KEATING & WALKER ATTORNEY SERVICE, INC., is over the age of eighteen years and is not a party to the action.

    That on the 29th day of May, 2008, at approximately 7:42 p.m., in an attempt to obtain the current military status of the individual defendant in this action Kevo-Jean Ayvazian, owner and officer of the corporate defendant KJA Diamonds Int'l Corp., I called his last known residence address [(201) 567-4337 at 321 Grant Avenue, Cresskill, NJ 07626] and spoke to Jacqueline Ayvazian, mother of the defendant. I asked her if Kevo-Jean Ayvazian is in active military service for the United States or for the State in any capacity whatsoever, or is dependent upon such person and received a negative reply.

Sworn to before me this
30th day of May, 2008

_____
JOHN J. WALKER
NOTARY PUBLIC, STATE OF NEW YORK
Reg. No. 01-WA-4851557
Qualified in Queens County
Certificate filed in New York County
Commission expires February 17, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

PUTRA MASAGUNG and IMELDA
MASAGUNG,                                          :

                Plaintiffs,             :    CASE NO.  08 Civ. 4049 (VM)

        -against-                    :    **CLERK'S CERTIFICATE**

KEVO-JEAN AYVAZIAN and K.J.A.                      :
DIAMONDS INT'L CORP.,

           Defendants.                :
                                          :

-------------------------------------- X

       I, J. MICHAEL MCMAHON, Clerk of the United States District Court for the Southern

District of New York, do hereby certify that this action commenced on April 29, 2008 with the

filing of the complaint, a copy of the summons and complaint was served on defendant K.J.A.

DIAMONDS INT'L CORP. on May 2, 2008 by personally serving two copies of the aforesaid

papers at the office of the New York State Secretary of State, located at 99 Washington Avenue,

6th Floor, in the City of Albany, New York, by delivering to and leaving papers with Carol Vogt,

an authorized person in the Corporate Division of the Department of State and empowered to

receive such service, and proof of such service thereof was filed on May 5, 2008 (Docket entry

#5).

       I further certify that the docket entries indicate that the defendant has not filed an answer

or otherwise moved with respect to the complaint herein.  The default of the defendant is hereby

noted.

Dated: New York, New York.
     June    , 2008

**J. MICHAEL MCMAHON**
   Clerk of the Court

By:_____
    Deputy Clerk

2.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PUTRA MASAGUNG and IMELDA
MASAGUNG,                                        :

                Plaintiffs,                   :    CASE NO.  08 Civ. 4049 (VM)

         -against-                       :    **CLERK'S CERTIFICATE**

KEVO-JEAN AYVAZIAN and K.J.A.
DIAMONDS INT'L CORP.,                            :

             Defendants.                   :
                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        I, J. MICHAEL MCMAHON, Clerk of the United States District Court for the Southern

District of New York, do hereby certify that this action commenced on April 29, 2008 with the

filing of the complaint, a copy of the summons and complaint was served on defendant KEVO-

JEAN AYVAZIAN on May 5, 2008 by serving "John Doe," an individual of suitable age and

discretion, on information and belief, matching the age, height, weight, and physical description

of Kevo-Jean Ayvazian at said defendant's usual place of business, and proof of such service

thereof was filed on May 8, 2008 (Docket entry #7).

        I further certify that the docket entries indicate that the defendant has not filed an answer

or otherwise moved with respect to the complaint herein.  The default of the defendant is hereby

noted.

Dated: New York, New York.            **J. MICHAEL MCMAHON**
       June _3_, 2008                Clerk of the Court

                                   By: _____
                                 Deputy Clerk



⑦

## This Joint Venture Agreement is made between:

**Mr Petra Masagung and Mrs Imelda Masagung**
(hereinafter known as Mr & Mrs Masagung)
C/o 1 Fifth Avenue #02-06/07, Guthrie House, Singapore 268802

AND

**Mr Kevo-Jean Ayvazian**
C/o 580 Fifth Avenue, Suite 2002 , NYC, NY 10036

AND

**KJA Diamonds International Corp.**
580 Fifth Avenue, Suite 2002, NYC, NY 10036

Further to the various discussions and facsimiles, it is agreed as follows:

That Mr Ayvazian and KJA Diamonds International Corp (hereinafter known as "KJA Diamonds") shall jointly provide US250,000/- while Mr & Mrs Masagung shall provide US$750,000/- towards the purchase of 2 rough uncut diamonds of total weight of 9.60 Carats which is priced at US$1 million.

In consideration of Mr & Mrs Masagung putting up the US$750,000/- towards the purchase of the 2 rough uncut diamonds and other valuable considerations given to KJA Diamonds and Mr Ayvazian including but not limited to entering into this venture with KJA Diamonds upon the recommendations and promises of Mr Ayvazian and his participation in this venture, both Mr Ayvazian and KJA Diamonds have jointly and severally given continuous warranties and guarantees to Mr & Mrs Masagung that:

A)    The 2 rough uncut diamonds are fancy green and blue green of natural color with good valid, clear legal and equitable title.

B)    The 2 rough uncut diamonds shall be capable of yielding 2 cut and finished gemstone grade diamonds of 4.00 Carats for one and 2.75 Carats for the other.

C)    The 2 rough diamonds may be cut into either an Asscher cut diamond or a Cushion cut diamond.

D)    Mr Ayvazian and KJA Diamonds shall complete the cut polishing certifying process within 1 year and they shall at all times and under all circumstances hold these 2 diamonds on Trust for Mr Ayvazian, KJA Diamonds and Mr & Mrs Masagung in the proportion of their contribution.

E)    Mr Ayvazian and KJA Diamonds shall at all times insure and keep insured the 2 rough uncut diamonds or the finished diamonds, as the case may be, at an agreed value and shall name Mr Ayvazian, KJA Diamonds and Mr & Mrs Masagung as legal and equitable beneficiaries under the policy in the proportion of their contribution and shall provide Mr & Mrs Masagung with satisfactory evidence of this.

KJA ←

F)    Mr Ayvazian and KJA Diamonds shall jointly and severally indemnify and keep indemnified Mr & Mrs Masagung at all times against any loss they may suffer whatsoever and howsoever arising from this venture

1



G)     At any time during the processing of the 2 rough uncut diamonds, should either one or both of them suffer any damage of any kind whatsoever howsoever caused including but not limited to negligence, acts of god or theft and regardless of whether the loss was partial or total loss, Mr Ayvazian and KJA Diamonds shall jointly and severally pay Mr & Mrs Masagung US$750,000/-, being the monies paid towards the purchase of the same immediately and without any reservation or condition whatsoever. However, notwithstanding the right to receive the US$750,000/- from Mr Ayvazian or KJA Diamonds as the case maybe, Mr & Mrs Masagung shall continue to retain a legal and beneficial interest in the diamonds in whatever form or state they are in.

