UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
PUTRA MASAGUNG and IMELDA
MASAGUNG,                           :

        Plaintiffs,             :   CASE NO. 08 Civ. 4049 (VM)

   -against-                       :   **AFFIDAVIT IN SUPPORT OF**
                                                **JUDGMENT BY DEFAULT**

KEVO-JEAN AYVAZIAN and K.J.A.       :
DIAMONDS INT'L CORP.,

        Defendants.             :
                                                 :
------------------------------------ X
STATE OF CALIFORNIA   )
                       ) ss.:
SANTA CLARA COUNTY    )

      I, PUTRA MASAGUNG, being duly sworn, depose and say:

      1.    I am a citizen of Indonesia and, together with Imelda Masagung ("Mrs. Masagung") (collectively, "Plaintiffs"), am a plaintiff in the above-captioned action, and I am fully familiar with all the facts and circumstances in this action.

      2.    I make this affidavit pursuant to Rule 55.2 and 55.2(b) of the Civil Rules for the Southern District of New York, and the Default Judgment Procedures of United States District Judge Victor Marrero, Southern District Of New York in support of the Plaintiffs' application for the entry of a default judgment against defendants K.J.A. Diamonds Int'l Corp. ("K.J.A.") and Kevo-Jean Ayvazian ("Mr. Ayvazian") (collectively, "Defendants").

      3.    This action is to recover one million three hundred and twenty-five thousand dollars ($1,325,000.00) owed by the Defendants to the Plaintiffs for our share of the proceeds of the sale of two diamonds (the "Joint Venture Diamonds"), as described in paragraph 13 of the complaint. A true and correct copy of the complaint is attached as Exhibit A.

4. Jurisdiction of the subject matter of this action is based on diversity jurisdiction and amount in controversy. I am a citizen of Indonesia. Co-plaintiff Mrs. Masagung is citizen of Singapore. The defendants are an individual citizen of New Jersey and a corporation incorporated and having its principal place of business in New York. The amount in controversy is $1,325,000.00. As provided in 28 U.S.C. §1332(a)(2) this is a controversy which exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

5. The Court has personal jurisdiction over the Defendants because a substantial part of the events giving rise to the claims occurred in this district, K.J.A. may be found in this judicial district, and Mr. Ayvazian maintains his office in this judicial district and may be found in this judicial district. Further, Mr. Ayvazian was, on information and belief, personally served with process in this state.

6. I represent that, to the best of my knowledge, Mr. Ayvazian is not an infant or an incompetent and K.J.A. is not a natural person.

7. This action was commenced on April 29, 2008 by the filing of the summons and complaint. A copy of the summons and complaint was served on K.J.A. on May 2, 2008 by personally serving two copies of the aforesaid papers at the office of the New York State Secretary of State, located at 99 Washington Avenue, 6th Floor, in the City of Albany, New York, by delivering to and leaving papers with Carol Vogt, an authorized person in the Corporate Division of the Department of State and empowered to receive such service. Proof of such service thereof was filed on May 5, 2008 (Docket entry # 5). K.J.A. has not responded to the complaint and its time to do so has expired.

8. A copy of the summons and complaint was also served on Mr. Ayvazian on May 5, 2008 by serving "John Doe," an individual of suitable age and discretion, on information and belief, matching the age, height, weight, and physical description of Mr. Ayvazian. Proof of such service thereof was filed on May 8, 2008 (Docket entry # 7) Mr. Ayvazian has not responded to the complaint and the time to do so has expired.

9. On May 29, 2008, Plaintiffs confirmed that Mr. Ayvazian is not a member of the uniformed services for the United States or for the State in any capacity whatsoever, or is dependent upon such person. Proof of confirmation thereof was filed on May 30, 2008 (Docket entry #8), a true and correct copy of which is attached as Exhibit B.