H)     Once the 2 rough uncut diamonds are finished as quality gemstones in accordance with this Agreement, should either or them or both of them suffer any damage of any kind whatsoever howsoever caused including but not limited to negligence, acts of god or theft and regardless of whether the loss was partial or total loss, Mr Ayvazian and KJA Diamonds shall jointly and severally pay Mr & Mrs Masagung at least US$750,000/- or the market value whichever is higher and this shall be payable immediately and without any reservation or condition whatsoever. However, notwithstanding the above right to be paid the US$750,000/-, Mr & Mrs Masagung shall continue to retain a legal and beneficial interest in the diamonds in whatever form or state they are in.

I)     Mr Ayvazian and KJA Diamonds shall sell both diamonds whether by way of a sale or an auction within 6 months once they are finished unless the time of sale is deferred as agreed to by Mr & Mrs Masagung in writing.

J)     All sale proceeds received for the diamonds shall at all times and under all circumstances be held on Trust for immediate distribution in the following agreed priority and proportion:

1)     To pay Mr & Mrs Masagung US$750,000/- first before paying
2)     Mr Ayvazian and KJA Diamonds jointly US$250,000/-
3)     The balance of the sales proceeds after deducting the cost of processing the 2 rough uncut diamonds, the necessary insurance premiums and such other cost reasonably incurred which is estimated to be around US$20,000/- which shall represent the profit made shall be distributed equally that is to say 50% to Mr Ayvazian and KJA Diamonds jointly and 50% to Mr & Mrs Masagung.

K)     All parties to this Agreement hereby agreed that the applicable law shall be the laws of the United States of America and shall submit to the jurisdiction of the Courts of the United States of America.

Dated _31_ of _October._ 2003

_____         _Imelda Masagung_
Mr Rudi Masagung                       Mrs Imelda Masagung

_____         _____
Mr Revazian Ayvazian                   Authorised Signatory
                                       Name:  Kino Jun Ayvazian
                                       Designation:  President
                                       KJA Diamonds International Corp.

2

# KJA *Diamonds Int'l Corp.*

KJA Diamonds Int'l Corp.          212-302-9100 Phone
580 Fifth Avenue                  212-302-9190 Fax
Suite 2002
NYC, NY 10036

## Invoice:

**Invoice #:2023**

Invoice Date:
Customer ID:

Bill To:                          Ship To:
**LJ WEST DIAMONDS INC**
**580 FIFTH AVE 7TH FLOOR**
**New york, ny 10036**

| Date | Memo # | Terms | Due Date | Sales Rep | Tax ID |
|------|--------|-------|----------|-----------|--------|
| 03/26/06 | | | Net Cash | | |

| Quantity | Carats | Description | Price Per Carat | Total |
|----------|--------|-------------|-----------------|-------|
| 1 | 4.53 | FANCY INTENSE GREEN | | 1,000,060 |
| | | 50% PARTNERSHIP | | |
| | | GIA REPORT # 13410398 | | |

Bank Info:    KJA Diamonds International Corp.

Bank Leumi U.S.A.
579 Fifth Avenue
New York, NY 10017-1917

Account # 0545858701
Routing # 026002784

Subtotal

Tax

Shipping
Miscellaneous
Balance Due    **$530,000.00**

2/1/06

19/04 2006 WED 11:37  [JOB NO. 6929]  @001



# KJA *Diamonds Int'l Corp.*

KJA Diamonds Int'l Corp.          212.302.9100 Phone
580 Fifth Avenue                  212.302.9199 Fax
Suite 2002
NYC, NY 10036

## Invoice:

**Invoice #:2031**
Invoice Date:
Customer ID:

Bill to:                          Ship To:
L..J.WEST
580 FIFTH AVE
NEW YORK NY 10036

| Date | Memo # | Terms | Due Date | Sales Rep | Tax ID |
|------|--------|-------|----------|-----------|--------|
| 4/27/05 | | NET CASH | | | |

| Quantity | Carats | Description | Price Per Carat | Total |
|----------|--------|-------------|-----------------|-------|
| RD | 3.20 | F.INT.GREEN | | 920,000.00 |
| | | PARTNERSHIP 50% | | |
| | | | | |
| | | | | |
| | | | | |

Bank Info:    KJA Diamonds International Corp.

Bank Leumi U.S.A.
579 Fifth Avenue
New York, NY 10017-1917

Account # 0545858701
Routing # 026002794

| | |
|---|---|
| Subtotal | |
| Tax | |
| Shipping | |
| Miscellaneous | |
| Balance Due | $460,000.00 |

⑫



# KJA *Diamonds Int'l Corp.*

580 Fifth Avenue     Phone:   212.302.9100
Suite 2002           fax:     212.302.9199
NYC, NY 10036

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax    212.302.9199

○ Urgent
○ For Review
○ Please Comment
○ Please Reply

Date sent:  8/23/06.
Time sent:
Number of pages including cover page:  2

---

1) DEAR Putra & Imelda —

...' I Do NOT know where to start...
-nt to apologize..." SPECIALLY The hurt part".
JEVER, Never, Never, did I mean to take
vantage... friendship wise on/ business wise
   I made a Big mistake and I
-m paying for it...
   I assure you that your share of
fit will be PAID A.S.A.P! I just CANNOT
-e you specifics tonight, please give me few day
, put accounts together and give you a report →

②

... by the end of the week.

I do NOT want to mislead you with a time frame as of yet. Tomorrow, I'm seeing my accountant, I'll report you better th

I'll do anything to make sure every penny will be accounted for ...

Words CANNOT explain how I feel t has been the worst year for me in very situation ...

Please Do NOT Give up on my sinceri nwards you. It is authentic!

I'll call you tomorrow after my meet

* Kevo

cell: 917. 495. 7197.
212. 302. 9100
hom 914. 961. 5472.
hone: 201. 567. 4337.