10. On June 2, 2008, the Plaintiffs applied to the Clerk of this Court for entry of the Defendants' default. On June 3, 2008, the Clerk of this Court entered the Defendants' default and issued a Certificate of Default for each defendant. Attached as Exhibit C and Exhibit D are true and correct copies of these Certificates of Default.

11. As alleged in the complaint, the facts underlying the current action are as follows. In or around October 2003, the Plaintiffs and Defendants began discussing the possibility of entering into an agreement to purchase two rough diamonds and, after cutting and polishing them, selling them for a profit. In a fax dated October 21, 2003, Mr. Ayvazian made certain promises regarding the purchase of these two rough diamonds, including the promise to keep the Plaintiffs informed at every step of the cutting and polishing process. Because of Mrs. Masagung's and my inexperience in the rough diamonds industry, we reduced the agreement to writing. On or about October 31, 2003, Mrs. Masagung and I, on the one hand, and Mr. Ayvazian and K.J.A., on the other hand, formalized our agreement by entering into a joint

3

venture agreement (the "Joint Venture Agreement"). A true and correct copy of the Joint Venture Agreement is attached as <u>Exhibit E</u>.

12. Pursuant to the Joint Venture Agreement, Mrs. Masagung and I wired $750,000 as an initial investment toward the purchase of the two rough uncut diamonds. Also pursuant to the Joint Venture Agreement, the Defendants were required to sell both Joint Venture Diamonds within six months after they were cut and polished, unless the Plaintiffs agreed in writing to defer such sale. The Plaintiffs and Defendants also agreed that all sale proceeds for the Joint Venture Diamonds would be held in trust for "immediate distribution" in the following priority and proportion:

(a) First, Mrs. Masagung and I would receive $750,000, representing the value of our initial investment into the joint venture with the Defendants;

(b) Second, K.J.A. and Mr. Ayvazian would receive $250,000, representing the value of their initial investment into the joint venture with the Plaintiffs;

(c) Third, any balance of the sale proceeds of the Joint Venture Diamonds, after deducting certain insurance and processing costs, *i.e.*, any remaining profits, would be distributed equally—fifty percent (50%) to Mr. Ayvazian and K.J.A., and fifty percent (50%) to Mrs. Masagung and me.

13. The Joint Venture Agreement also contained an indemnity provision, whereby Mr. Ayvazian and K.J.A. agreed to "jointly and severally indemnify and keep indemnified Mr. & Mrs. Masagung at all times against any loss they may suffer whatsoever and however arising from this venture." According to the terms of the Joint Venture Agreement, Mrs. Masagung and I expected a return on our investment by the spring of 2005.

14. The Plaintiffs are informed and believe and, on the basis of such information and belief, alleged that in the year following the execution of the Joint Venture Agreement, the Defendants obtained, using both the Plaintiffs' and the Defendants' initial investment, the two diamonds contemplated by the Joint Venture Agreement. The Defendants subsequently performed and completed the cutting and polishing process of these Joint Venture Diamonds, which the Joint Venture Agreement also contemplated and required. This cutting and polishing process resulted in the two Joint Venture Diamonds—(a) one 4.53 carat fancy intense green diamond (the "4.53 Diamond") and (b) one 3.20 carat fancy intense green diamond (the "3.20 Diamond"). Both Joint Venture Diamonds were subsequently certified by the Gemological Institute of America ("GIA").

15. During the cutting and polishing process, which lasted about one year, I traveled to New York to see Mr. Ayvazian two or three times. Mr. Ayvazian showed me the Joint Venture Diamonds at his office in New York. During one of these trips, I met with a GIA representative at Mr. Ayvazian's office. Mr. Ayvazian provided to the GIA representative the necessary paperwork to secure certification. Mrs. Masagung and I were comfortable that everything was going according to the Joint Venture Agreement during this time.