# KJA Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:   212.302.9100
fax:      212.302.9199

① 

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

O Urgent
O For Review
O Please Comment
O Please Reply

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax     212.302.9199

Date sent:          9/7/06.
Time sent:
Number of pages including cover page:

---

⊛  4.⁵³/  Fint Green.        $ 1,696,000ᵉ⁵      ①

⊛  3.²⁰/  F.int Green.       $   460,000ᵉ⁵

                             $   230,000ᵉ⁵         ②

                             $   690,000ᵉ⁵

⊛  3.²⁰/  × 500,000./ct × 25% = $ 400,000.ᵉ⁵

⊛  $  1,320,000ᵉ⁵

⊛  tobli    $ 3,000,000ᵉ⁵

# KJA Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone: 212.302.9100
fax:     212.302.9199

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

O Urgent
O For Review
O Please Comment
O Please Reply

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax      212.302.9199

9/7/06.

Date sent:
Time sent:
Number of pages including cover page:

②

★ *Agreement.*

INitial  INVESTMENT  PuTRA: $ 750,000 =
        "                "        KEVO : $ 250,000 =

Profit f U.S. $ 2,000,000 = million —

PuTRA: $ 1,000,000 = million —

KEVO : $ 1,000,000 = million —

therefore KEVO Amzin — owe PuTRA —
* Amount of : $ 1,750,000.⁰⁰ —

# KJA *Diamonds Int'l Corp.*

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:   212.302.9100
fax:      212.302.9199

(3)

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax     212.302.9199

Date sent:     9/7/06.
Time sent:
Number of pages including cover page:

○ Urgent
○ For Review
○ Please Comment
○ Please Reply

---

To: L.J. WEST DIAMONDS —

I, KEVO AJVAZIAN, sold a "transfered" my wnership share of 25% (3.²⁰ Fint. Green RADIANT) to MR. PUTRA MASAGUNG —

Therefore, MR. MASAGUNG has the right to collect directly, 25% of the whole SALE of the stone.

# KJA Diamonds Int'l Corp.

K.A Diamonds Int'l Corp.
580 Fifth Avenue
Suite 2002
NYC, NY 10036

212- 302.9100 Phone
212 302.9199 Fax

## Invoice:

**Invoice #:**
Invoice Date:
Customer ID:

**Bill to:**
**PUTRA& IMELDA MASAGUNG**
**28 RAMSGATE**
**SINGAPORE 437471**

**Ship To:**

| Date | Memo # | Terms | Due Date | Sales Rep | Tax ID |
|------|--------|-------|----------|-----------|--------|
| 9/7/06 | | | NET CASH | | |

| Quantity | Carats | Description | Price Per Carat | Total |
|----------|--------|-------------|-----------------|-------|
| * | 3.95 | DIAL -DIAMONDS | | $25,000.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Bank Info:**    KJA Diamonds International Corp.

Bank Leuimi U.S.A.
579 Fifth Avenue
New York, NY 10017-1917

Account # 0545858701
Routing # 026002794

| | |
|---|---|
| Subtotal | |
| Tax | |
| Shipping | |
| Miscellaneous | |
| Balance Due | $25,000.00 |



## *KJA* Diamonds Int'l Corp.

580 Fifth Avenue     Phone:   212.302.9100
Suite 2002         fax:     212.302.9199
NYC, NY 10036

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax    212.302.9199

☑ Urgent
☑ For Review
○ Please Comment
☑ Please Reply

Date sent: 12/01/06
Time sent:
Number of pages including cover page: 5.

---

Dear Putra & Imelda

     Faxing you our accounts ....

*Balance due to you: $1,350,000.

*Invoice # 2083     $25,000.

*Balance due to you   $1,325,000.

I

Best Regards

KEVO - JUAN AZVAZIAN.

# $K\mathcal{J}A$  Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:  212.302.9100
fax:      212.302.9199

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

O Urgent
O For Review
O Please Comment
O Please Reply

**From**

KJA Diamonds Int'l Corp.

Phone  212.302.9100
Fax     212.302.9199

Date sent:  12/01/06
Time sent:
Number of pages including cover page:

---

### K.J.A    to  L.J WEST

| | |
|---|---|
| | $500,000.00 |
| Sales | $135,000.00 |
| Balance | $365,000.00 |

### K.J.A   to  Global Diamonds

| | |
|---|---|
| | $500,000.00 |
| Sales | $162,792.00 |

★ Joint venture  $\dfrac{\$217,000.00}{2}$   ( 3.10ct  HS.Fancy Orangy Pink VS1)
( estimate $70,000.00 per ct minimum!)

$108,500.00

Balance due  $228,708.00

Note: K.J.A has consigned L.J.West & Global Diamonds Group,
Amount: $1,965,188.25    260.31cts

You have the detailed Inventory with estimate which are minimal!

**KJA** *Diamonds Int'l Corp.*

*580 Fifth Avenue*
*Suite 2002*
*New York, NY 10036*

*phone 212.302.9100*
*fax:212.302.9199*

L.J West to sell on A/C

| | | | | |
|---|---|---|---|---|
| Groups #1 | Page 1 | $ 303,837.25 | 91.15cts | |
| | 2 | $267,807.00 | 46.05cts | |
| | 3 | $51,724.00 | 15.41cts | |

| | | | |
|---|---|---|---|
| Group #2 | 4 | $304,820.00 | 82.90cts |
| Memo-march/april | | | |
| Group #3 | 5 | $1,037,000. | 24.80cts |
| Layout fancy multi-colors | | | |
| Total Estimate | | $1,965,188.25 | 260.31cts |
| For shipping | | | |

*J. West has original*
*9/7/06*

**GIA**
**GEM TRADE LABORATORY**

**New York Headquarters**
580 Fifth Avenue | New York, NY 10036-4794
T: 212-221-5858 | F: 212-575-3095

**Carlsbad**
5355 Armada Drive | Carlsbad, CA 92008-4699
T: 760-603-4500 | F: 760-603-1814

## COLORED DIAMOND GRADING REPORT

GIA REPORT 14577678


206794001

September 21, 2005

Shape and Cutting Style ................... MODIFIED SQUARE BRILLIANT

Measurements ................................. 8.60 x 8.35 x 4.61 mm

Weight ........................................... 3.04 carat

**Proportions**

Depth ........................................................ 55.2 %

Table ........................................................ 83 %

Girdle ................... VERY THIN TO EXTREMELY THICK

Culet ...................................................... NONE

**Finish**

Polish .................................................. GOOD

Symmetry ........................................... GOOD

Clarity Grade ...................................................... VS2

**Color**

Origin ............................................... NATURAL

Grade ............................................... FANCY INTENSE
.................................................................GREEN