16. When the Joint Venture Diamonds were finished, Mr. Ayvazian traveled to Northern California two times to meet with me and show them to me. Mr. Ayvazian also showed me the GIA certificates for the Joint Venture Diamonds. At the same time, Mr. Ayvazian showed me numerous diamonds unrelated to the Joint Venture Diamonds. Mrs. Masagung and I were satisfied that, at this time, everything was still proceeding as agreed to in the Joint Venture Agreement.

17. Mrs. Masagung and I trusted and relied on Mr. Ayvazian's knowledge of the industry to determine the appropriate sale price of the Joint Venture Diamonds. In the six-month period after the Joint Venture Diamonds were cut and polished, about the spring of 2005, we repeatedly requested that the Defendants advise us of the status of their efforts to sell the Joint Venture Diamonds. During this time, the Defendants consistently delayed in responding to us. Because Mr. Ayvazian rarely returned my numerous telephone calls, Mrs. Masagung and I would call Mr. Ayvazian's wife and/or mother. When we finally spoke with Mr. Ayvazian, he provided excuses about why the Joint Venture Diamonds had not been sold. For example, Mr. Ayvazian repeatedly told us that he was busy and so could not sell the diamonds. Mr. Ayvazian also told us that he was trying to sell the Joint Venture Diamonds in the Middle East because he believed that the Middle East was a better market for green diamonds.

18. On or around February 24, 2005, Mr. Ayvazian informed me that the 3.20 Diamond would be re-cut for more brilliance. After being re-cut, the 3.20 Diamond actually weighed 3.04 carats. This 3.04 carat diamond was certified by the GIA on September 21, 2005 in GIA Report 14577678.[1]

19. I was disappointed that it was taking so much time to sell the Joint Venture Diamonds. For that reason, I traveled to New York to see Mr. Ayvazian in the spring of 2005. I was unable to see the Joint Venture Diamonds during these visits because Mr. Ayvazian said that they were in Dubai, in the United Arab Emirates, so that they could be shown to potential buyers. Mr. Ayvazian even told me that someone had offered $400,000 per carat for one of the two Joint Venture Diamonds, but that Mr. Ayvazian believed that he could negotiate a sale price of over

---

[1] For clarity, all future references to the "3.20 Diamond" refer to the 3.04 carat diamond, as re-cut.

$500,000 per carat. This discussion reassured me that everything was still going according to the Joint Venture Agreement.

20. A few months after my visit to New York, Mr. Ayvazian again met with me in Northern California. During this visit, Mr. Ayvazian showed me the 3.20 Diamond and continued to say that he was still trying to sell it. I told Mr. Ayvazian that I wanted possession of the 3.20 Diamond so that I could try to help Mr. Ayvazian sell it in Asia. Mr. Ayvazian told me that he could still sell the 3.20 Diamond, and that he would continue to show it to buyers in the Middle East, as he would the 4.53 Diamond. Mr. Ayvazian also said that he believed he could extract a higher price per carat from these potential buyers in the Middle East.

21. I disagreed and instructed Mr. Ayvazian to sell the Joint Venture Diamonds at the price offered by the potential purchasers. Mr. Ayvazian said he understood and would do so. A few days later, when I contacted Mr. Ayvazian to inquire about the status of the sale, Mr. Ayvazian informed me that the purchaser was no longer interested and, as a result, no sale had been made. Mr. Ayvazian then told me that he had another potential purchaser for the Joint Venture Diamonds. In the following weeks, this process repeated itself several times: Mr. Ayvazian would tell me about a potential purchaser, I would approve the sale on the asked-for price, and Mr. Ayvazian would then report to me that he had lost the purchaser but that he had lined up another one.

22. Fearing that the Joint Venture Diamonds were becoming unsellable, Mrs. Masagung and I on multiple occasions requested that the Joint Venture Diamonds be auctioned by a reputable auction house, such as Christie's or Sotheby's. Mr. Ayvazian responded that this was not a good idea because if they did not sell in an auction house, this fact would become known to the industry and make any future sale impossible. Mr. Ayvazian, however, continued

7

to provide further assurances that he would be able to sell the Joint Venture Diamonds. In light of Mr. Ayvazian's assurances and experience in the industry, I reluctantly agreed not to put the Joint Venture Diamonds in an auction house.