Distribution ........................................... EVEN

Fluorescence ..............................MEDIUM BLUE

**Comments:**
NONE

This Report is not a guarantee, valuation or appraisal. This Report contains only the characteristics of the diamond described herein after it has been graded, tested, examined and analyzed by GIA Gem Trade Laboratory under 10X magnification, and/or has been inscribed, using the techniques and equipment available to GIA Gem Trade Laboratory at the time of the examination and/or at the time of being inscribed, including fully corrected triplet loupe and binocular microscope, master color comparison instruments, standardized viewing environment and light source, electronic carat balance, optical measuring device, micro laser inscribing device, ProportionScope®, ultraviolet lamps, millimeter gauge, additional visual color comparators, spectroscope, Illuminator Polariscope®, immersion liquids, ultraviolet-visible and infrared spectrometers, X-ray fluorescence spectrometer, gamma-ray spectroscopy systems, beta radiation scintillation detector, radiation survey meter, X-ray luminescence equipment, and ancillary instruments as necessary. Red symbols denote internal characteristics (inclusions). Green or black symbols denote external characteristics (blemishes). Diagram is an approximate representation of the diamond, and symbols shown indicate type, position, and approximate size of clarity characteristics. All clarity characteristics may not be shown. Details of finish are not shown. The recipient of this Report may wish to consult a credentialed Jeweler or Gemologist about the importance and interrelationship of cut, color, clarity and carat weight.

GIA CLARITY SCALE

GIA COLORED DIAMOND SCALE

FLAWLESS
INTERNALLY FLAWLESS
VVS₁
VVS₂
VS₁
VS₂
SI₁
SI₂
I₁
I₂
I₃








IMPORTANT DOCUMENT, STORE SAFELY

NOTICE: IMPORTANT LIMITATIONS ON BACK

COPYRIGHT ©2000 GEMOLOGICAL INSTITUTE OF AMERICA, INC.

**KEY TO SYMBOLS**
⌒ Indented Natural Feather
⌒ Natural
⌒ Extra Facet

# *KJA* Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:  212.302.9100
fax:      212.302.9199

# Fax Transmittal Form

**To:**

Name:
Organization Name/Dept:
CC:
Phone number:
Fax number:

O Urgent
O For Review
O Please Comment
O Please Reply

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax:    212.302.9199

Date sent:  10/30/06.
Time sent:
Number of pages including cover page:  5

---

(✻)  1  DEAR  PUTRA  &  Imelda –

As  promised  you  have  the  "INVENTORY"  (A)

that  a  faxed  to  you ...  (B)  SALES  #'s - sold ...

c)  Goods  on  Consignment ...

I  did  the  physical – part  with  Sege

it  seems  to  be  O.K. ...  with  the  exception  of

the  time – delayed !

I'll  go  over  it  with  you  tomorrow,  if

needed .

Best  Regards
✻ Kevy

## KJA Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
New York, NY 10036



phone 212.302.9100
fax:212.302.9199

*Consigned to LJ West from May 31 2006*
Rings

| | Weight | Color | Est | Value | |
|---|---|---|---|---|---|
| Physically 1. RD | 2.88 ct | F int Green | $15,000/ct | $40k-$50k/ct |
| Physically 2 RD | 5.51ct | F lty yell | $7,500/ct | $7,5k-8k/ct |
| 2)1.25ct | | sidestones | | |
| Physically 3 5) | 1.79ct | yell + pave white $3,500/ct | |
| Physically 4 RD | 7.19ct | F.Y | $ 9,050/ct | $10k-11k/ct |
| 2)1.05ct | | sidestones | | |
| Physically 5 PS | 2.01ct | EVS1 (139) | $9,700/ct | |
| 2)1.40ct | | sidestones | | |
| Physically 6 RB | 1.01ct | HVS1 (65) | $4,875/CT | |
| Physically 7 cush | 3.04ct | F org BR | $5,000/ct | |
| 2)0.92ct | | sidestones | | |
| Physically 8 RD | 1.25ct | F int Y | $6,800/ct | $7,2k-$8k/ct |
| Physically 9 RD | 1.00ct | F.Y | $4,300/ct | $4,5k/ct |
| Physically 10 RD | 5)1.45ct | F lt Yell | $4,500/ct | $5,5k-6,5/ct |
| Physically 11 RD | 1.00ct | F int Yell | $6,800/ct | $7,2k-$8k/ct |
| Physically 13 PR | 1.00ct | HVS1 | $4,300/ct | |
| Physically Broilette –pendant | 12.79 | | $1,200/ct | $1,8k-$2,5k/ct |
| Physically(10)white wedd ring -platinum | | | $5k/ | |

Out on memo  Cuf links –sapphires 2) 49.05 + white pave $1,200/ct

## KJA Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
New York, NY 10036



phone 212.302.9100
fax:212.302.9199

### Consignment to LJWest from May 31,2006

#### Bracelets

| Weight | Color | Est | | Value |
|--------|-------|-----|-----|-------|
| Physically 19.21ct  (42)FY | | $2,700/ct | $51,867. | +$8,000. L |
| Physically 21.69ct (40) FY | | $2,700/ct | $58,563. | +$8,000 L |
| Out on memo 23.95ct  (35)+whitecollection | | $4,200/ct | $100,590 | +$8,000L |
| Physically 13.73ct    FVY + W | | $4,000/ct | $54,920 | +8,000L |
| (15)4.50ct FY+w | | | $15,750 | +$3,500L  art deco |

#### Earrings

Out on memo 2.25ct  Rd  Fint Y    $9,000/ct    $38,880.
Out on memo 2.07ct  Rd
#1   Earring set
Physically 0.33/0.31ct  yell      $3,000/ct
Physically 0.40/0.46ct  Mq Blues $40,000/ct  ⊕
Physically 0.09/0.09ct  PR  FIPP  $20,000/ct
Out on memo 0.53/0.47ct  Mq Blues $70,000/ct ⊕
Physically 0.94/0.82ct  Ov  FIPP  $100,000./ct
Phyically  0.22/rb FIY        $7,000/ct
#2    Earring set
Physically 0.33/0.42    p/b      $35,000/ct  ⊕
Physically 0.,15/0.17/0.19 rb  FVY  $7,000/ct
Physically 0.22/0.19  PS  FIBL /FIP $35,000/ct ⊕
Physcially 0.33/0.31  PR FIY   $2,500ct/
#3   Earring set
sold 3.01ct cush  DVS₁   $16,830/ct   (–23%)  ↓
11.12ct Rb melle    $12,000/ct –5.52ct pinks/2.70ct blues/2.09ct lime(102)
out on memo (5) 2.59ct Rb FIPP  $150,000/ct
out on memo 0.65 kite F vivid yell org $20,000/ct

*handwritten notes:*

\* Mixed "Fancy - Colored" Layout!