23. Our patience wearing thin, however, Mrs. Masagung and I gave the Defendants an ultimatum, telling Mr. Ayvazian that he had until January 2006 to sell the Joint Venture Diamonds. We informed the Defendants that we would try to sell the diamonds on our own if the Defendants could not sell them by January 2006.

24. In or around March 2006, after yet further delay by Defendants in selling the Joint Venture Diamonds, Mrs. Masagung and I attempted to contact Mr. Ayvazian. We were only able to reach Mr. Ayvazian after we called his mother and apprised her that Mr. Ayvazian was not returning our calls. When he spoke to me, Mr. Ayvazian repeated the same excuse he had been providing—that he had a potential buyer looking at the Joint Venture Diamonds but that he thought he could obtain a little bit more in terms of the selling price per carat. At that point, I instructed Mr. Ayvazian to ship both of the Joint Venture Diamonds to Edmond Chin ("Mr. Chin") in Hong Kong for inspection and possible sale. Mr. Chin is a highly reputable jeweler. Mrs. Masagung and I believed that if Mr. Chin could not sell the Joint Venture Diamonds, then they should go to an auction. Mr. Ayvazian responded that he could not ship the 4.53 Diamond because it was still tied up in negotiations with potential purchasers in the Middle East. Mr. Ayvazian did agree, though, to ship the 3.20 Diamond to Mr. Chin.

25. Mr. Ayvazian sent the 3.20 Diamond from K.J.A. to Mr. Chin via courier. Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that Mr. Chin received the diamond in late March 2006 or early April 2006. Mr. Chin then called me to let me know that he had received and reviewed the 3.20

8

Diamond. According to Mr. Chin's analysis, the 3.20 Diamond could be sold for somewhere between $400,000 and $500,000 per carat.

26. On or about April 13, 2006, Mr. Chin telephoned me and told me that someone had called him, claiming to be the owner of the 3.20 Diamond and demanding that the diamond be sent to the caller. At first, I believed and assumed that Mr. Ayvazian was the caller, since he owned 25% of the 3.20 Diamond under the terms of the Joint Venture Agreement, and I instructed Mr. Chin not to release the 3.20 Diamond.

27. Later that same day, Mr. Chin called back the caller and related my instructions to the caller. At that point, Mr. Chin realized that the caller was Larry West ("Mr. West"). Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that Mr. West operates L.J. West Diamonds, Inc. ("L.J. West"), a New York corporation. Mr. West told Mr. Chin that he had purchased a fifty percent (50%) interest in the 3.20 Diamond from K.J.A. and Mr. Ayvazian. Mr. Chin responded that he believed that I was the 75% owner of the 3.20 Diamond.

28. To resolve this situation regarding the ownership of the 3.20 Diamond, L.J. West then sent to Mr. Chin on April 13, 2006 the "memorandum" for the diamond—a document purporting to establish that the diamond had been consigned or entrusted to L.J. West.

29. As a result, late on April 13, 2006, Mr. Chin called me to report the substance of his conversations with Mr. West. Mr. Chin also told me that Mr. West's agents threatened to call the Hong Kong authorities if he refused to release the diamond. Mr. Chin told me that he felt he had no choice but to release the 3.20 Diamond to L.J. West's agents in Hong Kong. Mr. Chin also gave me Mr. West's telephone number and asked me to call Mr. West immediately.

9

30. I did just that. It was at the time of this call to Mr. West that Mrs. Masagung and I first learned that K.J.A. had sold an interest in the Joint Venture Diamonds to L.J. West. Neither Mrs. Masagung nor I had any reason to suspect, before my conversation with Mr. West, that the Defendants had surreptitiously sold the Joint Venture Diamonds. In particular, during the telephone conversation, Mr. West informed me of Mr. West's belief that he owned 50% of the 3.20 Diamond and that he paid Mr. Ayvazian in full for his share.