5.52ct. Sold.

**KJA Diamonds Int'l Corp.**

580 Fifth Avenue
Suite 2002
New York, NY 10036

phone 212.302.9100
fax:212.302.9199



Consigned to LJ West from May 31 2006
loose

| Weight | Color | Est | Value |
|---|---|---|---|

Physically Rose cut PS 5.73ct  GVS2   $7,000/ct
      Ps 5.03ct  FIY    $7,500/ct

Out on memo Rose cut cush 5.12ct FIY $10,500/ct

Lay out box
  Out on memo Ec 3.43ct cognac     $4,500/ct        $5,5k/ct
       Ec 3.75ct
  Physically   Rd  1.13ct Fy      $3,850/ct        $4,5k/ct
       Rd  1.08ct Fy

  Out on memo Sq Ec 1.20 ct  cognac $3,500/ct        $4,5k/ct
       Sq Ec 1.45ct

  Out on memo Ec    5.05ct  cognac $4,500/ct        $5-6k/ct
       Ec    5.17ct

  Out on memo Rb    2.60ct  cognac $4,500/ct
       Rb   2.58ct

  Physically  Rb 0.97   EVVS2(74)   $5,550/CT

  Physically  RB 1.00ct FVVS2 (94)$7,200/ct

  Physically Rb 0.61ct FY      $3,500/ct
Rb 0.60ct

**K J A** Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
New York, NY 10036



phone 212.302.9100
fax 212.302.9199

### Consigned to L.J West from May 31,2006

| Weight | | Color | Est | Value |
|---|---|---|---|---|
| | | Loose | | |
| | | Pairs of side stones | | |
| (62) | (2) 2.92ct | DSI1 | $3,700/ct | |
| (65) | (2) 2.70ct | FVS | $3,900/ct | out on memo |
| (84) | (2)2.01ct | DVVS | $4,100/ct | |
| (27) | (2)0.95ct | FVS2 | $2,000/ct | out on memo |
| (52) | (2)1.80ct | GVS2 | $3,000/ct | |
| (53) | (2)2.78ct | FSI | $3,500/ct | out on memo |
| (29) | (2)1.13ct | FVS/SI | $2,350/ct | |
| (33) | (2) 1.12ct | D/EVS/SI | $2,200ct | |

+20% Minimum!

06 11:41a        Serge

Sold by L.J.Wst .

Ⓑ

| LOT# | #STONES | CARAT | K/A COLOR | PER CT | TOTAL | |
|---|---|---|---|---|---|---|
| K1011 | (2 ct) 1 | 0.42 | BR.FBL | $38,000.00 | $16,120.00 | Sold - cheap! |
| K1028 | Melle | 5.52 | BR.FIP | $7,600.00 | $41,400.00 | (-28/) Sold - cheap! |
| | | 3.01 | CUSH.D | $14,625.00 | $44,021.28 | Sold - cheap! |
| | | | | | $0.00 | |
| | | | | | $0.00 | |
| | | | | | $0.00 | |
| | | | | | $0.00 | |
| | | | | | $0.00 | |
| | | | | | $0.00 | |
| GLOBAL | 2 | 10.88 FY | 7,100 | $8,945.28 | $73,481.08 | |
| | | 12.01 FY | 7,100 | $8,945.28 | $83,412.81 | |
| | | | | | $0.00 | |
| | | | | | $100,541.25 | |

$162,648.

CONTRA KEVO

$263,189 ²⁵

# KJA Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:   212.302.9100
fax:        212.302.9199

# Fax Transmittal Form

**To:**

**Name:**
**Organization Name/Dept:**
**CC:**
**Phone number:**
**Fax number:**

○ **Urgent**
○ **For Review**
○ **Please Comment**
○ **Please Reply**

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax     212.302.9199

**Date sent:**
**Time sent:**
**Number of pages including cover page:**

... mailed.

The project tomorrow is to follow:

* A) Pick-up the Rod.

* B) Make a serious calculation with Heibl.

* C) Let you know what are the Steps...

* d) make a letter with Arey for the
balance of goods to you.

The 70ct. DF one can be re-submitted
GIA, N.y!! They need the stone though.

Talk to you tomorrow.

Best Regards
* Kevy

# *KJA* Diamonds Int'l Corp.

580 Fifth Avenue
Suite 2002
NYC, NY 10036

Phone:   212.302.9100
fax:        212.302.9199

# Fax Transmittal Form

**To:**

**Name:**
**Organization Name/Dept:**
**CC:**
**Phone number:**
**Fax number:**

O **Urgent**
O **For Review**
O **Please Comment**
O **Please Reply**

**From**

KJA Diamonds Int'l Corp.

Phone: 212.302.9100
Fax     212.302.9199

**Date sent:** 5/10/07.
**Time sent:**
**Number of pages including cover page:**

---

I, KEVO S. AYVAZIAN, promise
Mr. & Mrs. MASAGUNG ... "$50 K. - $100 K"
to reduce the Balance due from
$~~1,325,000~~  $ 1,325,000⁼ . by the end
of 5/07.

# DEBT WORKOUT AGREEMENT

This Debt Workout Agreement (this "Agreement"), dated as of  November 26, 2007, is made by and among Putra and Imelda Masagung ("Creditor"), KJA Diamonds Int'l Corp., a New York corporation ("Debtor") and Kevo-Jean Ayvazian, an individual residing in the State of New York ("Ayvazian").

## Recitals:

A.      Debtor and Ayvazian, jointly and severally, have incurred a debt to Creditor with a principal balance of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000) (the "Debt") as of the date hereof.

B.      Debtor desires to sell and Creditor desires to purchase a certain 3.95 carat diamond, a description of which is attached hereto as <u>Exhibit A</u> (the "395 Diamond") in exchange for a Twenty-Five Thousand dollar ($25,000) credit against the Debt.

C.      Debtor and Ayvazian desire to use proceeds from the sale of (i) a certain 3.20 carat green radiant diamond, a description of which is attached hereto as <u>Exhibit B</u> (the "Green Diamond"), (ii) a certain 2.50 carat radiant-cut fancy green diamond, a description of which is attached hereto as <u>Exhibit C</u> (the "Fancy Green Diamond"), and (iii) certain other precious stones and jewelry listed in the schedule attached hereto as <u>Exhibit D</u> (the "Jewelry") to affect payment of the Debt in part or in full to Creditor.