31. After a few calls back and forth, on or about April 19, 2006, I faxed to Mr. West a copy of the Joint Venture Agreement to show Mr. West that the Plaintiffs had a 75% ownership interest in the Joint Venture Diamonds. In return, Mr. West faxed to me the copies of two K.J.A. invoices for the Joint Venture Diamonds, dated January 26, 2005 and April 27, 2005. Attached as <u>Exhibit F</u> and <u>Exhibit G</u>, respectively, are true and correct copies of these invoices. These invoices purport to reflect L.J. West's payments to K.J.A. for Mr. West's purported 50% share of the Joint Venture Diamonds, amounting by itself to more than one million dollars ($1,000,000). Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that the profits of the sale of the Joint Venture Diamonds were approximately two million dollars ($2,000,000). Once Mr. West, on the one hand, and Mrs. Masagung and I, on the other hand, understood what the Defendants had done with respect the Joint Venture Diamonds, we began to discuss ways to collect what we were owed by the Defendants.

32. In light of the documents that Mr. West showed me, on or about April 19, 2006, I authorized Mr. Chin to release the 3.20 Diamond to Mr. West's agents. I asked, however, that the Receipt and Bailment Note—the document evidencing this release—state that "Larry West is aware that [as spoken on the phone] according to information this stone is 75% owned by Mr.

Putra Masagung." Attached as <u>Exhibit H</u> is a true and correct copy of this Receipt and Bailment Note. Mr. Chin thereafter released the 3.20 Diamond to Mr. West's agents in Hong Kong.

33.     Neither K.J.A. nor Mr. Ayvazian disclosed this sale to Mrs. Masagung or to me. The Defendants did not pay Mrs. Masagung or me for our 75% ownership of the Joint Venture Diamonds out of the sale, as was required by the Joint Venture Agreement. Nor did the Defendants pay us our 50% share on any profits realized on the sale, as was required by the Joint Venture Agreement.

34.     In his conversations with me, Mr. West confirmed that L.J. West still had possession of the 3.20 Diamond—on information and belief, the diamond that Mr. Chin had released to Mr. West's agent. Mr. West also said that he had bought a 50% interest in the 4.53 Diamond from K.J.A. and had already re-sold it, apparently to a purchaser in Hong Kong. Mr. West also told me that a friend of Mr. West's had purchased a 25% interest in the 3.20 Diamond and that Mr. Ayvazian had kept a 25% interest. Mrs. Masagung and I do not know the identity of the purchaser of the 25% interest in the 3.20 Diamond.

35.     Immediately after my April 19, 2006 call with Mr. West, I attempted to contact Mr. Ayvazian. I was only able to reach Mr. Ayvazian by telephone a couple of weeks later. During this telephone call, I confronted Mr. Ayvazian with these newly discovered facts regarding his conduct in connection with surreptitiously selling the Joint Venture Diamonds to L.J. West. Mr. Ayvazian denied these sales. Rather, Mr. Ayvazian told me that I was mistaken, and that the 3.04 carat diamond, which Mr. Ayvazian had sold to L.J. West, was a diamond completely different from the 3.20 Diamond in which Mrs. Masagung and I held a 75% ownership interest. Mr. Ayvazian also said that the 4.53 Diamond was still in the Middle East for potential buyers. I did not believe Mr. Ayvazian and told him that if that was in fact the case,

he was to immediately ship the 3.20 Diamond to Mr. Chin in Hong Kong and the 4.53 Diamond from the Middle East to me. Mr. Ayvazian assured me that he would do so.

36. Mr. Ayvazian never shipped the Joint Venture Diamonds per my instructions. Instead, in a telephone call a few days later, Mr. Ayvazian admitted to me that he had sold the Joint Venture Diamonds to L.J. West in early 2005.