D.      Debtor has transferred possession of the Fancy Green Diamond to Creditor, and Creditor intends to sell the Fancy Green Diamond and credit the proceeds of such sale toward payment of the Debt.

E.      Debtor has consigned the Green Diamond and the Jewelry (collectively, the "Consigned Jewels") to L.J. West Diamonds, Inc., a New York corporation ("West"), and West has taken possession of the Consigned Jewels and intends to sell the Consigned Jewels and return part of the proceeds of such sale to Debtor.

F.      Debtor and Ayvazian desire that West pay certain proceeds from the sale of the Consigned Jewels to which Debtor is entitled directly to Creditor and for Creditor to credit such proceeds toward payment of the Debt, all according to the terms set forth in this Agreement.

## Agreement:

In consideration of the mutual promises made herein, the parties to this Agreement hereby agree as follows:

1.      <u>Principal; Interest; Payment.</u>

(a)      Debtor and Ayvazian, jointly and severally, hereby promise to pay the Debt to Creditor with interest from the date of this Agreement on the unpaid principal balance at a rate of 8% per annum until paid.  Interest on the Debt shall accrue beginning on September 7, 2006.  All

interest due hereunder shall be computed on the basis of a year of 365 days for the actual number of days elapsed.

(b)     Unless paid or accelerated pursuant to the terms of this Agreement, the entire unpaid principal balance of the Debt and all accrued but unpaid interest thereon shall be due and payable on June 1, 2008.

(c)     Any payment amounts received by Creditor in connection with this Agreement shall be applied in the order of (i) any legal fees owed pursuant to Section 15 of this Agreement, (ii) any accrued interest on the Debt, and (iii) the principal balance of the Debt.

2.     Security Interest

(a)     To secure the due and punctual payment of the Debt, Debtor and Ayvazian hereby grant to Creditor a security interest in all of Debtor's and Ayvazian's right, title and interest in the Green Diamond, the Fancy Green Diamond and the Jewelry and any proceeds from the sale or other disposition thereof (the "Collateral"), subject to the interests of West and Global Diamond in the Collateral as set forth in this Agreement.

(b)     Debtor and Ayvazian shall perform any and all steps in all relevant or appropriate jurisdictions as may be necessary or reasonably requested by Creditor to perfect, maintain and protect Creditor's security interest in the Collateral.  Debtor and Ayvazian authorize Creditor to file financing statements describing the Collateral.

3.     Sale of the 395 Diamond.

(a)     Debtor hereby sells and transfers good and marketable title to the 395 Diamond to Creditor in exchange for a Twenty-Five Thousand dollar ($25,000) credit against the Debt, and Creditor hereby acknowledges receipt of the 395 Diamond in satisfaction of Twenty-Five Thousand dollars ($25,000) in principal amount of the Debt.

(b)     Debtor and Ayvazian represent and warrant that, notwithstanding a document of sale dated September 19, 2006 (the "395 Diamond Invoice") indicating that debtor did not have good title to the 395 Diamond, Debtor has, since the date of the 395 Diamond Invoice, obtained and presently owns full right and title to the 395 Diamond and hereby transfers the 395 Diamond to Creditor free and clear of any liens, security interests or other encumbrances.  Debtor and Ayvazian further agree to deliver to Creditor any certificates of title or other documents pertaining to ownership of the 395 Diamond concurrently with the execution of this Agreement.

4.     Payment Upon Sale of Green Diamond.

(a)     Debtor and Ayvazian acknowledge and agree that West shall use commercially reasonable efforts to sell the Green Diamond for cash proceeds and to apply such proceeds as follows:

(i)     Upon sale of the Green Diamond by West, West shall pay to Creditor Twenty-Five percent (25%) of the proceeds from such sale (the "Green Diamond Payment"), which Green Diamond Payment shall be credited toward the principal balance of the Debt and all

accrued but unpaid interest and expenses in such manner as Creditor elects upon such indebtedness.

(ii)    In the event that the Green Diamond Payment exceeds the principal balance of the Debt and all accrued but unpaid interest, Creditor shall nonetheless be entitled to the entire Green Diamond Payment, including the excess by which the Green Diamond Payment exceeds the Debt and all accrued but unpaid interest.

5.    <u>Payment Upon Sale of Fancy Green Diamond</u>

(a)    Creditor shall attempt to sell the Fancy Green Diamond for cash proceeds, which sale shall be made, if at all, at the sole discretion of the Creditor.  Creditor shall credit the proceeds of any such sale toward payment of the Debt and any accrued interest and expenses.  Creditor shall promptly return to Debtor any amount of such proceeds remaining following full satisfaction of the Debt and all accrued interest and expenses.

6.    <u>Payment Upon Sale of the Jewelry</u>.

(a)    Debtor and Ayvazian acknowledge and agree that West shall use commercially reasonable efforts to sell the Jewelry to a third party in exchange for cash proceeds (the "Jewelry Sale Proceeds") and to apply such proceeds as follows, in order of preference:

(i)    West shall retain Five Hundred Thousand dollars ($500,000) of the Jewelry Sale Proceeds (the "West Share").

(ii)    If the Jewelry Sale Proceeds exceed the amount of the West Share, West shall pay to Global Diamond Group Ltd., a New York corporation ("Global Diamond"), the amount by which the Jewelry Sale Proceeds exceed the West Share, up to an amount not greater than Two Hundred Twenty Thousand Seven Hundred Eight dollars ($228,708) (the "Global Diamond Share").

(iii)    If the Jewelry Sale Proceeds exceed Seven Hundred Twenty Eight Thousand Seven Hundred Eight dollars ($728,708), then West shall pay to Creditor the amount by which the Jewelry Sale Proceeds exceed Seven Hundred Twenty Eight Thousand Seven Hundred Eight dollars ($728,708), which amount shall be paid toward and shall not exceed the principal balance of the Debt and all accrued but unpaid interest and expenses (the "Creditor Share").

(iv)    Any Jewelry Sale Proceeds that remain after the Creditor Share has been paid shall be paid to Debtor.

7.    <u>Manner of Payment</u>.

Principal and interest on the Debt, and all other amounts payable to Creditor hereunder, shall be made in lawful money of the United States, without offset, deduction, or counterclaim of any kind, in immediately available funds at Creditor's address at 3235 Ralston Ave, Hillsborough, California, 94010 payable to the order of Creditor.