37. On or about May 5, 2006, my attorneys wrote to Mr. Ayvazian and to K.J.A., informing them of Mrs. Masagung's and my recent discovery that K.J.A. had sold the two Joint Venture Diamonds. Mrs. Masagung and I demanded to receive the Joint Venture Diamonds, or payment in full for their value, by May 15, 2006.

38. Over the next few months, the Plaintiffs and the Defendants then began discussing possible ways to resolve the dispute over the sale proceeds of the Joint Venture Diamonds. Mr. Ayvazian was again often unavailable during these months. Throughout this process, however, the Defendants consistently and repeatedly admitted responsibility for their misconduct. For example, in a signed fax dated June 21, 2006, Mr. Ayvazian assured Mrs. Masagung and me, "I assure you, you will know everything and will receive your share of the partnerships!" As another example, in a signed fax dated August 23, 2006, Mr. Ayvazian made the following admission to Mrs. Masagung and to me: "Dear Putra & Imelda – Do not know where to start. . . but to apologize. . . specifically the trust part. Never, never, never, did I mean to take advantage. . . friendshipwise or businesswise. I made a big mistake and I am paying for it. . . I assure you that your share of profit will be paid A.S.A.P.!" A true and correct copy of this August 23, 2006 fax is attached as <u>Exhibit I</u>.

39. On or about September 6 and 7, 2006, Mrs. Masagung, Mr. Ayvazian and I met in New York to continue discussing possible resolution scenarios. At that meeting, the Defendants

further admitted to their misconduct and stated to Mrs. Masagung and me their calculation of what they owed us. On K.J.A. letterhead dated September 7, 2006 memorializing these discussions (the "September 7, 2006 Writing"), Mr. Ayvazian valued the profit of the sales of the Joint Venture Diamonds at two million dollars ($2,000,000). The September 7, 2006 Writing also reflects that Mrs. Masagung's and my share of the profits, as provided by the Joint Venture Agreement, is one million dollars ($1,000,000), to be added to the $750,000 owed to Plaintiffs to reimburse their initial investment in the joint venture. Thus, Mr. Ayvazian expressly admitted, "Therefore, Kevo Ayvazian owe [sic] Putra [Masagung] amount of $1,750,000." A true and correct copy of the September 7, 2006 Writing is attached as <u>Exhibit J</u>.

40.     As a further admission of the debt they owed to the Plaintiffs, the Defendants informed L.J. West through the September 7, 2006 Writing that they had sold or transferred their remaining 25% ownership share of the 3.20 Diamond to me. This gave me the right to collect directly this 25% ownership share (in addition to my original 75% ownership share) of the whole sale of the 3.20 Diamond. Mrs. Masagung and I are informed and believe that this 25% ownership share of the 3.20 Diamond is worth approximately $400,000. This $400,000 amount was deducted from the Defendants' debt of $1,750,000, meaning that the Defendants now owed Mrs. Masagung and me at total of $1,350,000. Mr. Ayvazian signed the September 7, 2006 Writing in his office at K.J.A. in my presence and in the presence of Mrs. Masagung.

41.     Also on September 7, 2006, Mrs. Masagung purchased a diamond, unrelated to the Joint Venture Diamonds, from K.J.A., worth $25,000. Attached as <u>Exhibit K</u> is a true and correct copy of a fax dated December 1, 2006, the first page of which is the invoice for this purchase. Rather than paying for this diamond in cash, Mrs. Masagung and I agreed with the Defendants that the value of the diamond ($25,000) would be deducted from the Defendants'

13

debt owed to us ($1,350,000). As a result, the Defendants owed Mrs. Masagung and me a total of $1,325,000. This calculation is reflected on page 2 of Exhibit K, which is a true and correct copy of a fax dated December 1, 2006 and signed by Mr. Ayvazian.