8.    <u>Event of Default/Remedies.</u>

(a)    <u>Events of Default.</u>  Any of the following events shall constitute an Event of Default:

(i)    breach by Debtor or Ayvazian of any of Debtor's or Ayvazian's obligations or covenants under this Agreement; provided that the party in breach shall have ten (10) days from the date of any failure to perform any of its obligations or covenants under this Agreement not involving the payment of money to Creditor, within which to cure said failure; or

(ii)    Debtor or Ayvazian (A) becomes insolvent or admits in writing Debtor's or Ayvazian's inability to pay its or his debts as they mature, (B) makes any assignment for the benefit of creditors, or (C) applies for or consents to the appointment of a receiver or trustee for Debtor or Ayvazian or for a substantial part of the property or business of Debtor or Ayvazian, or a receiver or trustee otherwise is appointed and is not discharged within thirty (30) days after such appointment; or

(iii)    (A) any bankruptcy, insolvency, reorganization or liquidation proceeding or other proceeding for relief under any bankruptcy law or any law for the relief of debtors is instituted by Debtor or Ayvazian or (B) any such proceeding is instituted by third parties against Debtor or Ayvazian and not discharged within thirty (30) days; or

(iv)    any money judgment, writ or warrant of attachment, or similar process (singly or, if more than one, cumulatively in excess of $25,000) is entered or filed against Debtor or Ayvazian or any of the assets of Debtor or Ayvazian and (A) remains unvacated, unbonded, unstayed, undismissed or undischarged for a period of thirty (30) days or in any event later than five (5) days before the date of any proposed sale thereunder, or (B) Debtor or Ayvazian has not appealed the same in good faith to Creditor's satisfaction.

(b)    <u>Remedies.</u>  Upon the occurrence and during the continuance of an Event of Default, all indebtedness under this Agreement shall automatically be immediately due and payable.  In addition, Creditor, at its option, and without notice to Debtor or Ayvazian, may take one or more of the actions described below.  Upon the occurrence and during the continuance of any other Event of Default, Creditor at its option and, unless otherwise specified below, without notice to Debtor or Ayvazian, may do any one or more of the following:

(i)    declare all indebtedness under this Agreement immediately due and payable and credit any sums received thereafter in such manner as it elects upon such indebtedness; provided, however, that such application of sums so received shall not serve to waive or cure any default existing under this Agreement nor to invalidate any notice of default or any act done pursuant to such notice and shall not prejudice any rights of Creditor; and

(ii)    exercise any or all rights provided or permitted by law or granted pursuant to this Agreement in such order and in such manner as Creditor may, in its sole judgment, determine.

(c)    No Waiver of Remedies.    No waiver of any breach of or default under any provision of this Agreement shall constitute or be construed as a waiver by Creditor of any subsequent breach of or default under that or any other provision of this Agreement.

(d)    Remedies Not Exclusive.    No remedy herein conferred upon Creditor is intended to be exclusive of any other remedy herein or in any other agreement between the parties hereto or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

9.    Covenants and Agreements.

Debtor and Ayvazian hereby make the following covenants, which shall be deemed to be continuing covenants until payment in full of all indebtedness of Debtor and Ayvazian to Creditor arising under this Agreement:

(a)    Concurrently with the execution of this Agreement, (i) Debtor agrees to execute and deliver to Creditor a Confession of Judgment in substantially the form of Exhibit E attached hereto, and (ii) Ayvazian agrees to execute and deliver to Creditor a Confession of Judgment in substantially the form of Exhibit F attached hereto.

(b)    Debtor and Ayvazian each agree to furnish to Creditor, upon request, such other information relating to the Collateral or the financial condition of Debtor and/or Ayvazian as Creditor may from time to time reasonably request.

(c)    Debtor and Ayvazian shall (i) keep the Collateral in good condition, (ii) use reasonable care to prevent the Collateral from being damaged or otherwise from suffering any decline in value, (iii) maintain insurance for the Collateral in reasonable amounts, which shall not be less than the fair market value of such Collateral, and (iv) pay when due all taxes and other governmental assessments levied against Debtor or Ayvazian on the Collateral.

(d)    Debtor and Ayvazian shall promptly notify Creditor in writing of the occurrence of any act or event including, without limitation, the commencement or threat of any action, suit, claim or proceeding against or investigation of Debtor or Ayvazian which could materially and adversely affect Debtor or Ayvazian or which could impair the validity, effectiveness or enforceability of, or impair the ability of Debtor or Ayvazian to perform its or his obligations under, this Agreement, and of the occurrence of any Event of Default or any event which with the giving of notice, the lapse of time, or both, would become an Event of Default and the action Debtor and Ayvazian propose to take with respect thereto.

(e)    Debtor and Ayvazian shall, at any time and from time to time, upon the written request of Creditor, execute and deliver to Creditor such further documents and instruments and do such other acts and things as Creditor may reasonably request in order to effectuate fully the purpose and intent of this Agreement.

10.    Representations and Warranties of Debtor and Ayvazian.

Debtor and Ayvazian each hereby make the following representations and warranties, which shall be deemed to be continuing representations and warranties until payment in full of all indebtedness of Debtor and Ayvazian to Creditor arising pursuant to this Agreement:

(a)    No Conflict. The execution, delivery and performance of this Agreement are not in contravention of or in conflict with any agreement, indenture or undertaking to which Debtor or Ayvazian is a party or by which Debtor or Ayvazian or any of the assets or property of Debtor or Ayvazian may be bound or affected and do not cause any security interest, lien or other encumbrance to be created or imposed upon any such property by reason thereof.

(b)    No Default. There has occurred and is continuing no Event of Default or any event which with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

(c)    Litigation. There is no action, suit or proceeding pending or, to the best of the knowledge and belief or Debtor or Ayvazian, threatened against or affecting Debtor or Ayvazian which could impair the validity, effectiveness or enforceability of, or impair the ability of Debtor or Ayvazian to perform its or his obligations under this Agreement, whether said actions, suits or proceedings are at law or in equity or before or by any governmental authority.

11.    Default Rate.

Any amounts not paid when due shall thereafter bear interest at a rate per annum equal to the interest rate set forth in Section 1 above, plus five percent (5%).

12.    Right of Setoff.

Creditor is hereby authorized by Debtor and Ayvazian, at any time and from time to time, without notice to Debtor or Ayvazian, to set off against, and to appropriate and apply to the payment of, the obligations and liabilities of Debtor and Ayvazian hereunder (whether matured or unmatured), any accounts maintained with it by Debtor or Ayvazian and/or any and all amounts owing by Creditor to Debtor or Ayvazian (whether matured or unmatured, and however evidenced).