42. Also on September 7, 2006, immediately following this meeting with Mr. Ayvazian, Mr. Ayvazian, Mrs. Masagung and I together went to L.J. West's office in New York to meet with Mr. West. At this meeting, Mr. Ayvazian presented Mr. West with a copy of the September 7, 2006 Writing and informed him that Mrs. Masagung and I now owned a 100% interest in the 3.20 Diamond. Pursuant to the September 7, 2006 Writing, Mr. Ayvazian authorized Mr. West to transfer his 25% interest in the 3.20 Diamond to me. Mr. Ayvazian also surrendered the September 21, 2005 GIA certificate for the 3.20 Diamond (as re-cut) to Mr. West, and I kept a copy. Attached as Exhibit L is a true and correct copy of this GIA certificate. At that time, I also saw the 3.20 Diamond in Mr. West's office.

43. After the two meetings in September 2006, the Defendants continued to admit responsibility for their secretive sale of the Joint Venture Diamonds without providing Mrs. Masagung and me our agreed-upon share of the profits. The Defendants also continued to express their desire to make Mrs. Masagung and me whole. Because the Defendants said that they did not have enough liquid assets to pay off their debt to us, however, Mr. Ayvazian offered to consign his inventory of unrelated diamonds to L.J. West and to use the sale proceeds to pay down the Defendants' debt to us. Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that the value of this inventory was more than two million dollars ($2,000,000.00).

44. Mrs. Masagung and I are further informed and believe and, on the basis of such information and belief, alleged in the complaint that these other, unrelated diamonds were

14

consigned to L.J. West by K.J.A., and were in L.J. West's possession. Mr. Ayvazian confirmed this arrangement in writing several times, including in a signed fax dated October 30, 2006. Attached as <u>Exhibit M</u> is a true and correct copy of this October 30, 2006 fax.

45.     In a fax dated September 13, 2006, Mr. Ayvazian further confirmed this arrangement by telling me that he would send a letter to Mr. West to instruct him to return the balance of the unsold inventory to me. Attached as <u>Exhibit N</u> is a true and correct copy of this September 13, 2006 fax. Mrs. Masagung and I are informed and believe and, on the basis of such information and belief, alleged in the complaint that Mr. Ayvazian never sent such a letter to Mr. West.

46.     Mrs. Masagung and I are also informed and believe and, on the basis of such information and belief, alleged in the complaint that L.J. West did sell certain diamonds in K.J.A.'s inventory and collect the sale proceeds therefrom. Mrs. Masagung and I are also informed and believe that K.J.A. owed L.J. West approximately $800,000 from an unrelated transaction between those two entities. Mrs. Masagung and I are further informed and believe that after L.J. West sold enough diamonds from K.J.A.'s inventory to satisfy this $800,000 debt, L.J. West returned the balance of K.J.A.'s inventory to Mr. Ayvazian.

47.     By early 2007, however, Mrs. Masagung and I had still not recovered any money in payment of the debt owed to us by the Defendants. Mr. Ayvazian, meanwhile, was still promising to pay us the proceeds of his sale of the other diamonds and jewelry in K.J.A.'s inventory.

48.     Over the ensuing months, Mrs. Masagung and I continued to entertain possible resolution of the instant dispute without resort to litigation. To this end, in or around February 2007, our attorneys drafted a first draft of a Debt Workout Agreement (the "Draft Debt Workout

Agreement"). The Draft Debt Workout Agreement contemplated that the Defendants would use the proceeds of the sale of certain diamonds and other jewelry and stones owned by the Defendants—and unrelated to the Joint Venture Diamonds—as collateral to effect payment in part or in full of the debt owed by the Defendants to Mrs. Masagung and me, with interest of 8% per annum beginning on September 7, 2006. The Draft Debt Workout Agreement also provided that the Defendants agreed to execute and a deliver to Mrs. Masagung and me a Confession of Judgment.