13.    Jurisdiction.

For any action related to the judicial enforcement or interpretation of this Agreement, each of Debtor and Ayvazian expressly submits to the exclusive jurisdiction of the state and federal courts sitting in the Borough of Manhattan in the City of New York in the State of New York, at the election of Creditor. Each of Debtor and Ayvazian hereby irrevocably waives any objection to the venue of the state and federal courts sitting in the Borough of Manhattan in the City of New York in the State of New York, whether otherwise such an objection might be made on the ground of any statute or common law or the doctrine of *forum non conveniens* or any other ground. Each of Debtor and Ayvazian further irrevocably consents to the service of process issued by any of the aforementioned courts in any such action or proceeding by mailing of copies thereof by registered or certified mail, postage prepaid, to Debtor or Ayvazian at its or

his address for notice furnished herein to Creditor, such service to become effective five (5) days after such mailing. Nothing herein shall affect the right to serve process in any other manner permitted by law or the right of Creditor to bring legal action or proceedings in any other jurisdiction.

The address for Debtor is:

580 Fifth Avenue, Suite 2002
New York, New York 10036

The address for Ayvazian is:

580 Fifth Avenue, Suite 2002
New York, New York 10036

14.    Transferability.

This Agreement shall be shall be transferable or assignable at the discretion of Creditor.

15.    Legal Fees.

Debtor and Ayvazian agree to pay all costs and expenses, including without limitation attorneys' fees, costs and expenses actually incurred by Creditor in connection with the enforcement of any obligation of Debtor or Ayvazian under this Agreement.

16.    Severability.

In case any term or any provision of this Agreement shall be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

17.    Headings.

Headings used in this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

18.    Usury Savings Clause.

The Creditor shall never be entitled to charge, receive, or collect, nor shall amounts received hereunder be credited as interest so that the Creditor shall be paid, a sum greater than interest at the maximum nonusurious interest rate, if any, that at any time may be contracted for, charged, received, or collected on the indebtedness evidenced by this Agreement under applicable law (the "Maximum Rate"). It is the intention of the parties hereto that this Agreement, and all other instruments securing the payment of the Debt or executed or delivered in connection herewith, shall comply with applicable law. If the Creditor ever contracts for, charges, receives, or collects anything of value which is deemed to be interest under applicable law, and if the occurrence of any circumstance or contingency should cause such interest to

exceed interest at the Maximum Rate, any such excess amount shall be applied to the reduction of the unpaid principal balance of the Debt, and if the Debt is paid in full, any remaining excess shall be paid to the Debtor or Ayvazian as the case may be. In determining whether or not the interest on the Debt exceeds interest at the Maximum Rate, the total amount of interest shall be spread throughout the entire term of this Agreement until its payment in full in a manner which will cause the interest rate on the Debt not to exceed the Maximum Rate.

19.    Competency.

Debtor and Ayvazian each represent that they have carefully read this document, understand all of its contents, fully understand the final and binding effect of this Agreement, and execute this Agreement freely and voluntarily. Debtor and Ayvazian represent and acknowledge that, in executing this Agreement, it or he does not rely and has not relied upon any representation or statement not set forth herein made by the Creditor or by any of its agents, representatives or attorneys with regard to the subject matter, basis or effect of this Agreement or otherwise. Accordingly, the parties hereto agree that the common-law principles of construing ambiguities against the drafter shall have no application to this Agreement. This Agreement should be construed fairly and not in favor of or against one party as to the drafter hereof.

20.    Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws principles thereof.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned have executed this Debt Workout Agreement as of the date first written above.  This Debt Workout Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  Any signature page signifying approval of this Debt Workout Agreement may be delivered by a fax machine or other such means and shall be binding to the same extent as an original signature page.

**DEBTOR:**                                      **CREDITOR:**

KJA Diamonds International Corp.          Putra Masagung and Imelda Masagung

By: _____          _____
Name: Kevo-Jean Ayvazian                 Name: Putra Masagung
Title: _____

                                                 _____
                                                 Name:  Imelda  Masagung

**KEVO-JEAN AYVAZIAN**

_____
Kevo-Jean Ayvazian

## <u>EXHIBIT A</u>

### Description of 395 Diamond

Carats:  3.95

Laser Number:_____

Description:_____
_____
_____
_____

## <u>EXHIBIT B</u>

### Description of Green Diamond

Carats: 3.20

Laser Number:_____

Description:_____

_____

_____

_____

## <u>EXHIBIT C</u>

### Description of Fancy Green Diamond

Carats: 2.50

Laser Number:_____

Description:_____
_____
_____
_____

# EXHIBIT D

**Schedule of Jewelry**

(attached)

# **EXHIBIT E**

**Confession of Judgment – KJA Diamonds Int'l Corp.**

(attached)

**<u>EXHIBIT F</u>**

**Confession of Judgment – Kevo-Jean Ayvazian.**

(attached)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
PUTRA MASAGUNG and IMELDA            :
MASAGUNG,                           :
                                    :          CASE NO.  08 Civ. 4049 (VM)
              Plaintiffs,           :
                                    :
        -against-                   :          **<u>CERTIFICATE OF SERVICE</u>**
                                    :
KEVO-JEAN AYVAZIAN and K.J.A.       :
DIAMONDS INT'L CORP.,               :
                                    :
              Defendants.           x
---------------------------------------------------------

     I, Steven Skulnik, hereby certify that on this 18th day of July 2008, I caused true and

correct copies of the following documents:

    *Notice of Motion for Judgment by Default*

    *Affidavit in Support of Judgment by Default*

    *[Proposed] Default Judgment*

    *Application for Interim Award of Legal Fees and Disbursements As Part of Judgment by Default*

    *Declaration of Steven Skulnik in Support of Application for Interim Award of Legal Fees and Disbursements As Part of Judgment by Default*

to be served via first-class mail, upon the addressed list below as follows:

| | | |
|---|---|---|
| K.J.A. Diamonds Int'l Corp. | Kevo-Jean Ayvazian | Kevo-Jean Ayvazian |
| 580 Fifth Avenue, Suite 2002 | c/o K.J.A. Diamonds Int'l Corp. | 321 Grant Avenue |
| New York, NY 10036 | 580 Fifth Avenue, Suite 2002 | Cresskill, NJ 07626 |
| | New York, NY 10036 | |

_____
    Steven Skulnik (SS 7821)