49. In or around May 2007, Mr. Ayvazian's lawyer suggested revisions to the Draft Debt Workout Agreement that would have essentially negated much of the purpose of the Draft Debt Workout Agreement. My attorneys objected to these changes and indicated that they were unacceptable. Mr. Ayvazian then involved his advisor, who also reviewed the Draft Debt Workout Agreement. The process of further revisions to the Draft Debt Workout Agreement lasted until November 2007.

50. Meanwhile, Mr. Ayvazian was continuing to promise to Mrs. Masagung and me to make us whole. In a signed fax dated May 10, 2007, for example, Mr. Ayvazian wrote: "I, Kevo J. Ayvazian, promise Mr. & Mrs. Masagung . . . $50K. - $100K. to reduce the balance due" by the end of May 2007. Attached as Exhibit O is a true and correct copy of this May 10, 2007 fax. Contrary to his promise, Mr. Ayvazian never paid Plaintiffs this money.

51. On or around November 8, 2007, I met with Mr. Ayvazian in Singapore. At that meeting, Mr. Ayvazian again admitted to the Defendants' debt to Mrs. Masagung and me arising out of the Joint Venture Agreement and stated that he would pay off this debt.

52. On or around November 26, 2007, my attorneys circulated to the Defendants a final draft of the Draft Debt Workout Agreement. Attached as Exhibit P is a true and correct

16

copy of the Draft Debt Workout Agreement. Despite the Defendants' continuous assurances that they would sign the Draft Debt Workout Agreement, however, the Defendants backed out and refused to sign the Draft Debt Workout Agreement.

53. All of our other options exhausted, and having spent almost two years on Mr. Ayvazian's unfulfilled promises to pay off the debt, Mrs. Masagung and I had no choice but to file this action.

54. This action seeks judgment against Mr. Ayvazian and K.J.A., jointly and severally, for the liquidated amount of $1,325,000, plus interest at 9% (the New York statutory rate) from the latest possible date, *i.e.* April 27, 2005, plus attorney fees and costs totaling $79,982.60, for a total as of June 30, 2008 of $1,777,880.10, which is justly due and owing.

55. No part of the judgment sought has been paid. As reflected above, the $1,325,000 amount is based upon the provisions of the Joint Venture Agreement, Mr. Ayvazian's signed admissions of Defendants' debt to Plaintiffs, and is calculated as follows:

$750,000.00 – initial investment by Plaintiffs in joint venture

+ $1,000,000.00 – 50% of sale proceeds of the Joint Venture Diamonds ($2,000,000.00)

– $400,000 – value of 25% of 3.20 Diamond, signed over by Defendants to Plaintiffs on September 7, 2006

– $25,000 – value of unrelated diamond sold by K.J.A. to Mrs. Masagung on September 7, 2006

---

TOTAL: $1,325,000.00

The Defendants explained and admitted to this calculation and amount, as reflected in Exhibit J and Exhibit K.

56. The disbursements sought to be taxed have been made in this action or will necessarily be made herein.

57. The Defendants have been provided with reasonable notice in accordance with the Court's Default Judgment Procedures. In particular, a copy of this Application for Default Judgment was served upon K.J.A. by mailing the same by first-class mail to K.J.A.'s business address at 580 Fifth Avenue, Suite 2002, New York, New York 10036. Similarly, a copy of this Application for Default Judgment was served upon Mr. Ayvazian by mailing the same to him by first class mail at his business address of 580 Fifth Avenue, Suite 2002, New York, New York 10036 and at his last known address of 321 Grant Avenue, Cresskill, NJ 07626-1203. Attached as Exhibit Q is a proof of such service.

WHEREFORE, Plaintiffs request the entry of Default and the entry of the annexed Judgment against Defendants.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on July 15, 2008.

_____
Putra Masagung

Sworn to before me this 15
Day of July, 2008.

_____
Notary Public

CARLY DONNELLAN
Commission # 1641488
Notary Public - California
Los Angeles County
My Comm. Expires Jan 28, 2010